UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

STATE OF FLORIDA, and

STATE OF NEW YORK,                              Case No.    13 - cv - 210

     Plaintiffs,

     v.

THE TAX CLUB, INC., also doing business as
SUCCESS MERCHANT SERVICES,
CORPORATE TAX NETWORK, CORPORATE          **PLAINTIFFS' MEMORANDUM OF**
CREDIT, and E-TAX HOTLINE 8882790191, a   **LAW IN SUPPORT OF THEIR**
Utah corporation,                         **MOTION FOR A TEMPORARY**
                                          **RESTRAINING ORDER WITH**
MANHATTAN PROFESSIONAL GROUP, INC.,       **ASSET FREEZE, APPOINTMENT**
also doing business as THE TAX CLUB,      **OF TEMPORARY RECEIVER, AND**
BOOKKEEPING SERVICES, BOOKKEEPING         **OTHER EQUITABLE RELIEF AND**
SERVICES, IKONGO, ESSENTIAL PLANNING,     **ORDER TO SHOW CAUSE WHY A**
CORPORATE TAX NETWORK, BUSINESS           **PRELIMINARY INJUNCTION**
DOCUMENT CENTER, THE SUCCESS              **SHOULD NOT ISSUE**
PLANNING GROUP, ALL ACCESS BOOKS, and
VITAL PAYROLL, a New York corporation,

5410, INC., also doing business as INTERNET
MARKETING SUCCESS, THE SUCCESS
PLANNING GROUP, SUCCESS PLANNING
GROUP 2, SUCCESS ONLINE, BUSINESS
CREDIT, SUCCESS MERCHANT PROCESSING,
REAL ESTATE WIRE, DAY TRADE TEAM,
FUNDING FASTTRACK, CORPORATE
CREDIT, CORPORATE CREDIT 2, and
PRESTIGE FINANCING SERVICES, a Wyoming
corporation,

MARBLE BASE, INC., also doing business as
BUSINESS RESOURCES, CORPORATE
SOLUTIONS, BUSINESS SUCCESS, BUSINESS
SERVICES, ONLINE DEVELOPMENT, and
JADE SEEK, a Wyoming corporation,

6015, LLC, also doing business as CYPRESS

CORP. SERVICES, MY TAX SERVICE, and
ACCOUNTING GROUP SERVICES, a Wyoming
limited liability company,

1800ACCOUNTANT, LLC, a Delaware limited
liability company,

IKONGO, INC., a Wyoming corporation,

TAHUYA, INC., a Washington corporation,

VISAVIS, INC., a Washington corporation,

HB MARKETING SERVICES, LLC, also doing
business as GLOBAL EDUCATION, WEBSITE
SERVICES, CELL PHONE COACHING,
MAVERICK MM, and EMAIL CASH, an Arizona
limited liability company,

PREMIER COACHING & CONSULTING, LLC,
also doing business as PREMIER COACHING,
WEBSITE SERVICES, AC SECRETS:
8774372521, AUTOMATIC PROFIT SYSTEM,
ADVANCED PROFITS, VIP PROFITS,
AUTOMATIC PROFIT SYSTEM VIP, and
AUTOMATIC PROFIT SYSTEM ADVANCED,
an Arizona limited liability company,

SKORPIOS HOLDINGS, INC., also known as
SKORPIOS HOLDING, INC., a Delaware
corporation,

EDWARD B. JOHNSON, also known as TED
JOHNSON, also known as TEDD JOHNSON,
individually and as a director, officer or owner of
THE TAX CLUB, INC., MANHATTAN
PROFESSIONAL GROUP, INC., 5410, INC., and
IKONGO, INC.,

MICHAEL M. SAVAGE, individually and as a
director, officer or owner of MANHATTAN
PROFESSIONAL GROUP, INC., 5410, INC.,
MARBLE BASE, INC., 6015, INC., IKONGO,
INC., 1800ACCOUNTANT, LLC, TAHUYA,
INC., VISAVIS, INC., and SKORPIOS

HOLDINGS, INC.,

BRENDON A. PACK, individually and as an
officer or owner of MANHATTAN
PROFESSIONAL GROUP, INC., MARBLE
BASE, INC., and TAHUYA, INC.,

GARY J. MILKWICK, individually and as an
officer or owner of THE TAX CLUB, INC.,
MANHATTAN PROFESSIONAL GROUP, INC.,
5410, INC., 6015, LLC, 1800ACCOUNTANT,
LLC, HB MARKETING SERVICES, LLC,
PREMIER COACHING & CONSULTING, LLC,
and SKORPIOS HOLDINGS, INC.,

       Defendants, and

SANDRA C. SAVAGE,

       Relief Defendant.

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................... 1

II.    STATEMENT OF FACTS....................................................................................... 4

A.     THE DEFENDANTS' DECEPTIVE BUSINESS PRACTICES .......................................... 4

       1. Phase One: The Lead ........................................................................................ 6

       2. Phase Two: False Affiliation ............................................................................ 7

       3. Phase Three: Confidence .................................................................................. 9

       4. Phase Four: The Pitch .................................................................................... 12

              a) Misrepresentations about purchase price and earnings................................. 12

              b) Misrepresentations about the scope and nature of services provided ........................ 16

       5. Phase Five: The Upsells.................................................................................. 20

B.     COMMON ENTERPRISE PERPETUATES THE SCHEME ........................................... 22

       1. The Corporate Defendants .............................................................................. 23

       2. The Individual Defendants............................................................................... 24

       3. The Relief Defendant....................................................................................... 25

       4. Overview of the Enterprise .............................................................................. 25

              a)  The Individual Relationships..................................................................... 25

              b)  The Products and Brands........................................................................... 27

              c)  The Corporate Defendants Further the Scheme Through Payment Processing ........ 28

C.     THE DEFENDANTS HAVE TAKEN IN OVER $220 MILLION FROM CONSUMERS,
       CHURNED THOSE PROCEEDS AMONG THEMSELVES, AND FUNNELED OVER
       $50 MILLION INTO PERSONAL ACCOUNTS AND ASSETS........................................ 29

D.     THE DEFENDANTS' SMALL STAFF CANNOT PROVIDE INDIVIDUALIZED
       SERVICE TO TENS OF THOUSANDS OF CUSTOMERS ............................................ 31

III.   ARGUMENT.......................................................................................................... 33

i

A.  SECTION 13(B) OF THE FTC ACT, SECTION 63(12) OF THE NY EXEC. LAW, AND
    SECTION 501.207 OF FDUTPA AUTHORIZE THIS COURT TO GRANT THE
    REQUESTED RELIEF.......................................................................................................... 33

B.  THE EVIDENCE JUSTIFIES ENTRY OF A TEMPORARY RESTRAINING ORDER
    AND A PRELIMINARY INJUNCTION .............................................................................. 36

    1.  The Standard for Relief.......................................................................................................... 36

    2.  Plaintiffs Have Demonstrated a Likelihood of Success on the Merits ................................. 37

        a)  Plaintiffs Have Demonstrated a Likelihood of Success on the Merits that Defendants
            Violated Section 5(a) of the FTC Act, NY Exec. Law Section 63(12), NY GBL
            Sections 349, 350, and Section 501.204 of FDUTPA................................................. 37

            (1) Defendants Misrepresent Costs and Earnings..................................................... 41

            (2) Defendants Misrepresent The Scope and Nature of Their Services .................. 43

            (3) Defendants Falsely Claim Affiliation With Other Companies........................... 44

        b)  Plaintiffs Have Demonstrated a Likelihood of Success on the Merits that Defendants
            Have Violated the Telemarketing Sales Rule............................................................. 45

            (1) Defendants Make False and Misleading Statements to Induce Consumers to Pay
                for Products and Services.................................................................................... 46

            (2) Defendants Fail To Promptly and Clearly Identify Themselves As Sellers, the
                Sales Purpose of the Call, and the Nature of the Services Offered for Sale ...... 47

    3.  The Balance of Equities Favors Preliminary Injunctive Relief ........................................... 48

    4.  The Corporate Defendants Are Liable for Each Other's Violations as a Common
        Enterprise .............................................................................................................................. 50

    5.  The Individual Defendants are Liable.................................................................................... 51

    6.  The Relief Defendant Is Subject To Disgorgement of Ill-Gotten Gains .............................. 54

C.  AN ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, AND
    IMMEDIATE ACCESS TO THE DEFENDANTS' PREMISES ARE NECESSARY TO
    PRESERVE EFFECTIVE RELIEF...................................................................................... 55

IV. CONCLUSION ................................................................................................................... 57

## TABLE OF AUTHORITIES

Cases

*21st Century Leisure Spa Int'l Ltd.,* 153 Misc. 2d 938 (Sup. Ct. N.Y. Co. 1991) ........................ 39

*Bildstein v. MasterCard Intl.,* 2005 WL 1324972 (S.D.N.Y. June 6, 2005) ................................ 40

*CFTC v. Am. Bd. of Trade, Inc.,* 803 F.2d 1242 (2d Cir. 1986) .................................................... 49

*CFTC v. British Am. Commodity Options Corp.,* 560 F.2d 135, 141 (2d Cir. 1977) ................... 37

*CFTC v. Int'l Fin. Servs. (New York), Inc.,* 323 F. Supp. 2d 482 (S.D.N.Y. 2004) ..................... 50

*City of New York v. Golden Feather Smoke Shop, Inc.,* 597 F.3d 115 (2d Cir. 2010) ................. 36

*Davis v. Powertel, Inc.,* 776 So.2d 971 (Fla. 1st DCA 2000) ........................................................ 41

*Del. Watch Co. v. FTC,* 332 F.2d 745 (2d Cir. 1964) .................................................................... 50

*FTC v. 1263523 Ontario, Inc.,* 205 F. Supp. 2d 218 (S.D.N.Y. 2002) .......................................... 38

*FTC v. AmeriDebt, Inc.,* 343 F. Supp. 2d 451 (D. Md. 2004) ....................................................... 54

*FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564 (7th Cir. 1989) ........................................... 34, 51, 52

*FTC v. Bay Area Bus. Council, Inc.,* No. 02 Civ. 5762, 2004 WL 769388 (N.D.Ill. Apr. 9, 2004) ................................................................................................................................................... 44

*FTC v. Bronson Partners, LLC,* 564 F. Supp. 2d 119 (D. Conn. 2008) ........................... 34, 38, 45

*FTC v. Bronson Partners, LLC,* 654 F.3d 359 (2d Cir. 2011) ....................................................... 34

*FTC v. Career Assistance Planning, Inc.,* No. 96 Civ. 2187, 1996 WL 929696 (N.D.Ga. Sept. 19, 1996) ............................................................................................................................................ 44

*FTC v. Commerce Planet, Inc.,* No. 09 Civ. 01324, 2012 WL 2930418 (C.D. Cal. June 22, 2012). ................................................................................................................................................... 38

*FTC v. Consumer Health Benefits Ass'n.,* No. 10 Civ. 3551, 2012 WL 1890242 (E.D.N.Y. May 23, 2012) ............................................................................................................................. 50, 52, 56

*FTC v. Crescent Publ'g Group, Inc.,* 129 F. Supp. 2d 311 (S.D.N.Y. 2001) ................... 34, 36, 51

*FTC v. Cyberspace.com, LLC,* 453 F.3d 1196 (9th Cir. 2006) ..................................................... 38

iii

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ........................................................................ 38

*FTC v. Five-Star Auto Club, Inc.,* 97 F.Supp.2d 502 (S.D.N.Y. 2000) .................................. 42, 49

*FTC v. FTN Promotions, Inc.,* No. 07 Civ. 1279, 2008 WL 151888 (M.D.Fla. Jan. 15, 2008)... 45

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) .............................................................. 34

*FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982) ................................................................ 34, 56

*FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052 (C.D. Cal. 2012) .................. 50, 52

*FTC v. MacGregor,* 360 Fed. Appx. 891 (9th Cir. 2009) .............................................................. 53

*FTC v. Mallet*, 818 F. Supp. 2d 142 (D.D.C. 2011) ...................................................................... 36

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008) .................................. 33

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998) .................................................... 43

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) .................................................... 52

*FTC v. QT, Inc.,* 448 F. Supp. 2d 908 (N.D.Ill. 2006) .................................................................... 54

*FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711 (5th Cir. 1982), *cert. den.,* 456 U.S. 973 (1982) 35

*FTC v. Stefanchik,* 559 F.3d 924 (9th Cir. 2009) .................................................................... 38, 51

*FTC v. Think Achievement Corp.,* 144 F. Supp. 2d 1013 (N.D. Ind. 2000) .................................. 54

*FTC v. Verity Int'l*, 443 F.3d 48 (2d Cir. 2006) ............................................................................ 38

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) .............................. 48

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989) .................................................... 48, 49

*Gaidon v. Guardian Life Ins.*, 94 N.Y.2d 330 (1999) .................................................................... 40

*Global Tel\*Link Corp. v. Scott*, 652 F.Supp.2d 1240 (M.D. Fla 2009) ........................................ 41

*Guggenheimer v. Ginzburg*, 43 N.Y.2d 268 (1977). ...................................................................... 39

*In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 1984 WL 565319 (F.T.C. Mar. 23, 1984) ............. 38

*In re Thompson Med. Co., Inc.,* 104 F.T.C. 648, 1984 WL 565377 (F.T.C. Nov 23, 1984) ........ 38

iv

*Lefkowitz v. Bull Inv. Group*, 46 A.D.2d 25 (3d Dep't 1974) *aff'd*, 35 N.Y.2d 647 (1975)......... 39

*Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs*, 761 So.2d 1256 (Fla. 3d D.C.A. 2000) ............................................................................................. 37, 41

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960).................................................... 35

*North Am. Clearing, Inc. v. Brokerage Comp. Sys, Inc.* 666 F.Supp.2d 1299 (M.D. Fla 2009).. 41

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20 (1995). ... 40

*People v. Apple Health & Sports Clubs, Ltd.*, 174 A.D.2d 438 (1st Dep't 1991) ........................ 37

*People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803 (1992). .......................................... 35

*People v. Applied Card Sys, Inc.*, 27 A.D.3d 104 (3d Dep't 2005), *aff'd*, 11 N.Y.3d 105 (2008) ............................................................................................................................................... 39, 40

*People v. Court Reporting Inst., Inc.*, 240 A.D.2d 413 (2d Dep't 1997)....................................... 35

*People v. Fin. Servs. Network, USA,* 930 F. Supp. 865 (W.D.N.Y. 1996)................................... 46

*People v. Network Assocs. Inc.*, 195 Misc. 2d 384 (Sup. Ct. N.Y. Co. 2003).............................. 40

*People v. Telehublink Corp.*, 301 A.D.2d 1006 (3d Dep't 2003). ................................................. 46

*People v. Wilco Energy*, 284 A.D.2d 469 (2d Dep't 2001) ........................................................... 40

*PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So.2d 773 (Fla. 2003)..................................................... 41

*Porter v. Warner Co.*, 328 U.S. 395 (1946).................................................................................. 35

*SEC v. Cavanagh,* 155 F.3d 129 (2d Cir. 1998) ........................................................................... 54

*SEC v. Colello,* 139 F.3d 674 (9th Cir. 1998).............................................................................. 54

*SEC v. First Fin. Group of Tex.*, 645 F.2d 429 (5th Cir. 1981)..................................................... 56

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)............................................... 36

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ........................................... 55

*SEC v. The Am. Board of Trade*, 645 F. Supp. 1047 (S.D.N.Y. 1986)......................................... 56

*Standard Educators, Inc. v. FTC*, 475 F.2d 401 (D.C. Cir. 1973)................................................ 52

v

*State of New York v. Abortion Information Agency,* 69 Misc.2d 825 (Sup. Ct. N.Y. Co. 1971).. 35

*State of New York v. Remedial Education, Inc.,* 70 Misc.2d 1068 (Sup. Ct. N.Y. Co. 1972) ..... 35

*State of New York v. Saksniit,* 69 Misc.2d 554 (Sup. Ct. N.Y. C. 1972) ...................................... 35

*State v. Feldman*, 210 F. Supp.2d 294 (S.D.N.Y. 2002).............................................................. 40

*State v. Ford Motor Co.,* 136 A.D.2d 154 (3d Dep't 1988), *aff'd*, 74 N.Y.2d 495 (1989)........... 39

*United States v. Blue Ribbon Smoked Fish, Inc.,* 179 F. Supp.2d 30 (E.D.N.Y. 2001) ............... 49

*United States v. Diapulse Corp. of Am.*, 457 F.2d 25 (2d Cir. 1972) ........................................... 49

*United States v. Sun & Sand Imps., Ltd.*, 725 F.2d 184 (2d Cir. 1984) ........................................ 36

*Vuitton v. White,* 945, F.2d 569 (3d Cir. 1991)........................................................................... 56

*Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th Cir. 2007) ...................................... 41

## Statutes

15 U.S.C. § 45(a) ................................................................................................................... passim

15 U.S.C. § 53(b).............................................................................................................................. 34

15 U.S.C. § 57a.................................................................................................................................. 46

15 U.S.C. §§ 6101-6108 .................................................................................................................. 45

16 C.F.R. Part 310............................................................................................................................ passim

Fla. Stat. § 501.202 .......................................................................................................................... 36

Fla. Stat. § 501.204 .............................................................................................................. 41, 43, 44, 45

Fla. Stat. § 501.207 .......................................................................................................................... 36

NY Exec. L. § 63(12)......................................................................................................................... passim

NY GBL § 349.................................................................................................................................... passim

NY GBL § 350.................................................................................................................................... passim

## I. INTRODUCTION

Plaintiffs the Federal Trade Commission ("FTC" or "Commission"), the State of Florida, Office of the Attorney General, Department of Legal Affairs ("FDLA"), and the State of New York, Office of the Attorney General (collectively, "Plaintiffs") seek a temporary restraining order ("TRO") to bring an immediate halt to an unlawful, deceptive telemarketing scheme that has ensnared consumers all over the United States, tricking them into purchasing purported small business development services through false promises of individualized, unlimited guidance from experts and experienced professionals on matters of tax, business planning, and business credit development. This scam has victimized thousands of individual consumers, many of whom are unemployed or elderly. Defendants have defrauded each victim out of thousands, sometimes tens of thousands, of dollars and have taken in over \$220 million since 2008.

The Tax Club, Inc. and its related entities and principals (collectively, "The Tax Club Enterprise")[1] have preyed upon consumers since at least 2008. What began as one company in Utah has expanded into a sprawling enterprise operating out of the 60th floor of the Empire State Building that now encompasses at least twelve interrelated corporate entities, all controlled by four individuals. Defendants use this corporate complexity to maintain sufficient credit card processing capability despite extensive consumer complaints and disputed charges, to mask their operational structure, and to churn and extract the proceeds of their deceptive scheme.

The Tax Club Enterprise is part of an industry that buys and resells the same so-called consumer leads – the contact information of potential customers – used to market various kinds

[1] As used herein, "The Tax Club Enterprise" and "Defendants," refer to: (i) Edward B. Johnson, Michael M. Savage, Brendon A. Pack, and Gary J. Milkwick (collectively, the "Individual Defendants"); and (ii) The Tax Club, Inc., Manhattan Professional Group, Inc., 5410, Inc., Marble Base, Inc., 6015, LLC, 1800Accountant, LLC, Ikongo, Inc., Tahuya, Inc., Visavis, Inc., HB Marketing Services, Inc., Premier Coaching & Consulting, LLC, and Skorpios Holdings, Inc. (collectively, the "Corporate Defendants").

1

of purported business development services to individuals interested in starting an Internet, work-at-home, or similar small business. The Tax Club Enterprise pretends to be affiliated with other companies that already have done business with the consumers it contacts in order to build trust and initiate a dialogue. It then proceeds to make an array of dishonest and deceptive claims designed to lure consumers into believing they can build a profitable small business from home or over the Internet but only with The Tax Club Enterprise's help. The Defendants promise, but fail to deliver, customized tax advice, personalized business planning, and individualized business credit counseling, all supposedly provided by experienced professionals with specialized expertise. The Defendants also falsely claim that their services will enable consumers to recoup the thousands of dollars they already invested in their business endeavors and the thousands more they pay to The Tax Club Enterprise through tax deductions, from future business profits, or by transferring those expenditures into their business names.

The scam does not end there. Once The Tax Club Enterprise hooks consumers with an initial sale, it immediately proceeds to target them with repeated follow-up sales calls. These follow-up calls are often scheduled and portrayed as fulfillment calls, but, in fact, they are marketing calls designed to sell additional products and services costing thousands of dollars more. Defendants again promise individualized services that supposedly are essential to the success of consumers' would-be businesses and that supposedly will soon pay for themselves.

Within days, weeks, or months of purchasing a product or service from the Defendants, consumers discover that what they receive is far different from what they were promised. The products and services sold by The Tax Club Enterprise give little or no substantive guidance or assistance. For example, the business planning documents the Defendants provide typically are boilerplate and non-specific to the individual consumer, the credit development services are

2

similarly general and therefore ineffective, and expert tax and other business-related counseling is typically inaccessible. No matter how much consumers spend, they rarely recoup their investment, let alone earn a profit.

As Defendants are well aware, the falsity of their claims usually comes to light as consumers work through the programs they purchased. Nevertheless, Defendants maintain a refund policy that requires consumers to cancel within a short three-day window for a full refund or within fifteen days for a partial refund. This refund policy is unworkable because consumers often do not have the opportunity to use or access the Defendants' purported services before the three or even fifteen-day windows expire. As a result, many consumers who request a refund from the Defendants are not given their money back. Left with no other recourse, thousands of dissatisfied customers have lodged complaints against The Tax Club Enterprise with law enforcement agencies, the Better Business Bureau, and their own credit card providers.

The evidence within the accompanying five volumes of exhibits[2] includes, among other things, sales scripts utilized by the Defendants' telemarketers and a random selection of recorded sales calls[3] showing the promises made to consumers, declarations from victimized consumers

---

[2] Each volume includes an index that lists and identifies each exhibit. Volume I contains a declaration, with accompanying exhibits, by Assistant Attorney General Judy S. Prosper dated December 20, 2012 ("Prosper Dec."). Volume II contains a declaration, with accompanying exhibits, by FTC Investigator Florence M. Hogan dated December 20, 2012 ("Hogan Dec."). Volume III contains declarations, with accompanying exhibits, by FTC Investigator Michael Marino dated December 20, 2012 ("Marino Dec."), Renee M. Ippoliti of Bank of America Merchant Services, LLC (Discover) dated November 6, 2012 ("Ippoliti Dec."), Timothy Smith of DFS Financial Services LLC dated November 26, 2012 ("Smith Dec."), and Brittany Assay of the Utah Better Business Bureau dated December 14, 2012 ("Assay Dec."). Volume IV contains declarations, with accompanying exhibits, from the following consumers: Lana Allen, Amin Amer, Bobbie Lou Anderson, Leslie Barrick, William A. Brander, Christine (Tina) DeLong, Charles Jordan, Robert Dean Lytle, Shari Rieselman, Judith Schroeder, Jason Tarbet, and Suzzane Vierling. Volume V contains a declaration by FTC Economist Dr. Kenneth H. Kelly dated January 4, 2013.

[3] In and around May 2010, the Defendants supplied a selection of recorded sales calls from the first quarter of 2010 to the New York Attorney General. Prosper Dec., ¶ 2 & Exh. A. To provide the Court with a representative selection from this pool, FTC economist Dr. Kenneth Kelly randomly selected 12 consumers whose calls were included within this original set. Kelly Dec. ¶¶ 58-60. Because the calls with just a single consumer represent several hours of total call time, Plaintiffs further narrowed the pool from 12 consumers to four and have chosen 18 of those calls together with transcripts to present to the Court. *See* Prosper Dec., Exhs. B.1 – B.18. The different types of telemarketing calls are discussed in more detail later in the main text. *(footnote continued...)*

describing their experiences and what they actually received, samples of generic products that the Defendants supplied, financial records showing high levels of disputed charges, internal sales and staffing data showing the operation was incapable of adequately servicing its clients, prior statements from some of the principals, and a financial analysis by an FTC economist. The confluence of these various sources shows the pervasiveness of the Defendants' deceptive practices, which violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a) (prohibiting deceptive acts or practices in or affecting commerce), Sections 310.3 and 310.4 of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.3, 310.4, Section 501.204(1) of the Florida Deceptive Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes, Section 63(12) of the New York Executive Law ("NY Exec. Law"), and Sections 349 and 350 of the New York General Business Law ("NY GBL"). Because Defendants' deceptive practices are ongoing, the FTC and co-plaintiffs the State of Florida and the State of New York request immediate injunctive relief in the form of a TRO, on notice to the Defendants, and a preliminary injunction to stop Defendants' unlawful activities and preserve the Court's ability to order effective final relief

## II.    STATEMENT OF FACTS

## A.    THE DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

Defendants are engaged in a complex scheme designed to induce consumers to spend

---

For examples of recorded so-called "appointment-setter" calls, see Prosper Dec., Exhs. B.12 [941260_010410 audio] & N [941260_010410 Tr.], Exhs. B.1 [934918_080309 audio] & C [934918_080309 Tr.].

For examples of recorded initial sales calls, see Prosper Dec., Exhs. B.13 [941260_010510 audio] & O [941260_010510 Tr.]; Exhs. B.5 [941441_010810 audio] & G [941441_010810 Tr.]; Exhs. B.2 [934918_080409 audio] & D [934918_080409 Tr.], Exhs. B.8 [944406_030910 audio] & J [944406_030910 Tr.].

For examples of recorded upsell calls, see Prosper Dec., Exhs. B.15 [941260_012210 audio] & Q [941260_012210 Tr.], Exhs. B.16 [941260_021210 audio] & R [941260_021210 Tr.], Exhs. B.6 [941441_030110 audio] & H [941441_030110 Tr.], Exhs. B.3 [934918_081109 audio] & E [934918_081109 Tr.], Exhs. B.9 [944406_031610.1 audio] & K [944406_031610.1 Tr.].

4

thousands, or, in many cases, tens of thousands, of dollars on bogus small business development services. The scheme unfolds in five stages.

First, The Tax Club Enterprise identifies consumers who might be susceptible to its deceptive marketing practices by purchasing leads (names and contact information for potential customers) from other companies that have already succeeded in selling those consumers a business development product or service. Second, The Tax Club Enterprise employs sales representatives who telephone those consumers and falsely claim to be calling "on behalf of" or at the direction of the company that had sold the particular lead to The Tax Club Enterprise. Consumers therefore accept the call, thinking they are speaking to a consultant or other advisor connected to the product or service they had already purchased. Third, the Defendants' sales representatives build consumers' confidence by engaging in what appears to be a consultation about some aspect of small business development, typically, matters relating to corporate form selection. The Defendants explain that there are many tax advantages associated with forming an S-corporation and refer to experienced tax and business advisors available to guide consumers as they build their businesses. Only after this extended buildup, typically some 45 minutes or more into the call, do the Defendants' sales representatives reveal that what they have been discussing is a separate product that costs money. Fourth, the Defendants' sales representatives then pitch their product, typically reiterating and expanding on claims made during the confidence phase and emphasizing individualized, expert services for the life of consumers' would-be businesses. At the conclusion of these initial sales calls, consumers who purchase a product or service from the Defendants are given a number of appointments to discuss various business-related topics, such as business planning, bookkeeping, and credit development. Those appointments appear to be for consultation sessions but, in fact, merely segue the consumer to

5

further upsell calls, which represent the fifth stage of the Defendants' scheme.

## 1. Phase One: The Lead

The Defendants' scheme all starts with a lead. The Tax Club Enterprise purchases leads primarily from other vendors selling a variety of business-related products and services -- ranging from work-at-home programs and job placement guides to Internet business coaching and incorporation services -- marketed to consumers online, on television through infomercials, by direct mail solicitations, and through marketing workshops.[4]

After those entities sell consumers a product or service, they then proceed to sell their customers' contact information to The Tax Club Enterprise (and others) as leads. The Tax Club Enterprise, in turn, makes outbound telemarketing calls pitching its own tax, business development, and related services to those same consumers, knowing that those consumers are willing to spend money to build a business. The Tax Club Enterprise typically pays these referral, or "lead," sources a percentage, up to 35%, of the amount paid by the consumer to The Tax Club Enterprise.[5]

An analysis of the Defendants' bank records shows that The Tax Club Enterprise has paid approximately $44 million for consumer leads since 2008.[6] The primary lead sources during this period include: National Marketing Resources, LLC ("NMR"), which received over $15 million; Yolo Marketing Group, LLC and its affiliate, Yolo Media (collectively, "Yolo Marketing"), which together received over $7.7 million; Stores Online, Inc. ("StoresOnline"), which received over $7.6 million; and NSA Technologies, LLC ("NSA"), which received over $1.3 million.[7]

---

[4] Deposition of Michael M. Savage dated March 2, 2011 ("Savage Dep.") at 67:15-69:14, 92:21-24, 120:8-10; Deposition of Brendan A. Pack dated May 17, 2011 ("Pack Dep.") at 17:5-20; Marino Dec., Exh. W ¶¶ 1-7, Exh. G ¶¶ 15-17, Exh. X ¶¶ 9-15.

[5] Savage Dep. at 69:15-70:8; Pack Dep. at 19:21-21:1.

[6] Kelly Dec., ¶¶ 33-36.

[7] Kelly Dec. ¶ 35.

6

Each of these four lead sources has been the subject of numerous consumer complaints and/or law enforcement actions.[8] For example, StoresOnline has been sued by six state attorneys general and the Australian Competition and Consumer Commission for deceptively marketing software and service packages to startup Internet businesses.[9] NMR's affiliate, Professional Marketing International, Inc. ("PMI"), has been the subject of 768 consumer complaints to the FTC in the last three years reporting deceptive practices involving coaching programs sold to startup Internet businesses.[10] Similarly, the FTC has received 92 complaints against a website operated by Yolo Marketing reporting deceptive practices also involving support services sold to work-at-home businesses.[11] These entities alone received over \$30 million from The Tax Club Enterprise since 2008 for providing consumer leads.[12]

## 2. Phase Two: False Affiliation

As discussed, The Tax Club Enterprise purchases leads from other companies that have already sold those consumers a business development product or service. This prior relationship is key to the Defendants' scam because their telemarketers begin each sales call by falsely claiming they are calling "on behalf of" or at the direction of the company (known as the "lead source") that sold The Tax Club Enterprise that particular lead.[13] In this way, consumers

---

[8] Marino Dec. ¶ 7 & Exhs. A-Z.

[9] Marino Dec. ¶ 7(a) & Exhs. A-O.

[10] Marino Dec. ¶ 7(b) & Exhs. P-V.

[11] Marino Dec. ¶ 7(c) & Exhs. Q-Z.

[12] Kelly Dec. ¶ 35.

[13] *E.g.*, Tarbet Dec. ¶ 11 (caller states Defendants work with "98%" of lead source's clients); Anderson Dec. ¶6 ("[T]he representative told me that TTC worked with TV Travel."); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p. 1 ("Hello _____, this is _____ calling on behalf of _____ over here at Essential Planning here in NY, How are you? ... Alright ___ so the appointment we have set up for you today is going to be very important to the overall financial structure of the business. ... The second portion of what we're going to be covering is the actual business planning aspect of everything and figuring out step by step how we are going to be generating income with the business."), Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 1 ("Hello _____, this is _____ calling on behalf of _____ over here at Essential Planning in New York. How are you? ... This appointment is going to be very important in the overall financial structure of your business. What we're going to do is start tracking your progress here.... So, before we even get started, we want to immediately get started on the financial plan of the business."), Exh. BB [The Tax Club Consultation Script bp.doc],

receiving these calls are misled to believe that they are speaking with someone connected to the

product or service they already purchased and, therefore, accept the call and engage in a

discussion with the caller.[14] This false affiliation is the second step in the scam, getting the

Defendants "through the door."[15]

---

p. 1 ("Hello, is _____ there? Hello_____ this is (Name) giving you a call from the Business Development Center at The Tax Club, on behalf of _____ how are you today? Great. I am a Small Business Advisor and I've been assigned to your account to ensure we get you all squared away with your new endeavor. ... I'm in the _____ department (depends on their business (real estate, e-commerce, investing, generic business)), me and my colleagues on my team work exclusively with _____ clients just like you."); Exh. B.12 [941260_010410 audio] at 0:00:20-0:00:24, 0:00:56-0:01:19 & N [941260_010410 Tr.] at 4:12-14, 5:6-15 (caller identifies himself as "Michael Ruben giving you a call here on behalf of the Applied Knowledge Institute. How are you?"); Exhs. B.13 [941260_010510 audio] at 0:00:40-0:01:01 & O [941260_010510 Tr.] at 4:24-5:9 ("I'm giving you a call from the Tax Club. We are the business development center obviously on behalf of your coaches over at Applied Knowledge Institute, wonderful group of guys and girls over there. ... And I'm just here to make sure we get everything set up properly ...."), Exhs. B.5 [941441_010810 audio] at 0:00:26-0:00:40 & G [941441_010810 Tr.] at 4:8-15 ("This is [Stanley Iselian] calling from The Tax Club on behalf of your Bank Card Empire. Yeah. Your coaching staff asked me to give you a call. They wanted me to help you set up the back end of your business properly. It's really important that we get this done."), Exh. B.1 [934918_080309 audio] at 0:00:26-0:00:46 & C [934918_080309 Tr.] at 4:8-18 ("Good morning. My name is Blake Kantor, and I'm calling from the Tax Club on behalf of Mary Gerstein and the Billable Cash Flow Network. ... I've been assigned to your file here to make sure that when you're getting your business all set up that everything is done right the first time, okay?"). *See also* Jordan Dec. ¶ 16 & Exh. F (lead source tells consumer not to buy additional upsell product from Defendants); Prosper Dec., Exhs. B.16 [941260_021210 audio] at 0:00:27-0:02:18 & R [941260_021210 Tr.] at 4:14-6:14 (lead source tells consumer not to buy additional upsell product from Defendants), Exhs. B.8 [944406_030910 audio] at 0:02:41-0:03:57, 0:04:51-0:05:12, 0:27:56-0:28:27, 0:37:30-0:37:38 & J [944406_030910 Tr.] at 8:5-9:14, 10:17-11:4, 38:15-25, 50:2-6 ("exactly what your coaches have had us put together so we can get everything that you need taken care of"). *See also* Pack Dep. at 26:10-15 (discussing distribution of leads to sales representatives).

[14] *E.g.*, Allen Dec. ¶ 7 (caller's reference to lead source "gave me the impression that The Tax Club was affiliated with [lead source's] program"); Barrick Dec. ¶ 6 ("I thought My Essential Plans was part of FLS, since the representative informed me that he was aware that I was setting up a home business."); Jordan Dec. ¶ 12 (thought caller was connected to lead source "because he knew the details of my purchase from them"); Lytle Dec. ¶¶ 6, 7 ("The representative also said that TTC was affiliated with my coaching service ...."); Prosper Dec., Exhs. B.10 [944406_031016.2 audio] at 0:01:05-0:01:46, 0:05:34-0:05:50 & L [944406_031016.2 Tr.] at 5:21-6:20, 11:3-12 ("Well, you had all my information and I don't know how you got it unless [lead source] sent it. And that's the reason why I'm saying 1 was confused").

[15] Sometimes, the extended sales call discussed in the main text is preceded by a two to three minute, so-called "appointment-setter" call, the purpose of which is to schedule an appointment for a longer call. Savage Dep. at 67:6-14. *E.g.*, Lytle Dec. ¶ 11 ("A TTC representative first called me to set up an appointment. ... The appointment turned out to be a sales call for the service called My Essential Plans."). Either way, the Defendants' sales representatives begin their calls with the false claims of affiliation described in the main text. *E.g.*, Prosper Dec., Exhs. B.12 [941260_010410 audio] at 0:00:21-0:00:24, 0:00:55-0:01:19 & N [941260_010410 Tr.] at 4:12-14, 5:6-15 (appointment-setter call), Exhs. B.13 [941260_010510 audio] at 0:00:41-0:01:03 & O [941260_010510 Tr.] at 4:24-5:9 (sales call the next day).

## 3.    Phase Three: Confidence

Next comes the confidence phase. Believing that they are speaking with someone

connected to the product or service they already purchased, consumers then listen to the sales

representatives discuss the importance of some basic aspect of business development. Typically,

representatives tell consumers that an S-corporation protects them against lawsuits and opens the

door to over 330 tax deductions that are available even to those businesses that are not making

money.[16] As examples, sales representatives sometimes claim that, once incorporated,

consumers can deduct vacations and meals as business expenses so long as they mention their

business at some point.[17] These discussions typically go on for 45 minutes or more, and

consumers mistakenly believe they are participating in a consultation call relating to the product

they purchased from the lead source.[18]

---

[16] *E.g.,* Tarbet Dec. ¶ 11(S-corporations and tax benefits); Allen Dec. ¶ 7 (S-corporation, 330 tax deductions); Brander Dec. ¶ 7 (tax deductions and expenses); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p. 1 ("Asset protection – protect personal property, cash, credit, etc." and "Minimize Taxes – 330 plus deductions, minimize income taxes"), Exhs. B.13 [941260_010510 audio] at 0:02:59-0:03:25, 0:33:42-0:33:58 & O [941260_010510 Tr.] at 7:18-8:1 (S-corporation), 42:23-43:2 (over 350 tax deductions), Exhs. B.5 [941441_010810 audio] at 0:10:34-0:10:41, 0:15:00-0:15:06, 0:15:32-0:17:01 & G [941441_010810 Tr.] at 12:21-24, 17:22-24 (over 340 tax deductions), 18:14-20:5 (with LLC, have "asset protection" against possible "lawsuit"), Exhs. B.2 [934918_080409 audio] at 0:11:08-0:13:06 & D [934918_080409 Tr.] at 16:20-17:11 (S-corporation and 330 tax deductions), Exhs. B.8 [944406_030910 audio] at 0:24:26-0:24:31, 0:26:49-0:27:23, 0:27:41-0:27:45, 0:32:28-0:32:34 & J [944406_030910 Tr.] at 34:18-20, 37:17-38:8, 43:21-22 (S-corporations, 330 tax deductions, asset protection), Exhs. B.15 [941260_012210 audio] at 0:04:20-0:05:05, 0:12:28-0:12:51 & Q [941260_012210 Tr.] at 8:5-23, 16:21-17:8 ("even if you do not generate a single cent, we can still deduct thousands and thousands of dollars."), Exhs. B.3[934918_081109 audio] at 0:15:41-0:15:48 & E [934918_081109 Tr.] at 21:21-24 ("Two, you don't care if it works … if it makes money, great; if it doesn't, oh well, you got an additional write-off.").

[17] *E.g.,* Prosper Dec., Exhs. B.13 [941260_010510 audio] at 0:45:01-0:45:40 & O [941260_010510 Tr.] at 55:7-22 ("Now, if you go out to eat dinner, it becomes a business meeting. You know, you discuss business over dinner for five minutes, you're looking to write off the whole thing. You know, the same thing, if you go on a trip …."), Exhs. B.5 [941441_010810 audio] at 0:15:17-0:15:21 & G [941441_010810 Tr.] at 18:3-7 ("[Y]ou are going to be really necessarily writing off everyday expenses, like meals and entertainment."), Exhs. B.2 [934918_080409 audio] at 0:13:44-0:14:05 & D [934918_080409 Tr.] at 19:20-20:6 ("[W]hat if you could travel and write it all off? … Simply conduct business while you're on vacation, and these expenses such as hotel, airfare, rental car, it can all potentially be written off.").

[18] *See* note 14 *supra. E.g.,* Jordan Dec. ¶ 12 (hour and a half call with sales pitch "near the end"); Lytle Dec. ¶ 11 ("The appointment turned into a sales call …."); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], pp. 4-5 (additional cost first raised at end of page four of a four and one-half page sales script), Exhs. B.1 [934918_080309 audio] at 0:01:34-0:01:41 & C [934918_080309 Tr.] at 5:14-16 ("What time would be -- would be good for you to

9

Along the way, the Defendant's sales representatives attempt to befriend consumers,[19]

many of whom are elderly, disabled, or unemployed[20] and to probe their financial

circumstances.[21] They also entice consumers by suggesting types of businesses to pursue, often

proposing drop-shipping or Internet marketing,[22] and highlight the billions of dollars to be made

in these fields.[23] Sales representatives lead consumers to believe they can create a profitable

business but only with proper guidance from on-call experts and professionals who know from

---

set aside 45 minutes to an hour for a phone appointment?"), Exhs. B.8 [944406_030910 audio] at 37:30 -39:12 & J [944406_030910 Tr.] at 50:1-51:15 (additional cost first raised 37 minutes into call), Exhs. B.13 [941260_010510 audio] at 0:54:24-0:55:30 & O [941260_010510 Tr.] at 64:16-65:19 (additional cost for services first raised 55 minutes into call), Exhs. B.5 [941441_010810 audio] at 0:47:11-0:48:11 & G [941441_010810 Tr.] at 53:18-54:16 (additional cost for services first raised 46 minutes into call).

[19] *E.g.,* Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p. 2 ("RAPPORT: PUMP THEM UP HERE (GET THEM EXCITED)"), Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 2 (same).

[20] Marino Dec., ¶ 6 (42% of complaints to FTC in past year came from consumers at least 60 years old). *E.g.,* Jordan Dec. ¶ 3 (disabled, dialysis); Anderson Dec. ¶¶ 5, 14, 27 (64 year old widow, caring for sick family member); Lytle Dec. ¶ 3 (disabled, 64 years old); Rieslman Dec. ¶ 3 (unemployed); DeLong Dec. ¶ 3 (unemployed); Prosper Dec., Exhs. B.5 [941441_010810 audio] at 0:03:52-0:03:57 & G [941441_010810 Tr.] at 6:20-21 (retired), Exhs. B.2 [934918_080409 audio] at 0:00:54-0:01:01 & D [934918_080409 Tr.] at 4:20-25 ("great-grandmother"), Exhs. B.8 [944406_030910 audio] at 00:26-00:30 & J [944406_030910 Tr.] at 4:22-23 (retired).

[21] *E.g,* Pack Dep. at 39:9-40:6; Prosper Dec., Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 2 ("ask them if they have their credit card statements organized so that you can ask what credit limits are and how much they have put on each card whether it be personal or business debt so that you know exactly what you can pitch"), Exhs. B.13 [941260_010510 audio] at 0:16:23-0:21:10 & O [941260_010510 Tr.] at 22:6-26:24 (probing credit), Exhs. B.5 [941441_010810 audio] at 0:20:05-0:25:25 & G [941441_010810 Tr.] at 24:3-28:21 (probing credit), Exhs. B.2 [934918_080409 audio] at 0:03:36-0:06:39 & D [934918_080409 Tr.] at 8:1-11:23 (probing assets, debts, and credit).

[22] *E.g.,* Lytle Dec. ¶ 20 (drop shipping); DeLong Dec. ¶ 4 (Internet sales); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p. 2 ("Alright now what are you involved with exactly? Ecommerce, drop-shipping, affiliate marketing?"), Exhs. B.13 [941260_010510 audio] at 0:28:25-0:30:30 & O [941260_010510 Tr.] at 36:7-38:19 (affiliate marketing, drop-shipping); Exhs. B.2 [934918_080409 audio] at 0:02:19-0:02:38 & D [934918_080409 Tr.] at 6:18-7:1 ("Do you plan on drop-shipping your products, wholesaling, retailing? Are you just an affiliate?").

[23] *E.g.,* Prosper Dec., Exhs. B.13 [941260_010510 audio] at 3:33-4:17 & O [941260_010510 Tr.] at 8:6-24 ("You know, two years ago, there was 200 billion -- $198 billion done in revenue in 2008. 2009, they haven't calculated completely yet because of the holidays, but they are expecting to beat that by leaps and bounds. ... We're Americans, we know that most of us do shopping online. But the rest -- of the world is starting to get online now as well."), Exhs. B.2 [934918_080409 audio] at 0:15:24-0:16:06 & D [934918_080409 Tr.] at 21:19-22:8 ("This Internet is the largest market in the world. Billions and billions and billions of people. So, we want you to be able to take advantage of the Worldwide Web, because you could potentially be dealing with clients all around the world which can, of course, maximize your earning potential.").

10

experience how to make a business successful.[24]  Pairing these incentives with scare tactics,

representatives also discuss risks associated with running a business, including overpaying taxes,

IRS audits, and government filing deadlines, but repeatedly assure consumers that experienced

professionals working in New York City will answer any questions at any time and guide them

through all of those dangers. [25]

_____

[24] *E.g.,* Brander Dec. ¶ 6 (consumer was told services "were necessary to make my business successful. In all these calls, the telemarketers made it seem like TTC had some special expertise."), 7 ("[Sales representative] told me that My Essential Plans was a company that specialized in e-commerce platforms that had been in business for twelve years. He also told me that the company was located on the 60th floor of the Empire State Building."); Jordan Dec. ¶ 12 ("He said I needed … to use their expertise to create a successful business."); Barrick Dec. ¶ 5 (consumer received calls from Defendants "offering a variety of additional services that I was told were necessary to make my business successful … the telemarketers made it seem like they had some special expertise"); Allen Dec. ¶ 8 ("Based on everything I was told, I thought The Tax Club program would be essential for my business …."); DeLong Dec. ¶ 8 ("TTC's representatives continued to warn me that my business would not succeed unless I used TTC's services."); Lytle Dec. ¶¶ 7 ("The representative also said … that in order for me to succeed in my business, I needed to set up a corporation and buy their products."), 9; Anderson Dec. ¶ 5 (consumer told that Defendants' services "were necessary to make my business successful"); Rieslman Dec. ¶ 4 ("However, [the sales representative] told me … that TTC would get me signed up with various services that I would need in order to be considered a fully developed business."); Prosper Dec., Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 4 ("So what we need to do is assign you to your own certified personal business consultant and then he's gonna do these different things for you, like write up the financial plans both personal and corporate, the break even analysis, sales forecasting, projected cash flow analysis, put you in position for funding, etc. (elaborate here)"), Exh. BB [The Tax Club Consultation Script bp.doc], p. 3 ("A number of employees on our tax preparation teams were recruited from some of the largest and most prestigious accounting firms in the country, including PriceWaterhouseCoopers, Ernst & Young, and Deloitte & Touche. … The tax code and regulations consist of thousands of pages that stack two feet high. Only trained professionals know how to walk the tightrope between minimizing your tax and keeping you from being audited."), p. 4 ("unlimited, year round consulting with our team of experienced advisors."), Exhs. B.13 [941260_010510 audio] at 0:22:26-0:22:36, 0:34:48-0:35:11, 0:43:06-0:43:11 & O [941260_010510 Tr.] at 28:15-18, 44:2-10, 53:7-8 ("we're going to be assigning a group of professionals to work with you in a number of different areas [including] a separate group of accountants who specialize in the Internet industry."). *See* notes 32, 36 *infra*.

[25] *E.g.,* Vierling Dec. ¶ 9 (caller "falsely told me that I needed to sign up for their services in order to protect myself from liability."); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p.2 ("You want to be able to deduct all of your investments by 100% right? You won't be able to do that if everything isn't documented properly and you aren't in position for transferring business expenses over to the actual business itself."), Exh. BB [The Tax Club Consultation Script bp.doc], pp. 2-3 ("Because after you setup your entity, the job doesn't stop there, we have to deal with things like election filings—which have immediate deadlines. … And with the IRS targeting businesses that fit your profile more and more for audits, it is nice to have a company that has prepared nearly one hundred thousand of tax return backing you up."), Exhs. B.13 [941260_010510 audio] at 0:04:32-0:04:51, 0:11:35-0:11:49, 0:13:11-0:13:40, 0:14:17-0:14:47, 0:46:47-0:47:06 & O [941260_010510 Tr.] at 9:9-14 (identity theft), 16:18-22 (not being available if IRS calls "can get you into trouble."), 18:23-19:7 (legal professionals to make sure "any deadlines, any publication dates, any filing dates that have to be met are met"), 20:1-14 (IRS "red flags," "audit," " headache," "Because, you know, since September 11th, you know, everybody is a lot more careful these days."), 57:5-9 ("You know, even Albert Einstein, who is smarter than us both, said that he thought taxes were the hardest thing to do. So, of course, you know, you're never going to have to do those on your own."), Exhs. B.5 [941441_010810 audio] at 0:26:08-0:26:10, 0:27:22-0:27:47, 0:34:34-0:35:06 & G [941441_010810 Tr.] at 29:16 ("we don't want the IRS coming and knocking on our door"), 31:5-14 (comingling funds is an "automatic red flag for the IRS. … It will make it seem like you're laundering money …."), 39:7-19 ("we want to make sure that we don't encounter any

11

## 4.   Phase Four: The Pitch

After this extended discussion designed to build confidence, at the point when sales representatives conclude the time is right and the stage is set, only then do they mention an additional cost, and only then does the consumer realize that the various opportunities, protections, and guidance discussed so far are part of a separate package for more money.  By that time, however, consumers, who had already committed thousands of dollars in payments to the lead source, have been baited by the earnings and counseling claims they heard, and have been made to worry about the risks they face should they proceed without the supposed expert guidance from The Tax Club Enterprise's purported professionals.

In pitching the sale, the Defendants' sales representatives, who earn 10-20% commissions,[26] often reiterate and expound upon misrepresentations made during the confidence phase.  Whether during the confidence phase or during the pitch, the Defendants' sales representatives make a number of false claims, beyond the false affiliation with lead sources discussed in Section IIA.(2) above, to induce consumers to make a purchase.

### a)   Misrepresentations about purchase price and earnings

The Defendants typically charge consumers several thousand dollars for each of their various products and services.  The cost usually involves an initial payment of several thousand dollars followed by smaller monthly payments.[27]  The size of the transaction typically depends

---

penalties from the IRS … [b]eacuse … they will come after you"), Exhs. B.2 [934918_080409 audio] at 0:10:21-0:10:49 & D [934918_080409 Tr.] at 15:24-16:13 ("when you mix your personal and businesses capital … it could potentially raise red flags with the IRS.  They'll audit you, suspect you of laundering money, it's just a big headache."), 7:14-25 ("one out of three Internet businesses are sued every year").

[26] Pack Dep. at 31:17-32:32:24.

[27] *See* note 105 *supra*.

12

on the amount of savings and credit consumers have available, and Defendants probe consumers' financial circumstances during sales calls in order to maximize purchases and price.[28]

Consumers targeted by the Defendants tend to have fixed or limited financial means, often because they already spent money on purchases from the lead source or because they may be retired, disabled, or unemployed.[29] In instances where consumers do not have sufficient available savings, the Defendants' sales representatives persuade consumers to use their available credit.[30] In instances where consumers do not have sufficient savings or credit, sales representatives convince them to finance the charges.[31]

Sales representatives employ a common tactic to persuade consumers to spend the last of their savings, to tap their available credit, and to finance purchases from The Tax Club Enterprise. They do so by falsely claiming that consumers ultimately will not have to pay those costs out of their own pocket. That misrepresentation takes one of three forms, namely, that consumers who purchase the Defendants' products and services: (a) will earn enough money from their future businesses to recoup the purchase price;[32] (b) will be able to recoup the

---

[28] *See* note 21 *supra*. *E.g.,* Prosper Dec., Exhs. B.6 [941441_030110 audio] at 0:01:10-0:03:01 & H [941441_030110 Tr.] at 5:10-7:3 (reducing price to meet consumer's ability to pay), Exhs. B.3 [934918_081109 audio] at 0:20:57-0:21:31 & E [934918_081109 Tr.] at 24:9-23 (same).

[29] *E.g.,* Rieslman Dec. ¶ 3 (unemployed); Lytle Dec. ¶ 3 (disabled, unemployed); DeLong Dec. ¶ 3 (unemployed); Jordan Dec. ¶ 3 (disabled, unemployed); Anderson Dec. ¶¶ 5, 27 (retired, caring for sick family member), 22 ("64 year old widow who lives on Social Security and a small pension"); Prosper Dec., Exhs. B.5 [941441_010810 audio] at 0:03:52-0:03:57 & G [941441_010810 Tr.] at 6:20-21 (retired), Exhs. B.8 [944406_030910 audio] at 0:00:26-0:00:30 & J [944406_030910 Tr.] at 4:22-23, Exhs. B.6 [941441_030110 audio] at 0:02:18-0:03:17 & H [941441_030110 Tr.] at 6:10-7:5 ("I don't have the money to do that. ...The only thing was my pension check ....").

[30] *See* notes 32-34 *infra.*

[31] Savage Dep. at 129:20-130:8. *E.g.,* Barrick Dec., ¶ 11; Prosper Dec., Exhs. B.5 [941441_010810 audio] at 0:59:55-1:00:05, 1:27:06-1:27:40 & G [941441_010810 Tr.] at 67:9-14, 86:2-13, Exhs. B.9 [944406_031610.1 audio] at 1:09:54 – 1:10:41 & K [944406_031610.1 Tr.] at 80:16-81:12.

[32] *E.g.,* Vierling Dec. ¶ 6 ("The Tax Club said I should have no problem recouping the money I paid The Tax Club and making a fair profit."); DeLong Dec. ¶ 4 ("[O]nce the website was running, he guaranteed me that I would get 100% of my investment back."); Prosper Dec., Exhs. B.2 [934918_080409 audio] at 0:17:52-18:16 & D [934918_080409 Tr.] at 24:3-13 ("Generally, a business can be sold for double its net income.").

13

purchase price through deductions on their tax returns;[33] and (c) can transfer those costs from

their personal credit card to their future businesses and shift them onto a business credit card or

pay them using a Small Business Administration ("SBA") loan.[34]  Consumers are also led to

---

[33] E.g., Jordan Dec. ¶ 24 ("He told me that I could get all my money back using a tax management system."); Lytle Dec. ¶¶ 9 ("TTC also told me in almost every sales call that any money I paid them for a service, I would make it back when I file my taxes at the end of the year."), 12, 17; Vierling Dec. ¶ 3 ("I specifically remember that The Tax Club told me they would save me the money because I could write off my business expenses on my tax return."); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p.2 ("You want to be able to deduct all of your investments by 100% right? ... Also, you'll be able to get the first 5000 dollars invested into the business – return them in the form of a tax deduction."), Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 1 ("By setting up a corporation, no matter what you cau write off 5K in startup costs for this year, as well as potentially write off all expenses related to the business start up."), Exhs. B.13 [941260_010510 audio] at 34:20-43:19, 0:53:39-0:57:05 & O [941260_010510 Tr.] at 43:15-53:11 (claim that Defendants will "make sure that every dollar possible comes back into your pocket" through tax deductions repeated ten times in thirteen minutes), 63:21-67:20 (claim that purchase price is "100 percent tax deductible" repeated five times in four minutes), Exhs. B.5 [941441_010810 audio] at 0:58:48-0:59:15 & G [941441_010810 Tr.] at 66:4-17 ("[T]hat falls underneath the start-up expense. So, that amount that you actually spend, you are going to be getting 100 percent of that back."), Exhs. B.2 [934918_080409 audio] at 0:20:54-0:22:42 & D [934918_080409 Tr.] at 26:14-27:21 ("The 4,785 – the 4,785 is – is an up-front cost, but it's all a write off, okay? [t]he whole thing ...."), Exhs. B.8 [944406_030910 audio] at 0:17:17- 0:17:26 , 0:21:08- 0:21:17, 0:43:42- 0:44:02 & J [944406_030910 Tr.] at 25:23-26:3, 30:16-20, 56:17-25 ("So, this money that you're investing out of your own pocket, that we can literally recoup back through our business and get back through our taxes at the end of the year.").

[34] E.g., Rieslman Dec. ¶ 8 (caller claimed program "would allow me to transfer debt out of my personal credit cards and onto a company credit card."); Schroeder Dec. ¶ 10 ("He said ... when I get the business loan I should deposit it in my business account, write out a check to myself and deposit the check in my personal account to pay the personal credit cards ...."); DeLong Dec. ¶ 4 (business credit card); Tarbet Dec. ¶ 11, 9, 22 (transfer to business); Anderson Dec. ¶¶ 6 ("transfer the business-related purchases from my personal credit card to my business account"); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], pp. 1-2 ("It would be great if the business could take over all these expenses instead of you right? So once you've successfully established corporate credit you will be in a position to take the investments you've made so far and upon approval consolidate them with the line of credit or conduct a balance transfer to a corporate card."), p. 4 ("The main programs through the SBA that our clients work with are the 504 and the 7a programs. Those programs are back by 80-85% in most cases. We have set up a connection with financial institutions and investors and we've been working with them for almost 10 years, to be exact there are just over 150 of them. So instead of you going out and looking for funding they come to us to bid on your business plans and loan proposals. ... Last year alone we were able to approve nearly 108 million dollars."), Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 2 ("The first thing that I want to accomplish today ... as well as advising you on how you can either pay the debt off with an SBA loan which we will be speaking about later on, or apply for business credit cards and upon approval advising you on transferring any business debt over to the business and off of your personal credit."), Exhs. B.13 [941260_010510 audio] at 0:21:57- 0:23:12 & O [941260_010510 Tr.] at 28:4-29:8 ("But every dollar that's on your card that's business-related, we want coming out of your name."), Exhs. B.5 [941441_010810 audio] at 0:37:15-0:38:35, 0:59:16-0:59:43, 1:18:56- 1:19:01 & G [941441_010810 Tr.] at 42:17-43:24, 66:18-67:3, 81:12-14 ("[W]e're going to be virtually taking it off and transferring it over to the business line of credit. ... So, in other words, it will almost seem as if the debt was never even on the cards in the first place. It will be transferred over to the business – and we will have the business pay for the debt."), Exhs. B.2 [934918_080409 audio] at 0:16:07-0:16:27, 0:22:28-0:23:00 & D [934918_080409 Tr.] at 22:12-16, 27:21-28:2 ("And you're going to transfer any money that you lay out into the – into the business ...."), Exhs. B.3 [934918_081109 audio] at 0:17:00-0:17:05, 0:21:38-0:22:08, 0:23:50-0:24:12, 0:27:22-0:28:16 & E [934918_081109 Tr.] at 23:9-11, 25:4-15, 28:3-12 ("So, we do have a department, and it can do everything. They do all your loans so you can pay off your debt."), 31:20-32:11 ("We do have acecss to the Small Business

14

believe that they will recover the money they invested with the lead source in these same ways but only if they sign up with The Tax Club Enterprise.[35]

The Defendants also lead consumers to believe that if they purchase the Defendants' products and services, they will earn thousands of dollars per month from their business endeavors. They typically do so by highlighting the many billions of dollars spent on online purchases annually, by referencing The Tax Club Enterprise's so-called "proven method" or otherwise representing that prior clients' success means consumers will not have to "reinvent the wheel," or by claiming that their clients typically earn or can expect to earn thousands of dollars each month in their first year.[36]

---

Administration loan between 5- and 25,000. ... [I]f you decide that you want to apply for this loan, we can get you help – prequalify.").

[35] *E.g.*, DeLong Dec. ¶¶ 10, 33 (consumer told that "my business would not succeed without TTC's services. It seemed like a tying agreement ...."); Lytle Dec. ¶¶ 15, 17 ("TTC's representative told me that if I did not buy this service, everything else that I already purchased would not work and that 1 would lose all that money that I already spent."); Prosper Dec., Exhs. B.5 [941441_010810 audio] at 0:04:38-0:04:49, 0:13:17-0:13:36 & G [941441_010810 Tr.] at 7:16-21, 16:2-10 ("And as far as the initial investment that you basically spent so far, I don't know how much you spent with Bank Card Empire, but we're going to be virtually getting 100 percent of that back for you. So, that's another great thing.").

[36] *E.g.*, Tarbet Dec. ¶ 11 ("proven method"); DeLong Dec. ¶ 4 (coach will "fully explain the company's thirty steps towards building my home business"); Lytle Dec. ¶ 22 ("The TTC representative told me that 1 should shoot for $2,000 to $3,000 a month and that if 1 followed all their advice and did the hard work that they told me to do, I would be able to make that money. The TTC representative also told me that if I worked for about a year and a half, 1 would be able to make $5,000 to $6,000 a month."); Amer Dec. ¶ 5 ("The Tax Club representative I spoke with stated that with the purchase of their services, I could expect to make at least $10,000 per month."); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p.2 ("Great, we have a lot of clients that have become very successful already doing these types of businesses. ... We already know what works and what doesn't work so we want to avoid the whole trial and error period and get you set up and running. You know there is no need to re-invent the wheel."), p. 4 ("What happened was people were getting very excited about getting a business started because they saw the potential of making anywhere between 50-100 thousand dollars for just the first year alone."), Exhs. B.1 [934918_080309 audio] at 0:01:10-0:01:22 & C [934918_080309 Tr.] at 5:6-8 ("Well, look, our goal here is for you to be getting up into the six-figure range of income from this – from this new business."), Exhs. B.13 [941260_010510 audio] at 0:01:45-0:02:06, 0:48:15-0:50:53 & O [941260_010510 Tr.] at 6:9-17 ("As little as ten hours a week and you're looking to hit your goals."), 58:16-61:3 ("As I said, we've been doing this for just about a decade now. We've set up tens of thousands of these businesses. ... [T]he purpose of the guide is not to overwhelm you. It's just to see you learning from the success and, obviously, from the failures of other people."), Exhs. B.5 [941441_010810 audio] at 0:31:42-0:31:45, 0:57:20-0:57:48 & G [941441_010810 Tr.] at 36:4-5 ("we've come up with basically the dos and don'ts of the business"), 64:11-20 ("it just shows you, step by step, exactly what other successful clients have done"), Exhs. B.8 [944406_030910 audio] at 0:05:18- 0:05:32 & J [944406_030910 Tr.] at 11:7-12 ("no sense in repeating mistakes other people have made"), Exhs. B.2 [934918_080409 audio] at 0:06:04- 0:07:21 & D [934918_080409 Tr.] at 11:24-12:16 ("That's fantastic, okay, because investing as little as 10 hours a

The Defendants' claims about recouping the purchase price for their products and services, about recouping the money paid to lead sources, and about earnings are false. In numerous instances, consumers who purchase the Defendants' products and services do not earn thousands of dollars a month, nor can they recover the money they paid to The Tax Club Enterprise and the lead sources from business income because they are never able to establish a functioning business.[37] Consumers do not recoup the purchase price through tax deductions or by transferring the cost to their businesses either.[38] Tax deductions are not tax credits and, therefore, cannot by definition cover the entire purchase, and small business credit cards require the principal of the small business who applies for the card to remain jointly liable for all charges.[39] Similarly, when the Defendants tell consumers they can use would-be SBA loan proceeds to cover the purchase cost, this claim is misleading insofar as it presupposes consumers can find a lender willing to extend an SBA-backed loan to a home-based startup business. More importantly, the claim is outright false because, according to the SBA itself, its loans cannot be used to repay existing debts or a business owner's equity or capital contributions.[40]

### b) Misrepresentations about the scope and nature of services provided

Defendants make big promises about the service they will provide but fail to deliver on their claims. They misrepresent both the scope and the quality of the services consumers can

week, okay, can potentially generate a six-figure income. ... I mean, look, as long as you dedicate your time and allow us to work with you, I think we can reach that goal, okay?"), 26:22-23 ("We set up over 30,000 business like yours, okay?"), Exhs. B.3 [934918_081109 audio] at 0:15:49-0:16:10 & E [934918_081109 Tr.] at 21:25-22:8 ("This is the way that you see yourself maybe making six figures a year from [now]. This is the way that you can change your life."), Exhs. B.8 [944406_030910 audio] at 0:14:43- 0:15:28, 0:20:07- 0:20:38 & J [944406_030910 Tr.] at 22:23-23:20, 29:10-25, ("We're going to get out there and we're going to make 50 grand, that's the plan.").
[37] *E.g.*, Amer Dec. ¶ 9; Schroeder Dec. ¶ 9; DeLong Dec., ¶ 33; Tarbet Dec. ¶ 17; Allen Dec. ¶ 17.
[38] *E.g.*, Tarbet Dec. ¶¶ 16, 17; DeLong Dec., ¶ 32; Prosper Dec., Exhs. B.17 [941260_030810 audio] at 0:03:09-0:09:55 & S [941260_030810 Tr.] at 5:15-11:13, Exhs. B.18 [941260_071410 audio] at 0:02:11-0:02:19 & T [941260_071410 Tr.] at 5:17-19 (consumer contacts Defendants to prepare returns, told purchases not deductible this year, then files bankruptcy).
[39] Marino Dec., ¶ 10 & Exhs. EE-NN (business credit card agreements).
[40] Marino Dec., ¶ 9 & Exhs. AA-CC (SBA loan terms).

16

expect to receive.

First, Defendants mislead consumers about the scope of the programs they offer for sale.
The Defendants' products and services typically are bundled together and sold as programs.
Different programs include different products and services.[41]  Sales representatives discuss
various products and services that the Defendants offer, ranging at times from tax preparation,
tax advice, and bookkeeping to entity formation, business planning, and credit coaching to logo
design and website development. They do so, however, without clearly specifying which
products and services are, and which are not, included in any particular program.[42]  They also
broadly claim that The Tax Club Enterprise will "take care of everything" and guide the
consumer "every step of the way."[43]  Therefore, in numerous instances, consumers who purchase

---

[41] Deposition of Gary J. Milkwick dated July 26, 2011 ("Milkwick Dep.") at 116:11-122:22.

[42] *E.g.*, Allen Dec. ¶ 16 ("[W]hen I finally started to try and use their services it was not clear to me what I was getting for my $4,785."), Anderson Dec. ¶ 5 (paperwork "did not seem to include all of the services I was told would be included in my purchase"), Milkwick Dep. at 29:2-5 ("We work with sales in an effort to transition the client from what the sales department has told them to what we're actually providing them …."); Prosper Dec., Exhs. B.13 [941260_010510 audio] at 0:54:07-0:54:52 & O [941260_010510 Tr.] at 64:9-65:2 ("For everything we discussed, it would be a one-time initial investment, never to be done again, it would be 4,785."), Exhs. B.5 [941441_010810 audio] at 0:47:11-0:48:14 & G [941441_010810 Tr.] at 53:18-54:15 ("Basically, all the services that I basically went over with you just now, we're going to be basically putting that into action for you …."), Exhs. B.3 [934918_081109 audio] at 0:17:00-0:17:41 & E [934918_081109 Tr.] at 23:9-25 ("So, we do have a department, and it can do everything. They do all your loans … all the financial plans … press releasing kits … unlimited marketing analysis … I mean, literally everything you need to get the company from point A to point B.").

[43] *E.g.*, Vierling Dec. ¶ 3 (caller "told me … they would take care of everything for me"); Schroeder Dec. ¶5 ("The representative told me that Tax Club sets up the business and then handles everything, which is why their services are so expensive."); Allen Dec. ¶ 7 (consumer was told "account executive … would help me every step of the way"); Rieslman Dec. ¶ 5 ("[The sales representative] told me that he would be with me every step of the way and would oversee the entire process."); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], pp. 4-5 ("[S]o what we did to help the clients out is we set up a membership structure where there is an initial investment of ___ dollars that you pay one time and it covers literally everything I went over for the lifetime of the business including the unlimited market analysis and research, building corporate credit, and a business plan in general."), Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 5 ("We wanna make sure our clients can get this done so we stayed at the lower end of the range with a price of about $_____ **BUT**. (SAY THIS IMMEDIATELY AFTER YOU SAY THE PRICE) that includes everything we just went over, from writing up the financial plans, the break-even analysis, profit and loss ratios, the DUNS # set up, line of credit to be established, references, applications for corporate cards, as well as the unlimited marketing analysis for the company and the life-time proofing and editing and the loans. And again you will have your own personal business consultant that you will be working directly with you to help get this business up and running and off the ground."), Exh. BB [The Tax Club Consultation Script bp.doc], p. 2 ("One thing that will ring true to you over and over again as I discuss our process is that we 'do everything' for you. … Why be a bookkeeper, accountant, tax preparer, business consultant, and lawyer, when your

17

a particular program are misled to believe that they will receive many more products and

services than are actually included in their purchase. In fact, it is not until consumers receive an

upsell call that they first realize that products and services they believed they had already

purchased in actuality were not included in the programs they previously bought from the

Defendants.[44]

Second, the Defendants also deceive consumers about the nature and quality of the

products and services they sell. For example, in numerous instances, representatives falsely

claim that: (a) consumers will have unlimited access to tax and business advisors who will

provide specialized expert advice tailored to the consumers' specific needs;[45] (b) consumers will

---

real focus should be one thing and one thing only, MAKING MONEY."), Exhs. B.5 [941441_010810 audio] at
0:53:23-0:53:38 & G [941441_010810 Tr.] at 59:16-22 ("[W]e are going to be physically doing everything for you.
So, don't even worry about as far as you having to basically do anything on your own."), Exhs. B.2
[934918_080409 audio] at 0:16:52-0:18:45 & D [934918_080409 Tr.] at 23:6-24:25 ("[W]e're going to be working
with you throughout the year and provide unlimited, year-round consulting and advising for your -- from our entire
team to address any type of questions or situations that may present themselves.").

[44] *E.g.,* Tarbet Dec. ¶ 15 (business plan not included); Anderson Dec. ¶ 15 ("I told the [upsell] representative that I
had already purchased a website program .... The representative reviewed my account and told me that I had not.").

[45] *E.g.,* Jordan Dec. ¶ 12 (lifetime business consultant); DeLong Dec., ¶ 4 (business coach), ¶ 12 & Exh. C (tax
advisors, "personalized tax plan"), Exh. D ("ongoing tax consultations ... [by] professional Tax Advisors at client's
request"), Exh. H ("Professional business plan consulting services ... upon client's request"); Tarbet Dec. ¶ 11
(unlimited tax consultation); Allen Dec. ¶¶ 7, 15 & Exh. E (unlimited tax consultation); Barrick Dec. ¶¶ 5 (caller
"made it seem like they had some special expertise"), 8 ("weekly coaching sessions"), 28 ("I was promised all sorts
of business advisors and audit protection"); Lytle Dec. ¶¶ 11 ("Third, TTC claimed they offered coaching services,
where I could call their Utah office at any time to get advice."), 18 & Exh. F ("one-on-one consulting" about market
research); Anderson Dec. ¶¶ 6 , 7 ("one-on-one coaching"); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p.3-
4 ("[A]dvisors ... are able to pull all of the [market] analysis on an unlimited basis. ... [W]e've actually hired a
couple of certified advisors in house; they are going to be the ones that put together your financial plan."), Exh. CC
[Non-Member Business Plan Script 12_04_09 bp.doc], p. 4 ("So what we need to do is assign you to your own
certified personal business consultant and then he's gonna do these different things for you, like write up the
financial plans both personal and corporate, the break even analysis, sales forecasting, projected cash flow analysis,
put you in position for funding, etc. (elaborate here)"), p. 5 ("So we emphasize our program on the ability to get
assigned your own personal business advisor who will rewrite your business plan as often as you need, especially in
the very beginning. ... You will always be able to pick up the phone and get your advisor on the line ...."), Exh. BB
[The Tax Club Consultation Script bp.doc], p. 1 ("We do everything from turn-key business consulting and planning
throughout the year, all the way down to end-of-the-year tax preparation and forward thinking tax planning,
customized for you and your situation as a business owner."), p. 2 ("The cornerstone of our program is unlimited
advisory with our team of specialists...."), p. 3 ("A number of employees on our tax preparation teams were
recruited from some of the largest and most prestigious accounting firms in the country, including
PriceWaterhouseCoopers, Ernst & Young, and Deloitte & Touche. ... Only trained professionals know how to walk
the tightrope between minimizing your tax and keeping you from being audited."), p. 4 ("So the program will

receive individualized business plans tailored to their particular business;[46] and (c) consumers

will receive specialized assistance necessary to develop and obtain business credit.[47]

What they deliver, however, falls far short of these claims. Purchasers typically are

unable to reach a live tax or business advisor or even a single, consistent point of contact for

---

include a variety of different aspects, from the creation and implementation of a comprehensive business plan that will chart your course for success, to unlimited, year round consulting with our team of experienced advisors."), Exhs. B.13 [941260_010510 audio] at 0:22:26-0:22:36, 0:34:46-0:35:11, 0:36:17-0:36:36, 0:48:24-0:49:05, 0:51:58-0:53:39, 0:54:14-0:54:28 & O [941260_010510 Tr.] at 28:15-18 ("different groups of professionals that we're going to be assigning to you to handle your business"), 44:2-10 ("group of accountants who specialize in the Internet industry"), 45:15-21 ("customizing a tax plan"), 58:20-5910 ("weekly consultations" and in between, "we want you to call, we want you to ask, we want you to communicate."), 62:4-63:19 ("[Y]ou'll never be charged extra for asking questions. You know, whether you have a hundred questions a week ...."), 64:12-16 ("Of course, we're going to be ... getting you an entire team, including your team of accountants who are going to be customizing with you ...."), Exhs. B.5 [941441_010810 audio] at 0:30:18-0:30:38, 0:32:03-0:33:27, 0:47:52-0:47:55, 0:50:00-0:50:15, 0:56:22-0:56:25, 0:14:22-0:14:44, 0:16:51-0:18:45 & G [941441_010810 Tr.] at 34:16-23 (Defendants will "customize [a tax plan] to fit your industry. ... So, you're going to get the 100 percent attention pertaining to your business."), 37:15-22 ("you are going to get your own – your own personal CPAs and advisors for the lifetime of your business"), 54:9 ("unlimited consulting"), 56:12-17 ("[W]e are going to be actually customizing the tax plan for you, okay?"), 63:10 ("unlimited consulting from CPAs"), Exhs. B.2 [934918_080409 audio] at 0:16:52-0:18:45 & D [934918_080409 Tr.] at 20:16-24 ("the accountants are going to customize a tax plan for you"), 23:6-24:25 ("[W]e're going to be working with you throughout the year and provide unlimited, year-round consulting and advising for your – from our entire team to address any type of questions or situations that may present themselves."), Exhs. B.8 [944406_030910 audio] at 0:40:21-0:41:46 & J [944406_030910 Tr.] at 52:25-54:14 ("If you ever have questions or whatever it may be, you call us ...."). *See* note 24 *supra*.

[46] *E.g.*, Barrick Dec. ¶¶ 5, 6, 27 ("specialized business plan"); DeLong Dec., ¶ 18 (tailored business plan), Exh. H ("Professional business plan consulting services ... upon client's request"); Brander Dec. ¶¶ 7, 8 & Exh. C (business plan would be "blueprint ... for my business" and identify strengths and weaknesses); Prosper Dec., Exh. DD [MEP_SBC Script bp.doc], p.4 ("Aside from putting together your financial plan they run a SWOT analysis on an ongoing basis. Your SWOT analysis measures your strengths, weaknesses, opportunities, and threats in the business."), Exh. CC [Non-Member Business Plan Script 12_04_09 bp.doc], p. 5 ("So we emphasize our program on the ability to get assigned your own personal business advisor who will rewrite your business plan as often as you need, especially in the very beginning."), pp, 2-3 ("This is a thorough assessment and takes a great deal of time however everything will be looked at, income levels, cost segregation studies, profit & loss ratios, everything that has to do with your bottom line."), Exhs. B.5 [941441_010810 audio] at 0:51:11-0:52:20, 0:56:41-0:57:02 & G [941441_010810 Tr.] at 57:19-58:15, 63:19-25 ("SWOT" analysis for the business), Exhs. B.3 [934918_081109 audio] at 0:06:50-0:07:23, 0:21:39-0:22:11, 0:23:51-0:24:12 & E [934918_081109 Tr.] at 12:7-20, 25:4-20, 28:3-12 ("comprehensively build a business plan to get you there").

[47] *See* note 34 *supra*. *E.g.*, DeLong Dec., ¶ 17 & Exh. G ("Unlimited access to a business credit coach to answer questions- access for 6 months" "Access to our business credit specialists ..." "Access to our business funding specialists ..." "Access to our network of over 378 banks ..."); Barrick Dec. ¶ 27 ("Small Business Credit Solutions promised to develop a business credit account by providing weekly coaching sessions and online materials."); Prosper Dec., Exhs. B.3 [934918_081109 audio] at 0:13:01-0:13:36 & E [934918_081109 Tr.] at 18:18-19:14 ("That is the first step into us actually getting that credit score set up in your company's name."), 23:9-25 ("So, we do have a department, and it can do everything. They do all your loans so you can pay off your debt.").

service.[48]  Instead, when purchasers call The Tax Club Enterprise for assistance, in numerous

instances, they end up caught in a seemingly endless web of voicemail boxes and transfers from

one representative to the next.[49]  Moreover, as explained in Section II.D below, the handful of

"professionals" Defendants employ cannot possibly service their tens of thousands of clients.

Nor do the Defendants provide the personalized service they promise.  Customers do not

receive individualized tax or business plans tailored to their particular businesses but, rather,

only boilerplate, prefabricated plans.[50]  Customers likewise receive only generic business credit

information and are unable to obtain business credit.[51]  Consumers pay the Defendants

thousands, or, in many cases, tens of thousands, of dollars but typically receive little more than a

business entity form filed with a local secretary of state and some generic reference guides.

## 5.  Phase Five: The Upsells

Following an initial sale, the Defendants continue to target their customers with more

deceptive marketing tactics designed to induce additional sales.  The deception is continuous

because the Defendants lay the foundation for upsells before the initial sales call is even over.

Defendants conclude their initial sales calls by scheduling what they call "appointments" to

---

[48] *E.g.,* Amer Dec. ¶ 6; Allen Dec. ¶¶ 12, 13, 15; DeLong Dec. ¶¶ 9, 20, 21, 33; Barrick Dec. ¶¶ 17, 27; Anderson Dec. ¶ 22; Rieslman Dec. ¶¶ 8, 9; Brander Dec. ¶ 15.

[49] *E.g.,* Allen Dec. ¶¶ 12, 15 ("I was constantly shuffled from one Tax Club representative to the next," "my tax consultant did not return my several emails and messages"); DeLong Dec., ¶¶ 9, 20, 21, 33 ("On several occasions, I tried to contact TTC ... [but i]t seemed like once the company received my payments, TTC's representatives were no longer available to assist me with starting my home business."); Barrick Dec. ¶¶ 21 ("Instead, I was constantly transferred from one representative to another, and every time I spoke to a representative I was informed that he could not help me. I also left a voicemail message and a representative finally returned my call.").

[50] Milkwick Dep. at 81:13-82:4 ("The Tax Plans are, I think I mentioned earlier, that they're somewhat general, they're not super-specific."). *E.g.,* Rieslman Dec. ¶ 9 (generic business plan); Barrick Dec. ¶¶ 18, 27, & Exh. K (generic business plan); DeLong Dec., ¶ 19 & Exh. I (generic business plan); Tarbet Dec. ¶16 (generic business plan); Lytle Dec. ¶ 22 (generic business plan); Brander Dec. ¶ 9 & Exh. E (generic business plan); Prosper Dec., Exhs. U - Y (additional samples of generic business and tax plans supplied by Defendants).

[51] *E.g.,* DeLong Dec., ¶ 32 (no business credit card account); Barrick Dec. ¶ 27 ("However, the [credit] coach assigned to me merely verified that I read the online materials and did not provide additional suggestions and information to help me obtain a business credit account.").

20

discuss various business development topics, typically, in the first instance, business planning, bookkeeping, and credit development. In fact, Defendants attempt to sell consumers additional products and services during these supposed consultation calls.[52] By masking this sales purpose in this way, Defendants can extract more and more money from each victim, pulling them further and further into the scam with each sale.

During the upsell calls, the Defendants leverage consumers' initial financial commitment to induce additional sales. In numerous instances, representatives claim that consumers must supplement the corporate formation and purported tax services they already purchased from the Defendants with additional products and services in order to recoup the money they already paid.[53] Consumers are thus pressured into making additional purchases out of fear that the money they already spent will otherwise be lost. These supplementation claims are of course false because, in numerous instances, consumers who purchase additional products and services from

---

[52] *E.g.*, Brander Dec. ¶ 13 ("I had a telephone appointment to speak to [a representative] from TTC about the website I wanted to create .... Instead of a consultation call about my website, it was a sales call where [the representative] told me that I needed to purchase a merchant account in order to recover payments from customers online."); Tarbet Dec. ¶ 11 ("appointments" turned out to be upsell calls); Anderson Dec. ¶¶ 9, 22 ("The TTC coaching sessions turned out to be more high-pressure sale calls to persuade me to purchase additional programs from TTC ...."); Savage Dep. at 127:14-128:15, 132:17-133:10; Prosper Dec., Exh. GG [Compliance Script.doc] p. 2, Exhs. B.5 [941441_010810 audio] at 2:12:13-2:17:05 & G [941441_010810 Tr.] at 117:22-121:25 ("appointments" scheduled at conclusion of initial sales call), Exhs. B.13 [941260_010510 audio] at 1:22:04-1:26:48 & O [941260_010510 Tr.] at 94:12-97:23, B.15 [941260_012210 audio] at 0:00:19-0:00:32, 0:14:39-0:15:20 & Q [941260_012210 Tr.] at 4:15-16, 19:12-20:4, B.16 [941260_021210 audio] at 0:00:03-0:00:36 & R [941260_021210 Tr.] at 4:8-18 ("appointments" scheduled at conclusion of initial sales call).

[53] *E.g.*, Schroeder Dec. ¶ 10 ("He told me that I would lose everything I had spent if I did not invest the additional money."); Lytle Dec. ¶¶ 15, 17 ("TTC's representative told me that if I did not buy this service, everything else that I already purchased would not work and that I would lose all that money that I already spent."); Anderson Dec. ¶ 22 (consumer persuaded "to purchase additional programs from TTC that I was told I needed to make what I had already purchased work more effectively"); Prosper Dec., Exhs. B.6 [941441_030110 audio] at 0:03:28-0:05:08, 0:08:16-0:08:30, 0:12:21-0:13:15 & H [941441_030110 Tr.] at 7:9-8:20, 11:16-20, 15:10-25 ("If you want to dissolve it now, you can, but all is going to happen is that you won't – you know, it's just going to be personal debt and you won't be able to write anything off through your personal taxes that's business-related, you know?"), Exhs. B.3 [934918_081109 audio] at 0:09:04-0:09:35 & E [934918_081109 Tr.] at 14:17-16:5 ("Well, no, it's not exactly about going more into debt. What I would rather see you do is take the money you've already invested and kind of like pay it off with the loan ....").

21

the Defendants do not establish profitable businesses and do not recoup the money they paid.[54]

As they do during the initial sales calls, the Defendants again claim that customers will be able to recoup the cost of any additional products and services they buy from future business revenue, through tax deductions, and by transferring those costs to their businesses. The Defendants' sales representatives also make the same kinds of additional false claims about the services that customers will receive, again promising unlimited access to experienced professionals and individualized services tailored to the particular customer's specific business.[55] These recoupment and specialized service claims were false during the initial sales call, for the reasons explained in Section II.A(4) above, and remain false when repeated during upsell calls.

## B.    COMMON ENTERPRISE PERPETUATES THE SCHEME

The Defendants telemarketing scheme is perpetuated through a collection of twelve

---

[54] *E.g.*, Amer Dec. ¶ 9; Schroeder Dec. ¶ 9; DeLong Dec., ¶ 33; Tarbet Dec. ¶ 17; Allen Dec. ¶ 17.

[55] *E.g.*, Prosper Dec., Exhs. B.15 [941260_012210 audio] at 0:04:20-0:05:04, 0:07:39-0:8:00, 0:12:26-0:12:53, 0:05:16-0:05:31, 0:26:04-0:26:17, 0:08:41-0:08:47, 0:08:59-0:09:04, 0:09:23-0:09:48, 0:14:40-0:15:12, 0:15:50- 0:16:54, 0:25:54-0:26:06 & Q [941260_012210 Tr.] at 8:5-23, 12:3-8, 16:21-17:8 ("even if you do not generate a single cent, we can still deduct thousands and thousands of dollars."), 9:5-10, 30:19-24 (pitching upsell by referencing "the money you've invested into the business"), 13:7-9 ("We're going to be assigning you a bookkeeping team of which you need to make sure that you are keeping in pretty close contact."), 13:15-16 ("about 330 different deductions in the corporate tax code"), 13:23-14:8 ("People are audited for not having the proper documentation, okay? ... [W]e do offer full audit protection."), 19:12-24 ("unlimited tax consulting," "comprehensive tax plan for the business"), 20:14-21:15 ("The idea here again is just to make sure that you're not getting into any trouble with the IRS, okay?"), 30:15-18 ("Man, you guys are making it so I'm going to have to make a go at a business. ... Oh, man. Talk about pressure."), Exhs. B.3 [934918_081109 audio] at 0:09:04-0:10:21 & E [934918_081109 Tr.] at 14:17-16:5 ("Well, no, it's not exactly about going more into debt. What I would rather see you do is take the money you've already invested and kind of like pay it off with the loan .... So, you're really not borrowing any more money. You're just kind of paying off what you've already invested. Does that sound better?"), 21:21-24 ("Two, you don't care if it works ... if it makes money, great; if it doesn't, oh well, you got an additional write-off."), 22:21:25-22:8 ("This is the way that you see yourself maybe making six figures a year from [now]. This is the way that you can change your life."), 23:9-25 ("So, we do have a department, and it can do everything. They do all your loans ... all the financial plans ... press releasing kits ... unlimited marketing analysis ... I mean, literally everything you need to get the company from point A to point B."), Exhs. B.9 [944406_031016.1 audio] at 0:11:07- 0:12:05, 0:28:53- 0:29:33, 0:13:34- 0:13:55, 0:15:25-0:15:57, 0:18:20- 0:18:42, 0:18:54- 0:20:00, 0:21:12- 0:22:16, 1:07:21- 1:08:20, 1:09:20- 1:10:25, 1:11:48- 1:12:10 & J [944406_031016.1 Tr.] at 18:17-19:14, 37:23-38:13 ($1,000 per week is "a pretty good goal, as far as a minimum"), 21:4-13, 23:15-24:3, 27:1-10 (individualized business plan, team of "certified advisors"), 27:17-28:20, 30:5-31:2, 77:20-78:22, 80:1-81:2, 82:20-83:4 (unlimited access to one-on-one business credit coach, SBA loans, prequalification).

22

corporate entities operating as a common enterprise and through four individuals who formed, own, operate, and manage those entities. The Defendants transact business through this interrelated network of companies that have common ownership and control, that share office locations and mailing addresses, that co-mingle funds, and that utilize a common method to identify potential customers and generate sales.[56] For example, at least eight of the twelve entities within the enterprise (all but HB Marketing, Premier Coaching, Tahuya, and Visavis) list the same office address on the 60th floor of the Empire State Building on corporate filings and bank records,[57] all are managed or owned by one or more of the four individual defendants,[58] and all have processed, received, and/or redistributed funds from consumer purchases representing the proceeds of the Defendants' scheme.[59]

## 1. The Corporate Defendants

The Tax Club Enterprise includes twelve business entities (the "Corporate Defendants"). They are: (1) The Tax Club, Inc. ("TTC"), also doing business as Corporate Credit;[60] (2) Manhattan Professional Group, Inc. ("MPG"), also doing business as The Tax Club, Bookeeping Services, Ikongo, Essential Planning, Corporate Tax Network, Business Document Center, All Access Books, and Vital Payroll;[61] (3) 5410, Inc. also doing business as Internet Marketing Success, The Success Planning Group, Success Planning Group 2, Success Online, Business Credit, Success Merchant Processing, Real Estate Wire, Day Trade Team, Funding FastTrack,

---

[56] *See* notes 57-59 and Section II.C *infra*, Section II.A *supra*.

[57] Hogan Dec., ¶¶ 5, 6, 11, 17, 31, 52 & Exhs. C, D, I, P, Q, EE, WW. Ikongo was absorbed into MPG and is therefore included in this list. Savage Dep. at 140:5-23. Though administratively dissolved by the Wyoming Secretary of State on March 16, 2009 for failure to maintain a registered agent, Hogan Dec., ¶¶ 19, 20 & Exhs. S, T, Ikongo has continued to operate as a *de facto* corporation by maintaining bank accounts on behalf of The Tax Club Enterprise, Hogan Dec., ¶ 21 & Exh. U; Kelly Dec. ¶¶ 10, 27, 39, 41.

[58] *See* Sections II.A(1), (2) & (4) *supra*.

[59] Kelly Dec. ¶¶ 27, 37-57; Hogan Dec. ¶¶ 51-53 & Exhs. VV-XX.

[60] Hogan Dec., ¶ 52 & Exh. WW.

[61] Hogan Dec., ¶¶ 41, 52, 53 & Exhs. NN, WW, XX.

23

Corporate Credit, and Prestige Financing Services;[62] (4) Marble Base, Inc. ("Marble Base"), also doing business as Business Resources, Corporate Solutions, and Business Success;[63] (5) 6015, LLC, also doing business as Cypress Corp. Services, My Tax Service, and Accounting Group Services;[64] (6) 1800Accountant, LLC ("1800Accountant"); (7) Ikongo, Inc. ("Ikongo"); (8) Tahuya, Inc. ("Tahuya"); (9) Visavis, Inc. ("Visavis"); (10) HB Marketing Services, LLC ("HB Marketing Services");(11) Premier Coaching & Consulting, LLC ("Premier Coaching"); and (12) Skorpios Holdings, Inc., also known as Skorpios Holding, Inc., ("Skorpios").[65]

## 2. The Individual Defendants

Defendant Edward B. Johnson, also known as Tedd Johnson,[66] ("Johnson") is identified on correspondence and corporate filings as the Chief Executive Officer and sole owner of TTC and MPG[67] and an officer of Ikongo.[68]

Defendant Michael M. Savage ("Savage") is identified on corporate filings and financial records as the President of MPG, the President, Chief Executive Officer, and an owner of 5410, Inc., Secretary of Marble Base, President of 6015, Inc., President of 1800Accountant, an officer of Ikongo, President of Tahuya, President of Visavis, and President of Skorpios.[69]

Defendant Brendon A. Pack ("Pack") is the Sales Manager at MPG.[70] He is also listed in financial records as the President and an owner of Marble Base and Vice-President of Tahuya.[71]

[62] Hogan Dec., ¶¶ 51-53 & Exhs. VV-XX.
[63] Hogan Dec., ¶ 52 & Exh. WW.
[64] Hogan Dec., ¶¶ 52, 53 & Exhs. WW, XX.
[65] The Corporate Defendants collectively were incorporated under the laws of New York, Utah, Wyoming, Delaware, Washington, and Arizona. For specific incorporation information, see Hogan Dec., ¶¶ 3, 6, 11, 15, 17-22, 25, 27, 29, 31 & Exhs. A, D, I, N, P-V, Y, AA, CC, EE.
[66] Prosper Dec., Exh. A [Response Letter from Joseph Sanscrainte to Judy Prosper dated May 4, 2010 (the "May 4 Letter")], p. 1 ("Tedd Johnson").
[67] Prosper Dec., Exh. A [May 4 Letter], p. 1
[68] Hogan Dec. ¶ 20 & Exh. T.
[69] Hogan Dec., ¶¶ 8,12, 41, 51 & Exhs. F, J, NN, VV.
[70] Pack Dep. at 12:23-13:3, 14:4-6.
[71] Hogan Dec., ¶ 41 & Exhs. 52 & Exhs. NN, WW(14)-(16).

24

Defendant Gary J. Milkwick ("Milkwick" and, together with Johnson, Savage, and Pack,

the "Individual Defendants") is listed on public websites and financial records as the President of

TTC,[72] Vice-President of Operations at MPG,[73] Vice-President of 5410, Inc.,[74] Vice-President

and an owner of 6015, LLC,[75] Vice-President of 1800Accountant,[76] Vice President of

Skorpios,[77] and an officer of HB Marketing Services[78] and Premier Coaching.[79]

## 3.    The Relief Defendant

Relief defendant Sandra C. Savage is the spouse of defendant Michael Savage.[80]

## 4.    Overview of the Enterprise

### a)    The Individual Relationships

The Tax Club Enterprise began in 2003 when defendant Johnson formed TTC and MPG,

the core operating companies within the enterprise.[81] He is the CEO and sole owner of both

companies[82] and helped formulate policies governing the enterprise's sales practices. For

example, he created sample sale scripts to guide sales representatives during telemarketing

calls.[83] In 2003, soon after forming TTC and MPG, Johnson relocated the core enterprise to

New York City from St. George, Utah, where only a small sales and administrative office

---

[72] Hogan Dec., ¶ 59 & Exh. DDD (TTC website capture).

[73] Savage Dep. at 38:13-14; Milkwick Dep. at 18:23-25.

[74] Hogan Dec., ¶ 41 & Exh. NN.

[75] Hogan Dec., ¶ 41, 52 & Exh. WW(17)-(19).

[76] Hogan Dec., ¶ 41 & Exh. NN.

[77] Hogan Dec., ¶ 41 & Exh. NN.

[78] Hogan Dec., ¶ 41 & Exh. NN.

[79] Hogan Dec., ¶ 41 & Exh. NN.

[80] Savage Dep. at 10:4-7.

[81] Savage Dep. at 18:13-20, 27:12-28:6; Hogan Dec. ¶¶ 3, 6 Exhs. A, D; Prosper Dec., Exh. A [May 4 Letter], p. 1.

[82] Prosper Dec., Exh. A [May 4 Letter], p. 1; Savage Dep. at 20:6-8, 26:10-15, 28:10-15.

[83] Marino Dec. ¶ 11 (sales scripts drafted by "Tedd").

25

remained.[84] The enterprise's operations, including its telemarketing staff, are principally located in the Empire State Building in New York City.[85]

In 2003, Johnson also recruited Savage, his friend from college, as head accountant.[86] Savage soon became the President of MPG and served as The Tax Club Enterprise's senior-most official in New York.[87] He oversaw fulfillment, reporting, finance, customer service, client relations, and marketing operations.[88] He also formed Skorpios in August 2011.[89]

Savage hired Milkwick, his friend from college, in 2007.[90] Milkwick became the Vice-President of Operations for MPG[91] and is now the President of TTC.[92] He oversees fulfillment of The Tax Club Enterprise's products and services.[93] He also designed The Tax Club Enterprise's fulfillment operational structure, which is based on geographic regions.[94]

Pack joined The Tax Club Enterprise in 2004.[95] He is the Sales Manager, and he oversees sales operations and manages the sales staff.[96] Like Johnson, Pack also helped develop scripts to guide sales representatives during telemarketing calls.[97] He also formed Marble Base in May 2010.[98]

Like TTC and MPG, other entities within the enterprise were formed in proximity to one another, suggesting an orchestrated purpose. Visavis and Tahuya were incorporated within a

---

[84] Savage Dep. at 18:21-19:5, 22:23-23:20, 30:13-20, 63:6-8; Milkwick Dep. at 23:15-24:6.

[85] Savage Dep. at 22:23-23:1, 25:8-21; Pack Dep. at 14:15-20.

[86] Savage Dep. at 18:16-19:5.

[87] Savage Dep. at 17:8-10, 19:4-10, 21:12-14, 26:23-27:5.

[88] Savage Dep. at 20:18-21:11.

[89] Hogan Dec. ¶ 31 & Exh. EE.

[90] Milkwick Dep. at 13:10-11, 17:10-13, 19:2-8.

[91] Savage Dep. at 38:13-14; Milkwick Dep. at 18:23-25.

[92] Hogan Dec., ¶ 59 & Exh. DDD.

[93] Savage Dep. at 34:24-35:21; Milkwick Dep. at 19:20- 21:11, 106:10-14.

[94] Milkwick Dep. at 21:12-22:2.

[95] Pack Dep. at 13:19-20.

[96] Savage Dep. at 35:22-36:7; Pack Dep. at 12:23-13:3, 14:4-19.

[97] Marino Dec. ¶ 11 (sales scripts edited by "bpack").

[98] Hogan Dec. ¶¶ 15, 16 & Exhs. N & O.

26

week of each other in early 2008.[99] Six months later, Ikongo and 5410, Inc. were incorporated within a month of one another.[100] By mid-2010, two existing entities, HB Marketing and Premier Coaching, joined the enterprise; on March 12, 2010, Milkwick opened bank accounts for both of them in New York,[101] and on April 21, 2010, both amended their corporate filings to name 5410, Inc. as a member.[102] In February 2012, Milkwick formed 6015, LLC and 1800Accountant.[103]

### b) The Products and Brands

The Defendants purport to offer various small business development products and services including tax return preparation, tax advice and online tax resources, payroll and accounting services, business entity formation, business planning and counseling, credit coaching and development, and logo and website design. The Defendants bundle these same basic products and services into countless programs marketed under various brand names, including: The Tax Club, All Access Books, My Essential Plans, Success Planning Group, Small Business Credit, Vital Payroll, Internet Marketing, and Ikongo.[104] Some examples of the specific program bundles include: My Essential Plans Silver, My Essential Plans Bronze, Ikongo Silver Logo Package, Business Essentials Basic, A+Inc., Biz Suite Silver, New Small Biz One-On-One, 2010 Business Saver Plus, SBC One-On-One Coaching, Corp+MEP, Business Plan & Corporate Setup, Biz Manager Silver, 20 Week Sessions Gold, and Product Power Gold.[105] TTC owns the product and service brands related to tax and entity formation, and MPG owns other brands

---

[99] Hogan Dec. ¶¶ 22, 25 & Exhs. V & Y.
[100] Hogan Dec. ¶¶ 11, 19 & Exhs. I & S.
[101] Hogan Dec. Exhs. NN(22)-(23).
[102] Hogan Dec. ¶¶ 28, 3 & Exhs. BB & DD.
[103] Hogan Dec. ¶¶ 17, 18 & Exhs. P-R.
[104] Savage Dep. at 134:14-141:11; Pack Dep. at 89:18-91:16; Milkwick Dep. at 121:9-122:7; Prosper Dec., Exh. A [May 4 Letter], p. 2.
[105] Brander Dec., Exhs. C, F; Barrick Dec., Exhs. A, D; DeLong Dec., Exhs. A, D, G, H; Allen Dec., Exh. E; Anderson Dec., Exhs. A, B, D, F; Lytle Dec., Exh. F.

27

["

by other individuals linked to TTC, namely, Johnson and a TTC employee, Lee Callon, under different company names. These new accounts listed TTC's St. George, Utah address.[110]

## C. THE DEFENDANTS HAVE TAKEN IN OVER $220 MILLION FROM CONSUMERS, CHURNED THOSE PROCEEDS AMONG THEMSELVES, AND FUNNELED OVER $50 MILLION INTO PERSONAL ACCOUNTS AND ASSETS

In addition to the merchant accounts, the Individual Defendants also have opened dozens of commercial bank accounts in the names of the various Corporate Defendants to deposit, redistribute, and withdraw funds from the credit and debit card sales transactions generated by The Tax Club Enterprise. As delineated in the accompanying exhibits, each Individual Defendant opened and controlled accounts in the name of one or more Corporate Defendant on behalf of The Tax Club Enterprise.[111]

These accounts served various purposes. First, proceeds from sales transactions processed through one of the many merchant accounts maintained by the Corporate Defendants were deposited into many of these commercial bank accounts. Routinely, those deposits had been processed through merchant accounts maintained by a different Corporate Defendant within the enterprise, further demonstrating the interrelationships among the Defendants.[112] Those deposits, net of returns and chargebacks, total in excess of $220 million since 2008 alone.[113]

The Defendants also repeatedly transfer the proceeds of their scheme among the various company accounts and utilize pass-through tactics consistent with a desire to conceal the origin of funds.[114] For example, since February 2012, Skorpios received approximately $1.5 million in net deposits from 5410, Inc., MPG, TTC, Milkwick, and Visavis, and that same net amount was

---

[110] Smith Dec., ¶¶ 20-23.
[111] Hogan Dec. ¶¶ 41, 47 & Exhs. NN, SS(10).
[112] Kelly Dec. ¶¶ 27, 29.
[113] Kelly Dec.¶ 26.
[114] Kelly Dec. ¶¶ 37-39, 44-47, 52-57.

29

transferred from that same Skorpios account to Savage, 1800Accountant, and Johnson.[115]

Similarly, from June 2008 through June 2012, records for a Visavis bank account (x6921) show approximately $11.8 million in net deposits from Marble Base, 5410, Inc., and Tahuya. Of that, $1.66 million was transferred to defendant Michael Savage, and another $1.5 million, together with $700,000 more from a Tahuya account, was used to purchase a property in Seattle, Washington belonging to a holding company owned by Savage and Pack.[116]

Another $5.75 million was transferred from this Visavis account (x6921), through a second Visavis account (x6947), to relief defendant Sandra Savage, who received a total of $6.295 million from that second Visavis account.[117] These funds represent ill-gotten gains to which she has no legitimate claim. Michael Savage, Sandra Savage's husband, is the President of Visavis, and Sandra Savage, according to her husband, is a stay-at-home mom.[118]

The four Individual Defendants have funneled over $50 million in proceeds from their scheme into personal accounts and assets since 2008.[119] For example, Johnson received over $11 million in wire transfers just from MPG and Skorpios.[120] As mentioned, Savage and his wife together received $7.95 million from Visavis, and most of that came via a series of monthly wire transfers of $200,000 beginning in April 2010, the very same month The Tax Club Enterprise received a subpoena *duces tecum* from the New York Attorney General.[121] Pack received just under $4 million in monthly transfers from Marble Base beginning six months later.[122]

---

[115] Kelly Dec. ¶¶ 44-48 & Exh. H; Hogan Dec. ¶ 42 Ex. NN(24).
[116] Hogan Dec. ¶¶ 57, 58 & Exhs AAA-CCC, FF.
[117] Kelly Dec. ¶¶ 52-57 & Exh. K-M.
[118] Savage Dep. at 10:4-7; Hogan ¶ 41 & Exh. NN.
[119] Kelly Dec. ¶¶ 30-32.
[120] Kelly Dec. ¶¶ 42, 47.
[121] Kelly Dec. ¶¶ 54-57; Prosper Dec., Exh. A.
[122] Kelly Dec. ¶ 51 & Exh. J.

30

## D. THE DEFENDANTS' SMALL STAFF CANNOT PROVIDE INDIVIDUALIZED SERVICE TO TENS OF THOUSANDS OF CUSTOMERS

As discussed in Sections II.A(3) and (4) above, the Defendants promise consumers individualized service and support from experienced professionals, but consumers receive little more than boilerplate documents and generic advice and typically are unable to access a live advisor. The Defendants' own staffing and sales figures and cancellation rates further demonstrate these shortfalls.

The Defendants have sold their various products and services to tens of thousands of consumers. For example, TTC and MPG, the principal operating entities within The Tax Club Enterprise, acquired over 11,000 new customers annually both in 2010 and in 2009 and over 13,000 new customers in 2008.[123] Despite their promises of specialized expertise and individualized service, as of May 2010, TTC and MPG employed approximately 225 people, but fewer than 25% of them were tasked with product and service fulfillment. Sales representatives and administrative staff comprised over 75% of TTC and MPG's staff.[124] Moreover, as of July 2011, only "one or two" employees were preparing tax plans for customers,[125] and as of August 2011, only six employees were Certified Public Accountants, and only 11 were Enrolled Agents (an Enrolled Agent is a tax practitioner authorized to represent taxpayers before the Internal Revenue Service).[126] In short, the Defendants' fulfillment staff is far too small to provide the individualized service and expertise they promise.

---

[123] Prosper Dec., Exh. KK [Email from Joseph Sanscrainte to Judy Prosper dated August 29, 2011].

[124] Prosper Dec., Exh. JJ [UT employees for 5 and 6.pdf], Exh. Il [Employee info from 2010-01-01 to present for 5 and 6.xls], Exh. KK [Accounting Personnel.xlsx, attached to email from Joseph Sanscrainte to Judy Prosper dated August 29, 2011].

[125] Milkwick Dep. at 80:4-10.

[126] Prosper Dec., Exh. KK [Accounting Personnel.xlsx, attached to email from Joseph Sanscrainte to Judy Prosper dated August 29, 2011]. Milkwick Dep. at 27:17-28:3.

Because the Defendants' performance does not match their promises, their customers request refunds at a rate of 20-25% (according to Pack).[127] Defendants' refund policy, however, requires consumers to cancel within a short three-day window in order to receive a full refund.[128] Customers who cancel within fifteen days receive a partial refund.[129] This refund policy is unworkable because consumers often do not have the opportunity to use or access the Defendants' services before the three or even fifteen-day windows expire.[130] As a result, many consumers who actually attempt to use the products and services they buy and then request a refund from the Defendants are not given their money back. Even those customers who try to cancel within fifteen days promptly receive a so-called "save" call pressuring them to stay.[131]

Dissatisfied consumers have filed 758 complaints with the Utah Better Business Bureau against TTC in just the last three years,[132] and 609 complaints have been filed against TTC and MPG with the FTC's Consumer Sentinel Network.[133] Thousands of consumers also have lodged disputes with their credit card providers seeking to reverse, or "chargeback," their purchases. For example, from 2008 through 2010, the Defendants had a return and chargeback rate of over 20% of all sales processed through Bank of America Merchant Services, one of their principal merchant acquiring banks for Visa and MasterCard purchases.[134] The Defendants also processed

---

[127] Pack Dep. at 59:12-23.

[128] Savage Dep. at 143:15-20.

[129] Savage Dep. at 144:17-145:11.

[130] *E.g.,* DeLong Dec., ¶¶ 24, 27 (dealings with "cancellation department" and "secondary review"); Tarbet Dec. ¶ 18; Barrick Dec. ¶¶ 31 ("I was informed that my account was ineligible for a refund due to several factors including length of membership ...."), 32 ("secondary review"), 42; Jordan Dec. ¶¶ 18-28 (describing calls to "membership services," "billing department," and "cancellation department," review and secondary review processes, multiple "save" calls, hour and a half hold times, emails and letters attempting to cancel and seeking refund).

[131] *E.g.,* Prosper Dec., Exhs. B.14 [941260_010710 audio] & P [941260_010710 Tr.] (example of save call two days after purchase), Exhs. B.10 [944406_031610.2 audio] & L [944406_031610.2 Tr.] (save call one day after purchase).

[132] Asay Dec., ¶ 8. These BBB complaints were forwarded to The Tax Club Enterprise by the Utah BBB. Assay Dec. ¶¶ 8, 11-14. Savage helped review them. Savage Dep. at 79:6-16.

[133] Marino Dec., ¶¶ 3, 4.

[134] Ippoliti Dec. ¶ 7. Savage signed the application for a merchant account with Bank of America Merchant Services on behalf of MPG and communicated with the bank about excessive chargebacks. Ippoliti Dec.,¶¶ 6, 10.

Discover Card payments, and from January 2008 through May 2011, they incurred a return and chargeback rate of 13% of all sales, spiking to 19% in the first half of 2009.[135] A financial analysis of the Defendants' bank records from 2008 through 2012 reveals a return and chargeback rate of approximately 15% of total sales during that period.[136] By way of comparison, the average credit card chargeback rate nationwide is just 0.2%.[137]

## III. ARGUMENT

Plaintiffs seek a TRO halting Defendants' ongoing violations of the FTC Act, the TSR, FDUTPA, the NY Exec. Law, and the NY GBL. Plaintiffs ask the Court to enjoin Defendants from their ongoing violations of law, freeze Defendants' assets to preserve them for restitution to victims, appoint a receiver, and allow Plaintiffs access to Defendants' records and expedited discovery. As set forth below and supported by the volumes of accompanying exhibits, the evidence overwhelmingly supports entry of the proposed Order.

## A. SECTION 13(B) OF THE FTC ACT, SECTION 63(12) OF THE NY EXEC. LAW, AND SECTION 501.207 OF FDUTPA AUTHORIZE THIS COURT TO GRANT THE REQUESTED RELIEF

The FTC, an independent agency of the United States government created by the FTC Act, 15 U.S.C. § 41 *et seq.*, enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) which prohibits unfair and deceptive acts and practices in or affecting commerce. The FTC also enforces its Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. "Any violation of the TSR is deemed a 'deceptive act or practice' in violation of Section 5(a) of the FTC Act." *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 305 (S.D.N.Y. 2008) (citing 15 U.S.C. § 6102(c)).

---

[135] Smith Dec. ¶¶ 12, 13, 18.

[136] Kelly Dec. ¶ 26.

[137] *FTC v. Commerce Planet, Inc.*, No. 09 Civ. 1324, 2012 WL 2930418, at *20 (C.D.Cal. June 22, 2012).

33

Where, as here, the Defendants have violated the FTC Act and the TSR, Section 13(b) of

the FTC Act authorizes district courts to grant permanent injunctive relief. 15 U.S.C. § 53(b).

This "unqualified grant of statutory authority to issue an injunction under Section 13(b) carries

with it the full range of equitable remedies, including the power to grant consumer redress and

compel disgorgement of profits." *FTC v. Bronson Partners, LLC*, 654 F. 3d 359, 365 (2d Cir.

2011) (quotation omitted); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996) (same).

District courts are further empowered to grant temporary or preliminary relief that is necessary to

preserve the possibility of effective final relief, including an order freezing assets, a TRO

enjoining conduct, expedited discovery, the appointment of a temporary receiver, and immediate

access to business premises. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982)

(district court has "authority to grant any ancillary relief necessary to accomplish complete

justice"); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989) ("in a proceeding

under section 13(b), the statutory grant of authority to the district court to issue permanent

injunctions includes the power to order any ancillary equitable relief necessary to effectuate the

exercise of the granted powers"); *FTC v. Crescent Publ'g Group, Inc.,* 129 F. Supp. 2d 311, 325

(S.D.N.Y. 2001) ("courts have held repeatedly that district courts may employ the full range of

equitable remedies incident to their power to grant injunctive relief sought by the FTC under

Section 13(b)" (collecting cases)). Courts within the Second Circuit have routinely granted the

sort of "ancillary equitable relief" that is requested here.[138]

---

[138] *E.g., FTC v. PCCare247, Inc.,* No. 12-7189 (S.D.N.Y. Sept. 25, 2012) (granting *ex parte* TRO with asset freeze, immediate access, and expedited discovery); *FTC v. Consumer Health Benefits Ass'n.,* No. 10-3551 (E.D.N.Y. Aug. 3, 2010) (granting *ex parte* TRO with immediate access, asset freeze, temporary receiver, and expedited discovery); *FTC v. Navestad,* No. 09-6329 (W.D.N.Y. June 25, 2009) (granting *ex parte* TRO, asset freeze, financial reporting, temporary receiver, and immediate access); *FTC v. Classic Closeouts, LLC,* No. 09-2692 (E.D.N.Y. Jun. 29, 2009) (granting TRO, temporary receiver, and asset freeze of corporate defendant); *FTC v. Edge Solutions, Inc.,* No. 07-4087 (E.D.N.Y. Oct. 12, 2007) (granting TRO, temporary receiver, immediate access, and expedited discovery); *FTC v. Epixtar Corp.,* No. 03-8511 (S.D.N.Y. Oct. 29, 2003) (granting *ex parte* TRO, asset freeze, immediate access, expedited discovery, financial reporting, and temporary receiver); *FTC v. Essex Mktg. Group, Inc.,* No. 02-

34

The corresponding state statutes also authorize the immediate relief requested. Pursuant to NY Exec. Law § 63(12), courts are empowered to grant wide-ranging equitable relief, including temporary restraining orders or preliminary injunctions, to redress the kind of fraudulent or illegal conduct engaged in by Defendants. *See, e.g., People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807 (1992). The power of the court to grant broad remedial relief is not simply a matter of statutory authority under NY Exec. Law § 63(12) , but is also grounded in general equitable principles. *Porter v. Warner Co. Inc.*, 328 U.S. 395, 397-98 (1946). Furthermore, where the public interest is served, the court's powers are even broader than in private litigation. *Id.* at 397-98. *See also Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960). A court's power to grant equitable relief such as that authorized under NY Exec. Law § 63(12) includes the power to award the kind of interim ancillary relief requested here. *See FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982), *cert. den.*, 456 U.S. 973 (1982) (circuit court held that the trial court had the equitable power to grant preliminary relief to protect consumers, including freezing defendants' assets). New York courts routinely use their equitable powers under NY Exec. Law § 63(12) to impose such relief to protect consumers.[139]

---

3415 (E.D.N.Y. Jun. 28, 2002 & July 18, 2002) (granting TRO, asset freeze, immediate access, and expedited discovery); *FTC v. R & R Consultants, Inc.*, No. 01-1537 (N.D.N.Y. Oct. 10, 2001) (granting *ex parte* TRO, asset freeze); *FTC v. Four Vend, Inc.*, No. 01-8987 (S.D.N.Y. Oct. 17, 2001) (granting *ex parte* TRO, asset freeze, temporary receiver); *FTC v. Guzzetta*, No. 01-2335 (E.D.N.Y. April 17, 2001) (granting *ex parte* TRO, asset freeze, financial reporting, immediate access, and expedited discovery).

[139] *See, e.g., Apple Health & Sports Clubs*, 80 N.Y.2d 803 (upholding trial court's grant of TRO freezing respondents' bank accounts); *People v. Court Reporting Inst., Inc.*, 240 A.D.2d 413 (2d Dep't 1997) (denying respondents' motion to modify a stipulation entered into after the court granted a TRO enjoining respondent school from accepting new students and from disposing of funds in its bank account); *People v. 21st Century Leisure Spa, Int'l*, 153 Misc.2d 938 (Sup. Ct. N.Y. Co. 1991) (enjoining respondent owner of company from transferring, withdrawing or otherwise disposing of funds in any bank account in New York State except for ordinary living expenses); *State of New York v. Abortion Info. Agency*, 69 Misc. 2d 825, 830 (Sup. Ct. N.Y. Co. 1971), *aff'd*, 37 A.D.2d 142 (1st Dep't 1971) (enjoining respondents "from transferring or otherwise disposing of corporate assets or property" and appointing receiver to preserve assets); *State of New York v. Saksniit*, 69 Misc. 2d 554, 562 (Sup. Ct. N.Y. Co. 1972) ("[T]he defendants and the officers and directors of the defendant companies...are enjoined from and may not pay out or cause to be paid out any of the money of the corporate defendant Termpapers, Inc., nor any money of the other companies under which it or defendant Saksniit operates."); *State of New York v. Remedial Educ., Inc.*, 70 Misc. 2d 1068, 1070 (Sup. Ct. N.Y. Co. 1972) (enjoining defendants from paying out corporate funds and from dispersing corporate property).

Similarly, the FDLA enforces FDUTPA which prohibits unfair and deceptive acts and practices in the conduct of any trade or commerce. Section 501.202 of FDUTPA provides, in part, that the "provisions of this part shall be construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Section 501.207(1)(b) of FDUTPA authorizes the FDLA to seek injunctive relief to enjoin "any person who has violated, is violating, or is otherwise likely to violate" the FDUTPA. Section 501.207(3) provides that, upon motion by the plaintiff, a court may make appropriate orders to: (a) freeze assets; (b) reimburse injured consumers; (c) impose reasonable restrictions upon a defendants' future activities; and (d) appoint a magistrate or receiver to manage a defendants' assets and rights.

## B.    THE EVIDENCE JUSTIFIES ENTRY OF A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

### 1.    The Standard for Relief

In order to grant preliminary injunctive relief under the FTC Act, courts must: (1) determine that the FTC has a "fair and tenable chance of ultimate success on the merits," and (2) balance the equities. *United States v. Sun & Sand Imps., Ltd. Inc.*, 725 F.2d 184, 188 (2d Cir. 1984); *FTC v. Crescent Publ'g Group,* 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (same). "[W]hen the FTC seeks to enforce a matter entrusted to it by Congress, it operates not as an 'ordinary litigant,' but as a 'statutory guardian' charged with safeguarding the public interest in enforcing federal law." *FTC v. Mallet*, 818 F. Supp. 2d 142, 146 (D.D.C. 2011)) (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808-09 (2d Cir. 1975). Therefore, there is a "presumption of irreparable harm based on a statutory violation." *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010). *See CFTC v. British Am. Commodity Options*

36

*Corp.*, 560 F.2d 135, 141 (2d Cir. 1977) (noting "well-established rule" that government agencies "need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits, but only that there is a reasonable likelihood that the wrong will be repeated." (citations and footnote omitted)).

The standard for a grant of injunctive relief pursuant to NY Exec. Law § 63(12) is similar: a "likelihood of success on the merits, and a balancing of the equities in petitioner's favor." *People v. Apple Health & Sports Clubs, Ltd.*, 174 A.D.2d 438 (1st Dep't 1991) Proof of irreparable injury is unnecessary. *Id.*

Likewise, the FDLA is not required to show irreparable harm. "[B]ecause section 501.207(1)(b) expressly authorizes the Department to seek injunctive relief on behalf of the state [of Florida], the Department does not have to establish irreparable harm, lack of an adequate legal remedy or public interest." *Millennium Commc'ns. & Fulfillment, Inc. v. Office of the Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1260 (Fla. 3d D.C.A. 2000) (citations omitted). "The Department's sole burden at a temporary injunction hearing under FDUTPA is to establish that it has a clear legal right to a temporary injunction." *Id.*

## 2. Plaintiffs Have Demonstrated a Likelihood of Success on the Merits

### a) Plaintiffs Have Demonstrated a Likelihood of Success on the Merits that Defendants Violated Section 5(a) of the FTC Act, NY Exec. L Section 63(12), NY GBL 349, 350, and Section 501.204 of FDUTPA

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). In order to show that Defendants violated Section 5(a), the FTC "must show three elements: (1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) [that] the representation, omission, or practice is material." *FTC v. Med. Billers Network, Inc.*, 543 F.Supp.2d 283, 303

37

(S.D.N.Y. 2008) (quoting *FTC v. Verity Int'l*, 443 F.3d 48, 63 (2d Cir. 2006). "District courts consider the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading." *FTC v. Commerce Planet, Inc.*, No. 09 Civ. 01324, 2012 WL 2930418, at *23 (C.D. Cal. June 22, 2012). *See FTC v. Stefanchik,* 559 F.3d 924, 931 (9th Cir. 2009) (same); *FTC v. Med. Billers Network, Inc.,* 543 F.Supp.2d 283, 304 (S.D.N.Y. 2008) (same). The deception "need not be made with the intent to deceive; it is enough that the representation or practices were likely to mislead consumers acting reasonably." *Verity Int'l,* 443 F.3d at 63. *See Med. Billers Network, Inc.,* 543 F.Supp.2d at 304.

A misrepresentation, omission, or practice is material if it "involves information that is important to . . . consumers' choice of or conduct regarding a product." *FTC v. Bronson Partners, LLC,* 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (quoting *FTC v. Cyberspace.com, LLC,* 453 F.3d 1196, 1201 (9th Cir. 2006). Express claims, and deliberately made implied claims, are presumed to be material. *In re Thompson Medical Co., Inc.,* 104 F.T.C. 648, 1984 WL 565377, at *59 (F.T.C. Nov 23, 1984 (final order), *aff'd,* 791 F.2d 189, 190 (D.C. Cir. 1986); *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 1984 WL 565319, at *49 (F.T.C. Mar. 23, 1984 (order). *See also FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052, 1075 (C.D. Cal. 2012) ("All express representations are material, and implied representations are material when they pertain to the central characteristics of the products or services being marketed." (internal quotation omitted)). The FTC is not required to prove reliance by each misled consumer because a "presumption of actual reliance arises once the Commission has proved that the defendants made material misrepresentations, that were widely disseminated, and that consumers purchased the defendant's products." *FTC v. Figgie Int'l*, 994 F.2d 595, 605 (9th Cir. 1993); *FTC v. 1263523 Ontario, Inc.,* 205 F. Supp. 2d 218, 223 (S.D.N.Y. 2002) (same).

38

NY Exec. Law § 63(12)  defines the words "fraud" or "fraudulent" to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." Courts have consistently applied an extremely broad view of what constitutes fraudulent and deceptive conduct in proceedings brought by the Attorney General under NY Exec. Law § 63(12), going well beyond the view of fraud and deception that is found at common law. *See, e.g., Lefkowitz v. Bull Inv. Group, Inc.*, 46 A.D.2d 25, 28 (3d Dep't 1974 *aff'd*, 35 N.Y.2d 647 (1975); *21st Century Leisure Spa Int'l Ltd.,* 153 Misc. 2d 938, 943 (Sup. Ct. N.Y. Co. 1991). It is well-settled that it is not necessary to establish the traditional elements of common law fraud, such as intent to deceive and reliance, in order to establish liability for statutory fraud under N.Y. Exec. Law § 63(12). *People v. Apple Health & Sports Clubs, Ltd.*, 206 A.D.2d 266, 267 (1st Dep't 1994), *appeal denied*, 84 N.Y.2d 1004 (1994); *21st Century Leisure Spa Int'l Ltd.,* 153 Misc. 2d at 944; *State of New York v. Ford Motor Co.,* 136 A.D.2d 154, 158 (3d Dep't 1988), *aff'd*, 74 N.Y.2d 495 (1989).

The test of fraudulent conduct under NY Exec. Law § 63(12) is whether the act "has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud." *In re People v. Applied Card Systems, Inc.,* 27 A.D.3d 104, 107 (3d Dep't 2005), *aff'd on other grounds,* 11 N.Y.3d 105 (2008). NY Exec. Law § 63(12) protects the credulous and the unthinking as well as the cynical and the intelligent, the trusting as well as the suspicious. *People v. General Elec. Co., Inc.*, 302 A.D.2d 314, 314 (1st Dep't 2003); *Applied Card Systems, Inc.,* 27 A.D.3d at 106; *Guggenheimer v. Ginzburg*, 43 N.Y.2d 268, 273 (1977).

NY GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *Oswego Laborers'*

39

*Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 24 (1995). NY GBL § 350 declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." The definitions of deceptive practices under NY GBL § 349 and false advertising under NY GBL § 350 are given parallel constructions to that of fraud under NY Exec. Law § 63(12). *In re State of New York v. Colorado State Christian Coll. of the Church of the Inner Power, Inc.*, 76 Misc. 2d 50, 54 (Sup. Ct. N.Y. Co. 1973). A representation or omission is deceptive pursuant to NY GBL §§ 349 and 350 if it is likely to mislead a consumer acting reasonably under the circumstances. *Oswego*, 85 N.Y.2d at 26; *Applied Card Systems, Inc.*, 27 A.D.3d at 107.

Like NY Exec. Law § 63(12), NY GBL §§ 349 and 350 are "intended to be broadly applicable, extending far beyond the reach of common law fraud." *State of New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002); *People v. Wilco Energy Corp.*, 284 A.D.2d 469, 470-71 (2d Dep't 2001). As with statutory fraud under NY Exec. Law § 63(12), the elements of common law fraud need not be established to demonstrate a violation of NY GBL §§ 349 and 350. *Gaidon v. Guardian Life Ins.*, 94 N.Y.2d 330, 343 (1999); *Applied Card Systems, Inc.*, 27 A.D.3d at 107; *General Elec. Co., Inc.*, 302 A.D.2d at 315; *People v. Network Assocs. Inc.*, 195 Misc. 2d 384, 389 (Sup. Ct. N.Y. Co. 2003); *Colorado State Christian Coll.*, 76 Misc. 2d at 56. As a result, a practice or advertisement with the capacity to mislead or deceive a reasonable person violates NY GBL §§ 349 and 350 respectively, regardless of whether they fall within the scope of common law fraud. *Gaidon.* 94 N.Y.2d at 348. Even omissions may be the basis for claims pursuant to NY GBL §§ 349 and 350. *Bildstein v. MasterCard Int'l Inc.,* No. 03 Civ. 98261, 2005 WL 1324972, at *3 (S.D.N.Y. June 6, 2005); *Applied Card Systems, Inc.*, 27 A.D.3d at 107.

Section 501.204 of FDUTPA provides that "[u]nfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any

trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1). The statute does not

define deceptive acts or practices, but states that "[i]t is the intent of the Legislature that, in

construing subsection (1), due consideration and great weight shall be given to the interpretations

of the Federal Trade Commission and the federal courts relating to [Section] 5(a)(1) of the

Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006." §501.204(2).

In order to show that Defendants engaged in deceptive acts or practices in violation of

FDUTPA, the FDLA must establish that there was a "representation, omission, or practice that is

likely to mislead the consumer acting reasonably in the circumstances, to the consumer's

detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (quoting

*Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs*, 761 So.2d

1256, 1263 (Fla. 3d DCA 2000)); *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th

Cir. 2007); *Global Tel\*Link Corp. v. Scott*, 652 F.Supp.2d 1240 (M.D. Fla. 2009); *North Am.

Clearing, Inc. v. Brokerage Comp. Systems, Inc.,* 666 F.Supp.2d 1299 (M.D. Fla 2009). This

standard does not require subjective evidence of reliance, as would be the case with a common

law action for fraud. *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. 1st D.C.A. 2000).

The Defendants made misrepresentations concerning costs and earnings, the scope and

nature of products and services to be provided, and affiliation. Each is discussed in turn.

## (1)     Defendants Misrepresent Costs and Earnings

First, the Defendants falsely claim that consumers who purchase products and services

from The Tax Club Enterprise will ultimately not have to pay those expenses out of pocket,

because they will be able to recoup those costs through future business earnings or tax

41

deductions, or because they will be able to transfer those costs from their personal credit cards and to their future businesses where they will either (a) reside on a business credit card or (b) be paid with funds from an SBA loan.[140] Defendants also falsely claim that consumers who purchase their products and services will earn thousands of dollars a month from their future business endeavors.[141] These cost and earnings claims are false because, as explained in greater detail in Section II.A.(4)(a) above, in numerous instances: (i) consumers who purchase the Defendants' products and services do not earn enough from their future business endeavors to cover the purchase price, let alone thousands of dollars a month; (ii) are not able to recoup the cost through tax deductions, especially given that tax deductions are not tax credits and therefore cannot by definition cover the entire purchase price; and (iii) cannot transfer the expense to their businesses because business credit card agreements require the principal of the business to remain personally liable for all charges on the business credit card, and because SBA loans cannot be used to repay existing debts or reimburse an owner.[142]

Misrepresentations regarding the costs and profit potential of a transaction are both likely to deceive and material, in violation of Section 5(a). *FTC v. Med. Billers Network, Inc.,* 543 F.Supp.2d 283, 315 (S.D.N.Y. 2008) (granting summary judgment against defendants who understated cost of medical billing program, finding claim to be material misrepresentation); *FTC v. Five-Star Auto Club, Inc.,* 97 F.Supp.2d 502, 529 (S.D.N.Y. 2000) ("representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5"); *FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052, 1072, 1076 (C.D. Cal. 2012) (finding false defendants' claims that consumers can earn fast cash with no financial investment and earn back cost of coaching

---

[140] *See supra* notes 32-35 and accompanying text.
[141] *See supra* note 36 and accompanying text.
[142] *See supra* notes 37-40 and accompanying text.

program material); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 258 (E.D.N.Y. 1998) ("misrepresentations [that] tend to bear directly on the economic viability of the transaction under consideration ... are both likely to deceive and material"). Therefore, the Defendants' false claims about earnings and recouping the costs of their products and services violate Section 5(a) of the FTC Act (Count One), Section 501.204(1) of FDUTPA (Count Six), Section 63(12) of the NY Exec. Law (Count Seven), and Sections 349 and 350 of the NY GBL (Count Eight).

## (2) Defendants Misrepresent The Scope and Nature of Their Services

The Defendants also routinely misrepresent the scope and nature of the products and services they promise to provide. First, they lead consumers to believe they will receive more products and services for their money than are actually included in any particular purchase. They do so by making broad claims about the services The Tax Club Enterprise offers without clearly delineating which products and services are, and which are not, included in any particular program being sold.[143]

Second, the Defendants also promise unlimited access to tax and business advisors who will provide specialized expert advice tailored to the consumers' specific needs, individualized business plans tailored to their particular businesses, and specialized assistance necessary to obtain business credit.[144] What the Defendants deliver falls far short of these promises. Specifically, as explained in detail in Section II.A(4)(b) above, purchasers typically are unable to access a live tax or business advisor or even reach a single, consistent point of contact for service.[145] Customers do not receive individualized tax or business plans or specialized credit

---

[143] *See supra* notes 41-44 and accompanying text.

[144] *See supra* notes 45-47 and accompanying text.

[145] *See supra* notes 48, 49 and accompanying text.

43

counseling tailored to their particular business but, rather, only boilerplate, prefabricated materials and advice.[146]

In short, consumers pay thousands of dollars for little more than a business entity registration form filed with a local secretary of state and some generic tax or business guides. The Tax Club Enterprise provides only the bare minimum necessary to keep consumers from realizing immediately that they have been duped, in order to buy enough time for follow-up upsell calls. By misleading consumers as to the products and services included in a given purchase, and by falsely promising individualized service and unlimited guidance from experienced professionals, the Defendants have violated Section 5(a) of the FTC Act (Count Two) and Section 501.204(1) of FDUTPA (Count Six), Section 63(12) of the NY Exec. Law (Count Seven), and Sections 349 and 350 of the NY GBL (Count Eight). *E.g., FTC v. Bay Area Bus. Council, Inc.,* No. 02 Civ. 5762, 2004 WL 769388, at *11 (N.D.Ill. Apr. 9, 2004) (granting summary judgment against "Defendants [who] sold a product and failed to deliver that product, in violation of the FTC Act"); *FTC v. Career Assistance Planning, Inc.,* No. 96 Civ. 2187, 1996 WL 929696, at *2-3 (N.D.Ga. Sept. 19, 1996) (granting summary judgment against principals of company that promised individualized scholarship information but delivered only generalized and often outdated scholarship lists that were not tailored to consumers' particular qualifications and interests).

### (3) Defendants Falsely Claim Affiliation With Other Companies

As explained in Section II.A(2) above, at the outset of their telemarketing calls to consumers, the Defendants claim that they are calling on behalf of or at the direction of

---

[146] *See supra* notes 50, 51 and accompanying text.

companies that have prior or ongoing business relationships with those consumers.[147] The
Defendants' claim is false; no such affiliations exist. The referenced companies merely sold The
Tax Club Enterprise the particular consumer's contact information as a lead.[148]

These affiliation claims are likely to mislead consumers acting reasonably under the
circumstances, particularly because the Defendants know about the consumers' purchases from
their lead sources and are able to mention them at the outset of their sales calls. This tactic is
designed to make consumers believe the Defendants are connected to the product or service the
consumers already purchased, to accept the call, and, ultimately, agree to a purchase.

Moreover, the Defendants' false affiliation claims are express and, therefore, presumed to
be material. *Bronson Partners, LLC*, 564 F. Supp. 2d at 135; *In re Thompson Medical Co.*, 1984
WL 565377, at *59. These claims commence the deception and have led the Defendants to cheat
consumers out of thousands, or in some cases tens of thousands, of dollars. Consumers are far
more likely to engage in a call and believe what they hear if they think they have done business
with the caller before. The Defendants' false affiliation claims violate Section 5(a) of the FTC
Act (Count Three) and Section 501.204(1) of FDUTPA (Count Six), Section 63(12) of the NY
Exec. Law (Count Seven), and Sections 349 and 350 of the NY GBL (Count Eight). *E.g., FTC
v. FTN Promotions, Inc.*, No. 07 Civ. 1279, 2008 WL 151888, at *5, *8 (M.D.Fla. Jan. 15, 2008)
(ordering preliminary injunction prohibiting false claims of affiliation with consumers' banks by
sellers of buying/travel club memberships).

### b) Plaintiffs Have Demonstrated a Likelihood of Success on the Merits that Defendants have Violated the Telemarketing Sales Rule

In 1994 Congress directed the FTC to prescribe rules prohibiting abusive and deceptive
telemarketing acts or practices pursuant to the Telemarketing Act. 15 U.S.C. §§ 6101-6108. The

---

[147] *See supra* notes 13, 14 and accompanying text.

[148] *See* Section II.A(1) *supra*.

FTC accordingly promulgated the TSR, 16 C.F.R. Part 310, which prohibits various deceptive and abusive telemarketing acts and practices. 16 C.F.R. § 310.3 (deceptive practices); 16 C.F.R. § 310.4 (abusive practices). Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), authorizes the State of Florida and the State of New York to enforce the TSR, and violations of the TSR constitute violations of FDUTPA and the NY Exec. Law. *See* FDUTPA § 501.203(a); *People v. Financial Services Network, USA,* 930 F. Supp. 865 (W.D.N.Y. 1996); *In re People v. Telehublink Corp.,* 301 A.D.2d 1006 (3d Dep't 2003).

The Defendants have repeatedly violated the TSR by: (1) making false or misleading statements to induce consumers to purchase their products and services; (2) failing to promptly, clearly, and conspicuously identify themselves as the seller when calling consumers; (3) failing to promptly, clearly, and conspicuously identify the sales purpose of those calls; and (4) failing to promptly, clearly, and conspicuously identify the nature of the services offered for sale. Those violations are alleged in Counts Four and Five of the Complaint and are addressed in turn below.

### (1) Defendants Made False and Misleading Statements to Induce Consumers to Pay for Products and Services

The TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, in the sale of goods or services . . . any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii). The Defendants are sellers and telemarketers engaged in telemarketing

46

as defined by the TSR because they provide and sell goods and services by initiating and causing telemarketers to initiate outbound telephone calls. 16 C.F.R. § 310.2(aa), (cc), & (dd).

For the reasons discussed in Sections III.B(2)(a)(1) and (2), the Defendants have falsely claimed that consumers who purchase products and services from The Tax Club Enterprise will: (i) be able to recoup those costs or transfer them to their future businesses; (ii) earn substantial income; and (iii) receive unlimited access to tax and business advisors who will provide specialized expert advice tailored to the consumers' specific needs, individualized business plans tailored to their particular businesses, and specialized assistance necessary to obtain business credit. Therefore, they violate Section (a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii), by making false claims to induce the purchase of goods or services (Count Four).

### (2) Defendants Fail To Promptly and Clearly Identify Themselves As Sellers, the Sales Purpose of the Call, and the Nature of the Services Offered for Sale

Under Section 310.4(d) of the TSR, when telemarketers call consumers, they must "truthfully, promptly, and in a clear and conspicuous manner" disclose to the recipient of the call: "(1) The identity of the seller; (2) That the purpose of the call is to sell goods or services; [and] (3) The nature of the goods or services." 16 C.F.R. 310.4(d)(1)-(3). Defendants' practices fail on each front.

First, for the reasons discussed in Section III.B(2)(a)(3) above, Defendants falsely claim affiliation with companies that have prior or ongoing business relationships with the consumers they call and, therefore, fail to clearly and conspicuously identify themselves as a separate entity in violation of Section 310.4(d)(1) of the TSR. This false affiliation claim misleads consumers into believing the Defendants, and their call, are connected to the product or service the consumer purchased from the lead source.

47

Second, as explained in Sections II.A.(3) and (4) above, Defendants' sales representatives also fail to disclose their sales purpose until some 45 minutes or more into the call, which is in no way "prompt" and thus in violation of Section 310.4(d)(2) of the TSR.[149] In the interim, building on their false claim of affiliation with the lead source, sales representatives discuss basic corporate formation and tax concepts as if their call were a consultation.[150]

Finally, far from promptly, clearly, and conspicuously disclosing the nature of the products and services offered for sale, the Defendants in fact affirmatively mischaracterize their products and services throughout their calls to consumers, in violation of Section 310.4(d)(3) of the TSR. They misrepresent earnings potential as described in Section III.B(2)(a)(1) above, and they falsely promise personalized planning and guidance and unlimited access to experienced tax and business advisors as described in Section III.B.(2)(a)(2) above.

Defendants fail to disclose promptly, truthfully, and in a clear and conspicuous manner the identity of the seller, the sales purpose of the call, and the nature of the products and services being sold during the course of their telemarketing calls. Accordingly, Defendants are in violation of Sections 310.4(d)(1) through (3) of the TSR, 16 C.F.R. § 310.4(d)(1) - (3), by failing to make these disclosures (Count Five).

### 3.     The Balance of Equities Favors Preliminary Injunctive Relief

"[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). The public has a compelling interest in halting the Defendants' unlawful and injurious conduct and preserving assets that may be used for restitution to their victims. By

---

[149] *See supra* note 18 and accompanying text.

[150] *See supra* notes 16, 17, 22-25 and accompanying text.

48

contrast, ceasing their illegal conduct and complying with the law is not a cognizable burden on
the Defendants. "A business 'can have no vested interest in a business activity found to be
illegal.'" *United States v. Blue Ribbon Smoked Fish, Inc.,* 179 F. Supp.2d 30, 50 (E.D.N.Y.
2001) (quoting *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972)); *World
Wide Factors*, 882 F.2d at 347 ("there is no oppressive hardship to defendants in requiring them
to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from
dissipation or concealment" (internal quotation omitted)).

Defendants have engaged in deceptive practices since at least 2008. They have taken in
over $220 million since that time. Victimized consumers have lost thousands, and in some cases
tens of thousands, of dollars to the Defendants' scheme. Despite receiving over 750 consumer
complaints from the BBB over the last three years,[151] despite thousands of customer refund
requests,[152] and despite the millions of dollars in chargebacks and credit card returns,[153]
Defendants continue to promote their products and services in the same deceptive manner.
Absent injunctive relief, future violations will occur. *CFTC v. Am. Bd. of Trade, Inc.,* 803 F.2d
1242, 1251 (2d Cir. 1986) ("A district court may properly infer a likelihood of future violations
from the defendant's past unlawful conduct."); *FTC v. Five-Star Auto Club., Inc.,* 97 F. Supp. 2d
502, 536 (S.D.N.Y. 2000) ("[P]ast illegal conduct is highly suggestive of the likelihood of future
violations."). The public's interest in immediately halting this unlawful conduct and preventing
the victimization of additional innocent consumers far outweighs any nominal interest
Defendants may have in continuing to operate their scheme.

---

[151] *See* note 132 *supra*.

[152] Pack Dep. at 59:12-23 (20-25% request refund); Prosper Dec., Exh. KK [Email from Joseph Sanscrainte to Judy
Prosper dated August 29, 2011] (over 10,000 new customers annually).

[153] *See supra* notes 109, 134-137 and accompanying text.

49

## 4.    The Corporate Defendants Are Liable for Each Other's Violations as a Common Enterprise

"[I]f the structure, organization, and operation of a business venture among separate corporate entities reveal a common enterprise or a maze of interrelated companies, the FTC Act disregards the corporate form," and the various entities are jointly and severally liable for the actions of the group. *FTC v. Consumer Health Benefits Ass'n.,* No. 10 Civ. 3551, 2012 WL 1890242, at \*5, \*10 (E.D.N.Y. May 23, 2012) (internal quotation omitted)). *See Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (where "the same individuals were transacting an integrated business through a maze of interrelated companies ... the pattern and frame-work of the whole enterprise must be taken into consideration" and the companies are liable as a joint enterprise); *FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052, 1082 (C.D. Cal. 2012) ("Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others." (internal quotation omitted)). To determine the existence of a common enterprise, a court may consider factors including common control, shared office space, comingling of funds, common marketing, and whether business is transacted through a maze of interrelated companies. *CFTC v. Int'l Fin. Servs. (New York), Inc.,* 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004) (listing factors); *Consumer Health Benefits Ass'n.,* 2012 WL 1890242, at \*5 (listing factors); *John Beck Amazing Profits, LLC,* 865 F.Supp.2d at 1082 (listing factors).

As discussed in Section II.B above, the Corporate Defendants operate as a common enterprise. At least eight share the same office address on the 60th floor of the Empire State Building.[154]  At least one of the four Individual Defendants is an officer, director or owner of

---

[154] *See supra* note 57 and accompanying text.

50

each of the twelve Corporate Defendants.[155]  The products and services sold by The Tax Club Enterprise are marketed through the same telemarketing staff reporting to defendant Pack and are purportedly serviced by the same fulfillment staff reporting to defendant Milkwick.[156]  TTC and MPG own the brand names,[157] and they, along with 5410, Inc., Marble Base, 6015, LLC, HB Marketing, Premier Coaching, and 1800Accountant, maintain the merchant bank accounts necessary to process credit and debit card payments from consumers on behalf of the overall enterprise.[158]  Each of the twelve either receives consumer funds directly from the purchase transaction or holds and redistributes those proceeds among the various Defendants.[159]  Often, those deposited funds from consumer purchases were processed through a merchant account in the name of a different Corporate Defendant.[160]  The Defendants thus conduct business through an interrelated network of companies that have common and complementary business functions, ownership, management, finances, office locations, and sales techniques and each is liable for the deceptive business practices of the group.

## 5.   The Individual Defendants are Liable

To obtain injunctive and monetary relief against individuals for injury to consumers resulting from a company's conduct, Plaintiffs must establish that the individuals both (1) participated directly in the unlawful acts or practices or had authority to control them, and (2) had some knowledge of those acts or practices. *FTC v. Stefanchik,* 559 F.3d 924, 931 (9th Cir. 2009); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052, 1080 (C.D. Cal. 2012); *FTC v. Crescent Publ'g*

---

[155] *See* Sections 2.B(2), 2.B(4)(a) *supra.*
[156] *See supra* notes 93, 96 and accompanying text.
[157] *See supra* note 106 and accompanying text.
[158] Hogan Dec. ¶¶ 51-53 & Exhs. VV-XX.
[159] Kelly Dec. ¶¶ 27, 37-57 & Exh. C.
[160] Kelly Dec. ¶¶ 27, 29.

*Group, Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001). The "knowledge requirement may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000) (internal quotation omitted). *Accord Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875 F.2d at 574. "The degree of participation in a corporate defendant's affairs can be probative of knowledge," *Consumer Health Benefits Ass'n.,* 2012 WL 1890242, at *5 (citing *Amy Travel*, 875 F.2d at 574), and an "individual's status as a corporate officer on behalf of a corporate defendant can be probative of control," *id.* (citing *Publ'g Clearing House*, 104 F.3d at 1170); *see Amy Travel*, 875 F.2d at 573 ("active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer" demonstrates authority to control). Being a senior manager is particularly probative in closely-held companies. *See Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."); *FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052, 1080 (C.D. Cal. 2012) ("Status as a corporate officer is sufficient to establish individual liability."). Finally, individual liability does not require intent to defraud. *Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875 F.2d at 574.

The four Individual Defendants in this case directly participated in the business affairs of, and had authority to control, the Corporate Defendants. Each also had the requisite level of knowledge. As fully described in Sections II.B(2), II.B(4), and II.C above, each Individual Defendant is an owner, officer, and/or manager of multiple Corporate Defendants, and each

either helped formulate, or has a clear knowledge of, the business operations at issue. Among other things, Johnson founded the business, relocated it to New York City, recruited Savage, and wrote sales scripts for the telemarketing staff.[161] Savage oversaw fulfillment, finance, customer service, and marketing operations, corresponded with Bank of America Merchant Services about excessive chargebacks, reviewed BBB complaints, and recruited Milkwick.[162] Milkwick ran the fulfillment arm of the business, reporting to Savage, and organized the operational structure of that division. Pack managed the sales staff and wrote sales scripts for their use during telemarketing calls.[163] Each opened and controlled various merchant accounts used by The Tax Club Enterprise to process consumer credit and debit card purchases. Each opened and has had signature authority over commercial bank accounts used to receive and redistribute the proceeds from those purchases.[164]

Moreover, The Tax Club Enterprise received over 750 consumer complaints from the BBB during the last three years,[165] received customer refund requests at a rate of at least 20-25%,[166] and had a return and chargeback rate through its payment processors of approximately 20% of sales.[167] These glaring red flags indicate the Individual Defendants knew or should have known that their business practices were deceptive. *See FTC v. MacGregor,* 360 Fed. Appx. 891, 894-95 (9th Cir. 2009) (high refund and return rates, large number of consumer complaints, and investigations by BBB and state agencies indicative of individual defendant's knowledge or reckless indifference); *FTC v. Commerce Planet, Inc.,* No. 09 Civ. 1324, 2012 WL 2930418, at *20 (C.D.Cal. June 22, 2012) (the average credit card chargeback rate is 0.2% and companies

---

[161] *See supra* notes 81-86 and accompanying text.

[162] *See supra* notes 87, 88, 90, 132, 134 and accompanying text.

[163] *See supra* notes 96, 97 and accompanying text.

[164] *See supra* notes 108, 111 and accompanying text.

[165] *See supra* note 132 and accompanying text.

[166] *See supra* note 152 and accompanying text.

[167] *See supra* notes 134-137 and accompanying text.

53

with rates over 1% subject to monitoring by Visa); *FTC V. QT, Inc.,* 448 F. Supp. 2d 908, 936 (N.D.Ill. 2006) (customer refund request rate of 25% viewed as suspect). Furthermore, the Defendants, particularly, Johnson, Savage, and Pack, profited substantially from the scheme, further evincing their central roles in the conduct at issue.[168]

The Individual Defendants' leadership positions at the companies involved in the scheme, and their involvement in the activities described above, amply demonstrates their control over and knowledge of the Corporate Defendants' practices. Therefore, the Individual Defendants are properly subject to injunctive and monetary relief.

## 6.   The Relief Defendant Is Subject To Disgorgement of Ill-Gotten Gains

Though a "relief" or "nominal" defendant is not accused of wrongdoing, courts may order equitable relief against such a party where that person has received ill-gotten funds and does not have a legitimate claim to those funds. *SEC v. Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998); *SEC v. Colello,* 139 F.3d 674, 676-77 (9th Cir. 1998). *E.g., FTC v. AmeriDebt, Inc.,* 343 F. Supp. 2d 451, 464 (D. Md. 2004) (sustaining relief defendant claim against defendant's wife to the extent that she received any of the funds wrongfully obtained by defendant); *FTC v. Think Achievement Corp.,* 144 F. Supp. 2d 1013, 1021-22 (N.D. Ind. 2000) (relief defendant ordered to disgorge profits received from the principal defendant's deceptive business practices transferred into accounts that the two shared). Here, as explained in Section II.C above, relief defendant Sandra Savage received over $6.295 million in transfers from Visavis representing ill-gotten proceeds from The Tax Club Enterprise's deceptive practices, yet she is not an employee and has

---

[168] Specifically, since 2008, Johnson received over $18 million, Savage received over $16 million (plus over $6 million more directed to his wife, Sandra Savage), and Pack received over $8 million. Kelly Dec. ¶¶ 31, 32.

54

no legitimate claim to that money.[169] Therefore, those proceeds should be disgorged to help

repay the victims of the Defendants' scheme.

\*                \*                \*

Based on the evidence shown, Plaintiffs will ultimately succeed in proving that the

Defendants are engaging in deceptive practices in violation of the FTC Act, the TSR, FDUTPA,

the NY Exec. Law and the NY GBL, and the balance of equities strongly favors the public.

Preliminary injunctive relief is thus warranted.

## C.    AN ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, AND IMMEDIATE ACCESS TO THE DEFENDANTS' PREMISES ARE NECESSARY TO PRESERVE EFFECTIVE RELIEF

The permanent relief Plaintiffs seek includes redress for consumer victims who have lost

money to the Defendants' deceptive scheme. To ensure the possibility of such relief, the

proposed TRO is designed to preserve the status quo, pending a hearing on preliminary

injunctive relief. In addition to enjoining the Defendants' deceptive sales practices, the proposed

Order would: (1) freeze assets of the Individual Defendants, the Corporate Defendants, and the

relief defendant; (2) appoint a receiver over the Corporate Defendants; and (3) allow immediate

access to records, order financial disclosure, and authorize expedited discovery. Such additional

equitable relief is generally granted where, as here, Defendants' operations are permeated with

fraud and deception, because there is a strong likelihood that assets will be dissipated and

documents destroyed during the pendency of the action, which would irreparably diminish

Plaintiffs' ability to obtain relief for victimized consumers. *See generally SEC v. Manor Nursing

Centers, Inc.,* 458 F.2d 1082, 1105 (2d Cir. 1972) ("In view of appellants' fraudulent conduct, it

was not unreasonable for the court to conclude that it could not rely on appellants to locate

_____

[169] *See supra* notes 117, 118 and accompanying text.

purchasers ... and to refund them the proceeds of the offering."); *Vuitton v. White,* 945, F.2d 569, 571 (3d Cir. 1991) ("[I]t is extremely likely that a counterfeiter, upon being appraised of the institution of a lawsuit ... will conceal his infringing merchandise and either destroy or conceal all records ...." (quotation omitted)). Courts within the Second Circuit thus have frozen assets, imposed receiverships, and granted immediate access with expedited discovery and financial disclosure in similar circumstances.[170]

First, an asset freeze is essential to prevent dissipation or waste during the pendency of this litigation and to preserve funds for restitution. *See Singer*, 668 F.2d at 1113 (asset freeze appropriate when objective is "to obtain restitution of moneys fraudulently obtained"). An asset freeze is especially warranted here where corporate bank records show that the Defendants churned tens of millions of dollars, used pass-through accounts, and, ultimately, funneled over \$50 million to the Individual Defendants' and relief defendant's personal accounts and assets.[171]

Likewise, appointing a receiver for the Corporate Defendants is also essential to maintain the status quo. Otherwise, "the corporate assets will be subject to diversion and waste to the detriment of those [victims] for whose benefit. . . injunctive action was brought." *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981) *accord SEC v. The American Board of Trade*, 645 F. Supp. 1047, 1051 (S.D.N.Y. 1986). *See FTC v. Consumer Health Benefits Ass'n.,* No. 10 Civ. 3551,2011 WL 5513182, at *3 (E.D.N.Y. Nov. 10. 2011) (noting receiver's "function to preserve the assets of that business"). A temporary receiver can preserve records and make an accounting that will assist in (1) identifying the Defendants' assets, (2) determining the size and the extent of the deceptive scheme, and (3) identifying injured consumers.

---

[170] *See* note 138 *supra*.
[171] Kelly Dec. ¶¶ 30-32, 37-57. *See* Section II.C *supra*.

56

Third, in order to locate assets wrongfully obtained from defrauded consumers, Plaintiffs request expedited discovery, including immediate access to Defendants' business premises and records, and financial reporting by Defendants. District courts are authorized to depart from normal discovery procedures and fashion discovery by order to meet particular needs in particular cases. Fed. R. Civ. P. 1, 26(d), 34(b). Moreover, the prompt and full disclosure of the scope and financial status of the Defendants' business operations is necessary to ensure that the Court is fully advised regarding (1) the full range and extent of the Defendants' law violations, (2) the identities of injured consumers, (3) the total amount of consumer injury, and (4) the nature, extent, and location of Defendants' assets.

The requested ancillary relief is therefore necessary to identify and preserve assets that the Defendants wrongfully obtained from consumers. Any hardship on the Defendants caused by the relief sought would be temporary and is greatly outweighed by the public's interest in preserving evidence and assets obtained through the Defendants' unlawful practices.

## IV. CONCLUSION

The Defendants do not operate a legitimate business. They call consumers, mislead them into believing they are affiliated with other businesses, then trick them into spending thousands of dollars for services they fail to deliver. In order to put an end to these unlawful practices, Plaintiffs request that this Court grant their motion for a temporary and preliminary injunction with ancillary equitable relief.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

WILLIAM H. EFRON
Regional Director

57

Dated: 1/9/2013

Northeast Region

Darren H. Lubetzky
Ann F. Weintraub
Savvas S. Diacosavvas
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: aweintraub@ftc.gov
Email: sdiacosavvas@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PAMELA JO BONDI,
ATTORNEY GENERAL,

Dated:

Robert G. Clements
Office of the Attorney General
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone: (407) 234-0833
Facsimile: (407) 245-0365
Robert.Clements@myfloridalegal.com

Attorney for Plaintiff
STATE OF FLORIDA

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL,

Dated: 1|9|2013

Judy S. Prosper
Guy H. Mitchell
Jane M. Azia
Office of the Attorney General
Westchester Regional Office
101 East Post Road

58

Northeast Region

Dated: _____

Darren H. Lubetzky
Ann F. Weintraub
Savvas S. Diacosavvas
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: aweintraub@ftc.gov
Email: sdiacosavvas@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PAMELA JO BONDI
ATTORNEY GENERAL,

Dated: 1/9/13

Robert G. Clements
Office of the Attorney General
135 W. Central Blvd., Suite 1000
Orlando, Florida 32801
Telephone: (407) 234-0833
Facsimile: (407) 245-0365
Robert.Clements@myfloridalegal.com

Attorney for Plaintiff
STATE OF FLORIDA

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL,

Dated: _____

Judy S. Prosper
Guy H. Mitchell
Jane M. Azia
Office of the Attorney General
Westchester Regional Office
101 East Post Road

58

White Plains, New York 10601
Telephone: (914) 422-8755
Facsimile: (914) 422-8706
Email: Judy.Prosper@ag.ny.gov
Email: Guy.Mitchell@ag.ny.gov
Email: Jane.Azia@ag.ny.gov

Attorney for Plaintiff
STATE OF NEW YORK

59