# In The Matter Of:

*In the Matter of*
*The Tax Club*

---

*Michael Savage*
*March 2, 2011*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, New York 11501*
*516-747-9393   718-343-7227   212-581-2570*

Original File 55068MS(1).v1

FTC-TTC-000586

This Page Intentionally Left Blank

FTC-TTC-000587



**Page 1**

```
1
2  ------------------------------------x
3            IN THE MATTER OF
4            THE TAX CLUB
5  ------------------------------------x
6
7                      163 West 125th Street
8                      New York, New York
9
10                     March 2, 2011
11                     10:05 A.M.
12
13        DEPOSITION of MICHAEL SAVAGE, taken
14  pursuant to Subpoena, held at the above-mentioned
15  time and place, before Patricia Wor, a Notary
16  Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
1
2  A P P E A R A N C E S:
3
4        STATE OF NEW YORK
5        OFFICE OF THE ATTORNEY GENERAL
6        ERIC T. SCHNEIDERMAN
7              163 West 125th Street, Suite 1324
8              New York, New York 10027-8201
9        BY:  JUDY S. PROSPER,
10             Assistant Attorney General
11             GUY H. MITCHELL,
12             Assistant Attorney General In Charge
13
14
15        LAW OFFICE OF JOSEPH W. SANSCRAINTE
16             Attorney for The Tax Club and
17             the Witness
18             1120 Avenue of the Americas
19             Fourth Floor
20             New York, New York 10036
21
22        ALSO PRESENT
23             Ann Anorjuste, Intern
24
25
```

**Page 3**

```
1                    M. Savage
2   M I C H A E L   S A V A G E, having first been
3      duly sworn by a Notary Public of the State of
4      New York, was examined and testified as
5      follows:
6   EXAMINATION BY
7   MS. PROSPER:
8      Q.  Please state your name for the record.
9      A.  Michael Savage.
10     Q.  What is your current address?
11     A.  Business address is:  Manhattan
12  Professional Group, Inc./The Tax Club, 350 Fifth
13  Avenue, Suite 6015, New York, New York 10118.
14  Home address is: ███████████████████
15  ████████
16        MS. PROSPER:  Good morning.  Thank you
17     for coming.  My name Judy Prosper.  I'm an
18     Assistant Attorney General in the Office of
19     Eric T. Schneiderman, the Attorney General
20     for the State of New York.
21        Today is March 2, 2011.  It's about five
22     after 10.  We are in the conference room of
23     the Harlem Regional Office of the New York
24     State Attorney General's office.  With me are
25     Assistant Attorney General in Charge of this
```

**Page 4**

```
1                    M. Savage
2   office, Guy H. Mitchell, M-I-T-C-H-E-L-L, one
3      of our interns, Ann Anorjuste, A-N-N,
4      A-N-O-R-J-U-S-T-E, and our court reporter is
5      Pat Wor.
6        Mr. Sanscrainte, can you state your name
7      and appearance and law office address,
8      please.
9        MR. SANSCRAINTE:  Sure.  Joseph,
10     J-O-S-E-P-H, Sanscrainte,
11     S-A-N-S-C-R-A-I-N-T-E.  I serve as General
12     Counsel for The Tax Club and I'm located at
13     1120 Avenue of the Americas, Fourth Floor,
14     New York, New York 10036.
15        MS. PROSPER:  This examination is being
16     conducted pursuant to Article 22 of the
17     General Business Law and Article 5 of the
18     Executive Law.  The Attorney General has
19     civil and criminal jurisdiction and as such
20     we give you the following warnings:
21        First, anything you say or any documents
22     you produce may be used against you in a
23     legal proceeding.
24        Second, you have the right to refuse to
25     answer any question if a truthful answer
```

FTC-TTC-000588

Page 5

1              M. Savage
2   would tend to incriminate you criminally.
3       Third, any willful misstatements may
4   constitute perjury. The Attorney General
5   will permit you to have an attorney present
6   during this examination. The attorney's role
7   is limited to consultation with you in order
8   to give you legal advice regarding privileged
9   answers but for no other reason.
10      Do you understand all that I've said?
11      THE WITNESS: Yes.
12      Q.  Have you taken any prescription or
13  nonprescription drugs or medication that would
14  effect your ability to proceed?
15      A.  No.
16      Q.  Are you prepared to proceed?
17      A.  Yes.
18      Q.  Mr. Savage, have you ever testified
19  under oath in any proceeding before today?
20      A.  Yes.
21      Q.  Can you name those proceedings, please?
22      A.  I was a witness to an incident, like a
23  car accident in Seattle in 1988, '89.
24      Q.  Anything else?
25      A.  No.

Page 6

1              M. Savage
2       Q.  Have you ever been the subject of an
3   investigation by any law enforcement agency?
4       A.  Personally? No.
5       Q.  Personally, I did mean personally.
6       Have you ever been convicted of a crime?
7       A.  No.
8       Q.  What is your full name, please?
9       A.  Michael Savage.
10      Q.  Do you have a middle initial?
11      A.  M.
12      Q.  Which stands for?
13      A.  Monahan.
14      Q.  Have you ever used any other present name?
15      A.  Mike.
16      Q.  Did you receive notification or a
17  subpoena requiring you to appear at this office?
18      A.  Yes.
19      Q.  What did you receive?
20      A.  I received both, the original
21  subpoena -- well, to appear in this office I
22  received this (handing).
23      Q.  Thank you.
24      MS. PROSPER: I guess we'll mark your
25  copy. If you'd like a copy, I'll make it.

Page 7

1              M. Savage
2       MR. SANSCRAINTE: Don't worry.
3       MS. PROSPER: Could you please, Pat,
4   mark this as AG 1 for identification, please.
5       (Whereupon, AG Exhibit-1, Subpoena Ad
6   Testificandum, was marked for identification,
7   as of this date by the Reporter.)
8       Q.  Mr. Savage, showing you what's been
9   marked as AG Exhibit-1 for ID, do you recognize
10  it?
11      A.  Yes.
12      Q.  What do you recognize it to be?
13      A.  The subpoena for my testimony.
14      MS. PROSPER: I'm going to move AG 1
15  into evidence, please.
16      (Whereupon, AG Exhibit-1, as previously
17  described, was marked in evidence, as of this
18  date by the Reporter.)
19      MS. PROSPER: In pertinent part, it is a
20  Subpoena Ad Testificandum for Michael Savage,
21  President, Manhattan Professional Group,
22  Inc./The Tax Club at 350 Fifth Avenue, Suite
23  6015, New York, New York 10118 requesting his
24  appearance on February 15th, but counsel
25  adjourned this to today here in this office

Page 8

1              M. Savage
2   with some warnings about failure to appear,
3   signed by me on January 28th.
4       At this time I would like to mark and
5   enter AG Exhibit-2, which is the Affidavit of
6   Service by Investigator Robin Womack who
7   swears that on January 31st she delivered to
8   Nicole Thornton, a Receptionist at The Tax
9   Club, Exhibit-1 it's sworn and notarized
10  and this is in evidence as AG Number 2.
11      (Whereupon, AG Exhibit-2, Affidavit of
12  Service, was marked in evidence, as of this
13  date by the Reporter.)
14      Q.  Do you recall that The Tax Club had been
15  served with a subpoena to produce documents in
16  February of 2010?
17      A.  Yes.
18      Q.  Did The Tax Club respond to the subpoena
19  and provide the requested documents?
20      A.  Yes.
21      Q.  In what form did they provide the
22  documents?
23      A.  Both, I would say some in paper form and
24  I think a lot in electronic form.
25      Q.  In electronic form? What exactly do you

FTC-TTC-000589

In the Matter of
The Tax Club

Michael Savage
March 2, 2011

---

**Page 9**

M. Savage

1
2 remember or do you know?
3    A.  Yeah, files of --
4    Q.  Just the form, you need to tell me what
5 it was, just the form that you sent it to us in,
6 if you know.
7    A.  Thumb drives, hard drives.
8    Q.  Hard drives?  Were all the documents
9 requested produced by the company?
10    A.  Yes.
11    Q.  Now, throughout the subpoena hearing I
12 will be referring to and showing you some
13 documents culled from that production and asking
14 if you recognize them.
15    A.  Okay.
16       MS. PROSPER:  If at any time -- I'll
17    tell you this now, the following questions
18    are -- hopefully you'll know the answers to.
19    If at any time you don't know the answer from
20    your personal knowledge, I'll ask you if you
21    know someone else who knows and then we'll
22    move on and we'll note that person's name and
23    contact information and then we'll just kind
24    of keep moving along, but hopefully you'll
25    know the answer to at least the following.

---

**Page 10**

M. Savage

1
2    Q.  Mr. Savage, are you currently married?
3    A.  Yes.
4    Q.  What is your spouse's name and
5 occupation?
6    A.  Sandra Savage.  She's a stay-at-home
7 mom.
8    Q.  Do you have any children?
9    A.  Two.
10    Q.  How old are they?
11    A.  ▓▓▓ and ▓▓▓
12    Q.  Are these the only children you have?
13    A.  Yes.
14    Q.  Do you pay any child support to anyone
15 else for any children?
16    A.  No.
17    Q.  What is your home address?
18    A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓
20    Q.  With whom do you reside there?
21    A.  With my wife and kids.
22    Q.  How long have you resided there?
23    A.  About a year.
24    Q.  Where did you reside previous to that
25 going back five years, please?

---

**Page 11**

M. Savage

1
2    A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
4    Q.  How long did you live there?
5    A.  Five years.
6    Q.  That's in Manhattan?
7    A.  Ahuh.
8    Q.  Do you own any real estate in New York
9 State?
10    A.  Yes.
11    Q.  What is that real estate?
12    A.  I own my townhouse on ▓▓▓▓▓ and I
13 own some property upstate.
14    Q.  Where upstate?
15    A.  Some vacant, undeveloped property in --
16 I've been there once.  Where is it?  It's
17 Cobbleskill, Cobbleskill, New York.  It's just
18 vacant land.
19    Q.  Do you own any other real estate in
20 another state or another country?
21    A.  Yes, in another state, Connecticut and
22 the State of Washington.
23    Q.  What do you own in Connecticut?
24    A.  Connecticut I own my house, and in the
25 State of Washington I own my parents' house and

---

**Page 12**

M. Savage

1
2 my sister's house, and a four-plex.
3    Q.  Do you own a car, boat, aircraft or
4 motorcycle?
5    A.  Car.
6    Q.  What kind of car is it?
7    A.  I have a Mercedes SUV.
8    Q.  Just one?
9    A.  No.  Well, my wife's cars?
10    Q.  Do you own them?
11    A.  No, they're in her name.
12    Q.  Do you have a safety deposit box?
13    A.  No.
14    Q.  Do you have any retirement savings,
15 stocks or investments?
16    A.  Yes.
17    Q.  Without going into full detail, give me
18 sort of a general idea.
19    A.  It's pretty simple.  I have a Merrill
20 Lynch account and then I have a 401K from --
21 yeah, 401K from my previous employer,
22 Pricewaterhouse, and currently at The Tax Club.
23    Q.  Were you ever enlisted in the military?
24    A.  No.
25    Q.  What is your social security number,

---

FTC-TTC-000590

Page 13

1          M. Savage
2  please?
3     A.  ███████████
4     Q.  And your date of birth, sir?
5     A.  ████████████
6     Q.  Do you have a driver's license with you?
7     A.  Yes.
8     Q.  Can you show it to me, please?
9     A.  Sure.
10        MS. PROSPER: Thank you.
11        Let the record reflect that the witness
12  has handed me his driver's license and prior
13  to the beginning of the subpoena hearing I
14  made a copy of both front and back of this
15  driver's license. It reads:  Michael Savage,
16  Michael M. Savage, █████████████████████
17  ██████████████████████████████  and the
18  number on the license is █████████, and I ask
19  you to please mark and enter this in evidence
20  as AG Number 3.
21        (Whereupon, AG Exhibit-3, Copy of
22  driver's license, was marked in evidence, as
23  of this date by the Reporter.)
24     Q.  What is your highest level of education?
25     A.  I have a degree from -- bachelor of

Page 14

1          M. Savage
2  science degree from Brigham Young University.
3     Q.  What was your major?
4     A.  Accounting.
5     Q.  Do you have any other degrees or
6  certifications?
7     A.  I have a CPA license that is inactive.
8  I haven't kept it up. You know, I haven't kept
9  it active, but, yeah, I was a CPA.
10     Q.  Other than The Tax Club, I'll ask you a
11  lot of questions about that later, have you
12  previously had any interest in any other tax or
13  business organization related company?
14     A.  "Interest" meaning ownership?
15     Q.  Ownership, yeah.
16     A.  In a tax related --
17     Q.  Tax related or business organization
18  related company.
19     A.  I own other companies or have interest
20  in other companies.
21     Q.  You do?
22     A.  Yes. I own a lounge up the street,
23  109th and Columbus.
24     Q.  What's the name of it?
25     A.  It was called La Negrita. Now they just

Page 15

1          M. Savage
2  changed it to Noco, north of Columbus. I own
3  some real estate that's in companies.
4     Q.  What kind of companies?
5     A.  Like an LLC.
6     Q.  What does the company do?
7     A.  It's just holds the real estate.
8     Q.  This is the real estate you previously
9  testified about?
10     A.  Yes.
11     Q.  The upstate real estate?
12     A.  Yes.
13     Q.  And the two houses?
14     A.  Yes.
15        Any interest in businesses? I have a
16  consulting company.
17     Q.  What kind of consulting?
18     A.  It's just an S corporation that manages
19  my properties and some other different business
20  deals that -- where I get -- you know, I get a
21  commission or broker fee on. That's it. Those
22  are my business interests.
23     Q.  What is the name of the LLC that holds
24  your interests?
25     A.  I have Utsayantha, U-T-S-A-Y-A-N-T-H-A,

Page 16

1          M. Savage
2  LLC.
3     Q.  Where is that incorporated?
4     A.  In New York.
5     Q.  Just in sum and substance, what --
6     A.  That holds the properties here.
7     Q.  Here in New York State?
8     A.  Yes. And then I have Celina
9  Enterprises, C-E-L-I-N-A Enterprises, and that
10  runs the coffee shop here on 109th Street, that
11  owns that, has a liquor license in its name, and
12  then I also have a -- what else do I have?
13  What's it called? Tuncol, LLC.
14     Q.  Spell it.
15     A.  T-U-N-C-O-L, LLC in Washington State.
16     Q.  What it Tuncol?
17     A.  It does consulting and real estate
18  services for the property I own in Washington
19  State.
20     Q.  By "property," are those the homes you
21  mentioned earlier in your testimony?
22     A.  Yes.
23     Q.  Are there any commercial properties?
24     A.  Four-plex.
25     Q.  Is it rented?

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

FTC-TTC-000591

Page 17

M. Savage

1
2    A.   Loosely to a sister-in-law who doesn't
3  pay rent, but yes.
4    Q.   Can you describe your employment history
5  for the last 10 years?
6    A.   Sure.
7    Q.   Please.
8    A.   Prior to working at The Tax
9  Club/Manhattan Professional Group, one and the
10 same, I worked at Pricewaterhouse for
11 approximately five years in the fraud
12 investigation department.
13   Q.   What years, approximately?
14   A.   '98 to 2003.
15   Q.   When did you begin to affiliate with The
16 Tax Club?
17   A.   In 2003.
18   Q.   Have you ever been fired from any
19 position, other than for downsizing or
20 restructuring?
21   A.   No.
22   Q.   Did any of your prior jobs require you
23 to supervise others?
24   A.   Yes.
25   Q.   If so, how many people did you

Page 18

M. Savage

1
2  supervise?
3    A.   Five people.
4    Q.   What were their positions?
5    A.   Junior associates, senior associates at
6  Pricewaterhouse.
7    Q.   What was your position at
8  Pricewaterhouse?
9    A.   Senior Associate.
10   Q.   What is your current position at The Tax
11 Club?
12   A.   I'm the President.
13   Q.   How did you first come to be related to
14 The Tax Club?  Can you give me a little history
15 about The Tax Club, please?
16   A.   Sure.  In 2003 I received a phone call
17 from a friend of mine from college, Ted Johnson,
18 the owner of The Tax Club, and he asked me for
19 some assistance, some accounting assistance with
20 his new business, The Tax Club, and so --
21   Q.   Where was this business?
22   A.   It's in Utah, and so I said, you know,
23 I'm fine here at Pricewaterhouse and don't really
24 want to move but I'll help you out, and I know he
25 wanted to open a business in New York City.  It

Page 19

M. Savage

1
2  was a dream of his to have a business in New
3  York, so after looking into what The Tax Club was
4  and the potential, at that point I decided to
5  join as a head accountant.  I was the only CPA
6  that Ted knew at the time so -- and we were
7  friends, we went to college together, and that
8  was in 2003, and then I just progressed through
9  the company to become the President, I would say,
10 two years ago, two or three years ago.
11       MR. MITCHELL:  Let me interject.  I got
12   to ask a question.
13       What about The Tax Club in 2003 did you
14   know surrounding the organization,
15   surrounding what the purpose of The Tax Club
16   was in 2003?
17       THE WITNESS:  In 2003 I understood it to
18   be what it is now, essentially tax
19   preparation, tax consulting, tax planning,
20   services for the small business, brand new
21   business owner, entrepreneur.
22       What I liked -- what I saw that I really
23   liked was that it brought bigger services
24   like what I was used to doing at
25   Pricewaterhouse to a brand new small business

Page 20

M. Savage

1
2   owner.
3  BY MS. PROSPER:
4    Q.   Tell me the name of your friend again.
5    A.   Ted Johnson.
6    Q.   What was Ted Johnson's position with the
7  Utah Tax Club?
8    A.   Owner.
9    Q.   He was the owner?
10   A.   He still is.
11   Q.   Was The Tax Club ever known by any other
12 names?
13   A.   No.
14   Q.   What are your current responsibilities
15 at The Tax Club?
16   A.   As the President?
17   Q.   Yes.
18   A.   I oversee reporting, fulfillment
19 reporting.  I oversee finances.  I meet regularly
20 with the department heads, the heads of the
21 different departments and talk about customer
22 service, product fulfillment, client relations,
23 growth in the business, marketing.  I'm high
24 level.  I admittedly don't -- I'll tell you, you
25 know, I don't know all the details, but yeah, I

FTC-TTC-000592

Page 21

1          M. Savage
2  primarily meet with the department heads and
3  discuss direction for the company and make
4  decisions on where to take the company from a
5  marketing perspective, from a financial
6  perspective, from an operational perspective.  I
7  allow a lot of the department heads a great deal
8  of flexibility, you know, but ultimately I
9  delegate to them the ability to make their own
10  decisions and I review and discuss and consult a
11  lot.
12      Q.   Are you sort of the top person at The
13  Tax Club in New York?
14      A.   In New York, yes.
15      Q.   So I'm going to get some details on
16  that.
17          What kind of corporate entity is The Tax
18  Club, the thing you call "The Tax Club"?
19      A.   It's an S corporation.
20      Q.   Where is it incorporated?
21      A.   Utah.
22      Q.   Is it incorporated in anyway in New York
23  State?
24      A.   It's registered here.
25      Q.   "Registered," and what is it registered

Page 22

1          M. Savage
2  as?
3      A.   Doing business as The Tax Club, a Utah
4  corporation.
5      Q.   Doing business here in New York?
6      A.   Yes.
7      Q.   Is it known here in New York by any
8  other name?
9      A.   No.
10      Q.   What about Manhattan Professional Group?
11      A.   Manhattan Professional Group is a
12  separate entity, another S corporation that is --
13  that deals with -- that owns the brands to other
14  products that aren't tax related.  We set up
15  Manhattan Professional Group to manage business
16  services that don't necessarily only pertain to
17  tax.
18      Q.   We'll talk about those a little bit
19  later.
20          Can you give me the names and addresses
21  of the principal places of business for The Tax
22  Club?
23      A.   Principal place would be here in New
24  York City in the Empire State Building, 350 Fifth
25  Avenue, the entire 60th floor, New York, New York

Page 23

1          M. Savage
2  10118.
3      Q.   What about the Utah?
4      A.   Utah, 1620 -- no, sorry.  It is 1492 --
5  1429 Silicone Way, St. George, Utah.
6      Q.   Can you explain to me the relationship
7  between the Utah office and the New York office?
8      A.   Absolutely.  Everything started in the
9  St. George, Utah office and we originally set up
10  the office in New York City strictly for
11  fulfillment, just preparing tax returns and
12  offering tax consulting to the clients in which
13  the St. George office sold services to.  They're
14  primarily a sales division, just sales.  I mean,
15  originally it was all there, and so we set that
16  up in 2003, and the relationship still to this
17  day, everything that is sold in New York State is
18  fulfilled in -- I'm sorry, everything that's sold
19  in Utah, in the State of Utah is fulfilled here
20  in New York City.
21      Q.   When you say "fulfilled," can you
22  elaborate?
23      A.   Tax preparation, the preparation of tax
24  returns, signing tax returns, offering tax
25  advice, tax consulting, tax planning, business

Page 24

1          M. Savage
2  plans.  We'll get into that, right?
3      Q.   Yes.
4          Are there offices in any other states
5  besides Utah and New York?
6      A.   We have had offices in other states.
7  Currently?
8      Q.   Yes.
9      A.   No.
10      Q.   Where did you used to have offices?
11      A.   We've had an office in Arizona,
12  Washington State and Texas and Wyoming.
13      Q.   Just a little bit more about how you
14  progressed through.  You testified earlier that
15  you started out as head accountant?
16      A.   Ahuh.
17      Q.   And then can you just give me a little
18  bit of a progression of how you came to be the
19  President?
20      A.   Absolutely.  I started out as the head
21  accountant.  My first task was to fulfill the tax
22  returns.  Really basic, preparing tax returns,
23  get them out the door, servicing the clients.
24      Q.   I'm going to interrupt.
25          When you talk about "clients," who are

Page 25

M. Savage

1   these "clients"?
2   A.   Small businesses that are in all 50
3   states.  And soon thereafter, having a business
4   background, I guess, I started taking over more
5   and more administrative duties of the business.
6   Q.   That's here in New York or in Utah?
7   A.   In New York.  Everything has always been
8   in New York.  I've always been in New York.  And
9   we just started doing more and more in New York.
10  We started up selling other products,
11  bookkeeping, payroll, business plans, and that
12  was being -- those were being sold for the
13  first -- for the first time something was being
14  sold in New York and fulfilled in New York, and
15  the company naturally grew in New York, but the
16  way that I progressed through was just taking on
17  more responsibility and running more of the
18  day-to-day administrative as opposed to the
19  day-to-day fulfillment.  Again, preparing the tax
20  returns.
21  Q.   So how much of the business is dedicated
22  to preparing tax returns versus some of the other
23  stuff that you've described?
24  A.   Tax returns are our primary -- that's

Page 26

M. Savage

1   our core product.  Every time we talk to a
2   client, we introduce them to the -- to our tax
3   club membership, which is an incorporation
4   service and tax preparation, tax consulting,
5   year-round tax consulting, and from there,
6   depending on their situation, we offer up more
7   sells, whether it be a bookkeeping packages,
8   payroll services, business plans, so on.
9   Q.   In Utah there's only one partner.  Are
10  there other partners either in Utah or in New
11  York?
12  A.   There's only one owner.
13  Q.   One owner of the whole entire Tax Club?
14  A.   Yes.
15  Q.   So there's no other people sharing in
16  the profits, so to speak?
17  A.   No.
18  Q.   Were you involved in the incorporation
19  of the company?
20  A.   No.  The company was already
21  incorporated for a couple years before I started.
22  I was involved in the formation of Manhattan
23  Professional Group as an officer but not as an
24  owner.

Page 27

M. Savage

1   Q.   As what officer did you --
2   A.   I don't remember what -- what -- you
3   know, what we said on the incorporation papers,
4   but now I'm the President.
5   Q.   Were you involved in the actual drafting
6   and signing of the incorporation -- of the
7   registration papers as you called them earlier
8   here in New York?
9   A.   For Manhattan Professional Group, I
10  believe so.
11  Q.   Is Manhattan Professional Group
12  something that you yourself started sort of as an
13  offshoot or Manhattan Professional Group is a
14  part of The Tax Club?
15  A.   Well, this is how -- originally we set
16  up an entity to sign the lease just to be -- just
17  to sign the lease in the Empire State Building,
18  it was Manhattan Professional Group, and Ted owns
19  it, owned it.  He set it up.  I think I might
20  have signed it as a resident agent or point of
21  contact, and then when we started to develop
22  other products, bookkeeping, payroll business
23  plans, we were going to incorporate -- you know,
24  each brand is its own business, but we just put

Page 28

M. Savage

1   them all under Manhattan Professional Group since
2   we already had that company up and running and it
3   was, you know, vague enough to be able to
4   encompass more than tax.  Tax Club is like only
5   tax.
6   Q.   You said that the gentleman -- I'm
7   terrible with names.
8   A.   Ted.
9   Q.   Ted, thank you.
10  Ted owns Manhattan Professional Group as
11  well?
12  A.   Yes.
13  Q.   But they are two separate entities?
14  A.   Yes.
15  Q.   And is Manhattan Professional Group
16  incorporated in Utah or just in New York?
17  A.   Just in New York, as far as I know.
18  They might be registered as a foreign entity in
19  Utah for tax purposes, but I couldn't say for
20  certain.
21  Q.   I'm going to show you for informational
22  purposes what I'm going to call AG Exhibit-4 for
23  identification, please.
24  (Whereupon, AG Exhibit-4, Incorporation

Page 29

1           M. Savage
2   paperwork for Manhattan Professional Group,
3   Inc., was marked for identification, as of
4   this date by the Reporter.)
5       Q.  AG Exhibit-4 for identification is a
6   four-page exhibit.
7           I'm going to ask you to just look it
8   over and see if you recognize what it is, if it's
9   familiar to you?
10      A.  Yes.  It's the Certificate of
11  Incorporation.
12      Q.  For?
13      A.  Manhattan Professional Group.
14      Q.  That's how many of the four pages?
15      A.  This would be, okay, the Articles of
16  Incorporation.  This is the certificate
17  (indicating).
18      Q.  The third page you're referring to?
19      A.  Yes.  Registered Agent, that's what I
20  was.  Okay, this is the S Corp. Election.
21      Q.  The S Corp.?
22      A.  S Corp. Election to be taxed as an S
23  Corp., meaning flow-through entity.
24          MS. PROSPER: I'm going to put these
25  into evidence since they're documents you

Page 30

1           M. Savage
2   recognize as being incorporation papers for
3   Manhattan Professional Group as AG 4.
4           (Whereupon, AG Exhibit-4, as previously
5   described, was marked for identification, as
6   of this date by the Reporter.)
7           MS. PROSPER: I'll say it again, if you
8   know the answers, please provide them.  If
9   you don't know the answers but know who could
10  provide the answers, you know, don't guess or
11  don't -- you know, we could just keep moving
12  on.
13      Q.  How many employees work at each
14  location, in New York and Utah?
15      A.  It changes.  I tried to get -- I tried
16  to nail that down before I came here in
17  anticipation of this question, but right now we
18  have approximately 200 total employees.  In New
19  York I would say about 150 to 180, it varies, and
20  in Utah I would say 20 to 30.
21      Q.  I'm showing you what I'm going to mark
22  as AG Exhibit-5.  These documents, again, were
23  culled from the production that The Tax Club made
24  in and around April of 2010, and this is for
25  identification a seven-page document that I'm

Page 31

1           M. Savage
2   going to ask to be marked as Exhibit-5.
3           (Whereupon, AG Exhibit-5, Seven-page
4   document, was marked for identification, as
5   of this date by the Reporter.)
6       Q.  Mr. Savage, I'm going to ask you to take
7   a look at this, the seven pages I think it was,
8   and tell me if it's something that's familiar to
9   you.
10      A.  Yes, organizational chart.
11      Q.  Is this structure still in operation?
12      A.  Yes.
13      Q.  Are the same people that are indicated
14  on this -- these charts -- this is actually part
15  of it, I think.  It talks about the various
16  departments.
17      A.  Okay.
18      Q.  It came together in the production.
19      A.  Okay.  He left a week ago, Database
20  Management, Terry Owens.
21      Q.  You can write on that.  I'll give you a
22  pen.  If you know the name of the new person who
23  is in that position --
24      A.  Still looking for somebody.
25      Q.  So you could just put "vacant," that

Page 32

1           M. Savage
2   would be great.
3           MR. MITCHELL: And initial it.
4           (The witness complied.)
5           MS. PROSPER: Thanks.
6       A.  This is limited, if any, activity.
7   There isn't a sales force anymore, so should I --
8       Q.  Yes, please.
9       A.  They sell one of our brands.  It's
10  not -- we're not necessarily incorporated there.
11  We outsource these sales.
12      Q.  You're referring to --
13      A.  Clearwater.
14      Q.  -- "3) Clearwater, Florida"?
15      A.  Should I say exactly what they sell?
16      Q.  Sure.
17      A.  Corporate Tax Network.  Corporate Tax
18  Network.
19          MR. SANSCRAINTE: Could I interrupt just
20  one second?  I'm worried about the court
21  reporter.  Are you okay?  Just in general
22  just kind of describe what you're doing as
23  you're doing it.
24          MS. PROSPER: Right, you're marking up
25  the 7th page of the exhibit, AG Number 5,

FTC-TTC-000595

Page 33

M. Savage

1 updating it, basically.
2
3    MR. MITCHELL: For identification.
4    MS. PROSPER: For identification.
5    Q.   So is this a fair and accurate
6 representation of the Manhattan Professional
7 Group as it stands in New York?
8    A.   Yes.
9    MS. PROSPER: I'm going to enter AG 5
10 into evidence, please.
11    (Whereupon, AG Exhibit-5, as previously
12 described, was marked in evidence, as of this
13 date by the Reporter.)
14    MS. PROSPER: Now that we have AG Number
15 5 in evidence, I just want to note for the
16 record a few changes made by the witness,
17 Mr. Savage.
18    On the fourth page of the exhibit,
19 Database Manager, the name Terry Owens is
20 crossed out and that position is vacant, and
21 on the sixth page the name Richard Cappelli
22 is crossed out and that position of Sales
23 Manager for Team C is now vacant, and on the
24 last page of the exhibit entitled Manhattan
25 Professional Group Offices, under Number 2,

Page 34

M. Savage

1
2 Seattle, Washington (a) Sales Floor is
3 crossed out and Number 3, Clearwater, Florida
4 (outsourcing) (a) Sales Floor Mr. Savage
5 added a slash and Corporate Tax Network.
6    Q.   Can you briefly describe the roles of
7 the various departments and how they might
8 interface with each other?
9    A.   Sure. I'll start from the top.
10    Q.   Please.
11    A.   I've already described what I do.
12    Lindsey Kush, we worked together at
13 Pricewaterhouse, and I brought her on to run as
14 the controller essentially. She deals with all
15 of our -- the accounting, all of our debits and
16 credits of the money coming in and the money
17 going out. She also oversees human resources,
18 public relations, but her primary duty is as a
19 controller. She sets the budgets. She makes
20 financial decisions on -- she makes a lot
21 decisions based on what bills get paid and how
22 much we have per department. That's what she
23 does as a controller.
24    Gary Milkwick, he is Director of
25 Operations. He's a certified public accountant

Page 35

M. Savage

1
2 and he oversees all of our tax operations,
3 meaning he ensures that we're compliant with all
4 the IRS regulations as a tax preparation firm.
5 He also makes sure that the clients are getting
6 fulfilled. Whatever package or whatever product
7 they bought, he ultimately makes sure that they
8 get exactly what it is that they bought. He also
9 oversees client services which also deals with
10 clients. It's a customer service department.
11 When clients are -- you know, if they have any
12 issues that fall outside of our process, he deals
13 with those, with the people in charge of those
14 clients and operations in general. Again, he
15 assures that everybody gets their -- our clients
16 get their tax returns, makes sure that we sign
17 them. He also oversees our bookkeeping product.
18 He makes sure that the books are prepared in
19 accordance with Generally Accepted Accounting
20 Principles, and his role is very compliance
21 focused with the IRS.
22    Brendan Pack is our Sales Manager. He
23 is in charge of sales, making sure that we
24 continue to make sales, and he also oversees the
25 sales managers making sure that they are -- that

Page 36

M. Savage

1
2 they aren't only making their -- you know,
3 reaching their goals or their -- or whatnot, you
4 know, bringing in revenue but also that they are
5 in compliance with our sales best practices
6 policies. He's involved with creating and
7 managing sales teams.
8    Lindsey, again, she's over billing. Her
9 right-hand person would be Christine Vazquez, and
10 what Lindsey oversees is making sure that
11 everyone gets refunded who requests a refund
12 within our refund policy. She makes sure that
13 people don't fall through the cracks. She
14 manages our billing practices, making sure that
15 we are in compliance with general merchant
16 account, you know, Visa/MasterCard regulations,
17 making sure that we handle our refunds and
18 chargebacks effectively. She oversees human
19 resources. I don't think she does much with
20 human resources.
21    Tracy Stead is our HR manager and she
22 oversees hiring and firing and administrating
23 drug testing, making sure that employees sign our
24 employee handbooks, 401K administration, health
25 care administration, makes sure everyone gets

FTC-TTC-000596

Michael Savage
March 2, 2011

In the Matter of
The Tax Club

**Page 37**

M. Savage
1   M. Savage
2   health care. She does some recruiting and she's
3   in charge of all the compliance that we have with
4   human resource law and employment law.
5       Matthew Cohen is no longer with us.
6       Q.   Let the record reflect that the witness
7   is making edits to the second page of the
8   exhibit.
9       A.   Her name is Shakista. I don't know the
10  last name.
11      Naressa, Linda oversees Naressa.
12  Naressa makes sure that we process our
13  chargebacks. We do quite a bit of volume. We do
14  close to 1,000 transactions a week and
15  inevitably -- we have extensive merchant account
16  maintenance, meaning when chargebacks come in, a
17  chargeback is when a client doesn't necessarily
18  recognize the charge or calls their credit card
19  company and reverses the charge for various
20  reasons. She does the research and presents our
21  case to the credit card companies and gets them
22  reversed, meaning we win the chargeback. She's
23  in charge of winning chargebacks.
24      Q.   Since we talked about the edits earlier,
25  I just want to reflect the actual edit made on

**Page 38**

1       M. Savage
2   page two to replacing Matthew Cohen as Assistant
3   to the HR Manager with the first name Shakista,
4   S-H-A-K-I-S-T-A. Sorry to interrupt you.
5       A.   No problem.
6       You know, feel free to interrupt me. I
7   could elaborate on what they do.
8       Q.   This is exactly what we need.
9       A.   This is high level. I mean, I could
10  drill down and talk about details.
11      Q.   Those details may come up, but let's go
12  ahead with the overhead.
13      A.   Gary Milkwick, Vice President of
14  Operations. He's in charge of -- we'll start
15  from the top, tax operations. Joe Rush is our
16  Director of Tax Operations. He's an EA, Enrolled
17  Agent.
18      Q.   Describe what "enrolled agent" is.
19      A.   An enrolled agent is -- every one of our
20  tax preparers are tax professionals either as a
21  CPA or EA or is in the process of becoming one,
22  whether they've taken parts of the test or the
23  whole test, and essentially what this is -- an
24  enrolled agent has a very tax specific
25  certification that the IRS provides that it gives

**Page 39**

1       M. Savage
2   the enrolled agent ability to talk on a client's
3   behalf to the IRS and represent a client to the
4   IRS, and it's actually more extensive than a
5   certified public accounting as far as tax
6   preparation, tax planning, tax -- very tax
7   specific certification.
8       So Joe Rush is in charge of our
9   Corporate Department. What our Corporate
10  Department does in general is help assist clients
11  in registering the appropriate entity from a tax
12  perspective, what benefits them, you know. What
13  we do is we go over different tax scenarios,
14  whether they're a C Corp., LLC, S Corp., sole
15  proprietor, and we assist the clients in making
16  that decision as to what entity they want to
17  structure and we prepare all the incorporation
18  papers for them.
19      Q.   Which division does that specifically?
20      A.   It's either Corporate Department or
21  Incorporation Department.
22      Q.   That's overseen by?
23      A.   Joe Rush who assist Director of Tax
24  Operations. Again, I think we have filed over
25  8,000 businesses and --

**Page 40**

1       M. Savage
2       Q.   When you say you filed them, what does
3   that mean?
4       A.   I mean, we prepared the corporation
5   documentation. We send that documentation to the
6   client, they sign it, they pay the state fee and
7   send it in.
8       Q.   What happens when they do that? What's
9   the end result of that process?
10      A.   Then they form an entity, whether it's
11  an LLC or an S Corp. or a C Corp., they have an
12  official entity that -- in which they're doing
13  business. They're doing business within that
14  entity, depending whether they have a local, I
15  don't know, coffee shop, bookstore or they have a
16  web site that does -- you know, sells things on
17  line or real estate. We have a bee farmer.
18      Q.   You provide this service throughout the
19  country?
20      A.   Yes, in all 50 states.
21      Q.   What about internationally?
22      A.   We do some work in Canada, not that
23  much, pretty immaterial, but yeah, we have
24  serviced some clients in Canada.
25      Q.   Any other countries?

**Precise Court Reporting**
516-747-9393   718-343-7227   212-581-2570

FTC-TTC-000597

In the Matter of
The Tax Club

Michael Savage
March 2, 2011

Page 41

M. Savage
1
2      A.  Australia, same thing, not to the extent
3  that we deal with Canada, but I would say it's
4  immaterial as well as -- "immaterial" meaning
5  it's a small percentage, less than five percent
6  of our business, as well as England.  You know,
7  pretty much the English speaking countries.
8           Okay, so Joe Rush is also -- he also
9  oversees our different accounting zones.  We have
10  divided up our accountants based on time zones.
11  Because we are in every state, we have tens of
12  thousands of clients throughout the country and
13  it's easier from a phone management, from a time
14  management perspective to break it up Eastern,
15  Mountain, Central, Pacific zones so we have the
16  phones manned during those times, and so, again,
17  that's just how we organize our tax preparation,
18  and, you know, we'll prepare 50 to 75,000 tax
19  returns a year and this is just part of the
20  organization of handling that volume.
21      Q.  Can I ask you, now that you've given us
22  an amount of the number of returns, how many CPAs
23  or registered agents do you have servicing that
24  number of clients?
25      A.  We have approximately 100 tax

Page 42

M. Savage
1
2  professionals, some are CPAs, some are EAs.
3      Q.  Are some not?
4      A.  Some are admin, yeah, but anyone who is
5  talking to a client or touching a tax return is
6  in -- you know, we have a process.  It's very
7  similar to what we did at Pricewaterhouse where
8  they're on a path to becoming an EA or CPA.  They
9  have to be.
10      Q.  When you say "on the path," are they
11  attending school or classes elsewhere or is that
12  part of The Tax Club training or in-house
13  program?
14      A.  Yeah, we have a lot of in-house
15  training.  We also have -- we also pay for review
16  courses like Becker, CPA review courses.  We'll
17  pay for that.  We'll cover those expenses.  But
18  all of our professionals are -- you know, they
19  already have a degree.
20      Q.  Like what kinds of degrees?
21      A.  Accounting degree, and so, yeah, they're
22  in route to becoming certified.
23      Q.  You used the sum 100.  You said you have
24  100 tax professionals or 100 CPAs and registered
25  agents.

Page 43

M. Savage
1
2      A.  Tax professionals.  The breakdown I
3  don't know.  It fluctuates.
4      Q.  Do you know who would know specifically
5  how many CPAs and registered agents?
6      A.  Gary Milkwick or I could find out today.
7  You know, all of our zone managers are either
8  CPAs or EAs.  The management team is all
9  certified and they, again, sign the tax return.
10  If you prepare a return, you have to sign it.  If
11  you touch a return, you have to sign it.
12      Q.  So even though the tax professionals who
13  aren't CPAs or EAs, do they sign too, like an
14  intern helped out with this, recognition that
15  someone besides the person who signed it touched
16  it as you described they legally can?
17      A.  I think that's changing this year where
18  every tax preparer has to be certified, which is
19  a great thing, but the way it works as per IRS
20  regulations is that the manager, the last person
21  to review it -- and all of our tax returns go
22  through several review processes, so the manager
23  reviews the tax return, the manager has to sign
24  so that in the event -- which is not the case,
25  but if a tax professional, I don't even think

Page 44

M. Savage
1
2  they need a college degree, I think HR Block they
3  don't necessarily need college degrees to sign
4  returns, but in our case, yes.
5      Q.  How many managers do you have?
6      A.  We have one representing each zone, zone
7  managers.
8      Q.  How many zones are there?
9      A.  Four.
10      Q.  To represent the time zones you're
11  saying?
12      A.  Yes, and then we have director of -- Joe
13  Rush who is in charge of those four and then we
14  have Gary who is in charge of Joe.
15      Q.  Is there anything else under operations
16  that we didn't cover?
17      A.  Well, there's operations.  I'll break it
18  down with fulfillment.  This would be
19  fulfillment, the corporate -- set up the
20  corporate entities, tax preparation under
21  operations.  We also have our customer service,
22  as well as our business plans and some sales
23  verification processes that we call compliance.
24           Can we talk about that in operations
25  or --

FTC-TTC-000598

Michael Savage
March 2, 2011

In the Matter of
The Tax Club

---

Page 45

1            M. Savage
2     Q.  Sure.
3     A.  Okay.  Client services, essentially we
4  have a department, roughly a dozen what we call
5  account executives but they're customer service
6  representatives.  We found that account
7  executives, the clients like that term, and we
8  assign every client when they come on board a
9  client executive.  The next day the account
10  executive has a meeting with the client and let's
11  them know they're the point of contact.
12     Q.  How do they have a meeting, in person
13  or --
14     A.  No.  That's the important point, is that
15  99 percent of our -- fulfillment of our
16  operations is not in person.  It's all over the
17  phone or via e-mail.  It's all electronic.  We're
18  a virtual office, paperless office, but that's
19  not to say that we wouldn't -- we love when
20  clients come to visit us.  We are in a sense
21  brick and mortar that in the sense that we have
22  25, 28,000 square feet in the Empire State
23  Building and we love when clients come by.  We
24  take them on a tour and we do workshops every
25  month that we allow our clients come to.

---

Page 46

1            M. Savage
2     Q.  What kind of workshops?
3     A.  Small business workshops.  You know,
4  they're free workshops.  Obviously we don't sell
5  anything at the workshop, and every client has --
6  they tell me they're very successful.  The
7  clients love them.  They're two days and we just
8  got -- we signed a 10-year lease in the Empire
9  State Building this year, or 2010, and we just --
10  we obtained another 7,000 square feet where we're
11  building a classroom or a 50-person plus
12  conference center where we're going to really
13  focus on these workshops.  The feedback we get
14  from our clients is that they love it, because,
15  unfortunately, not being -- one of the challenges
16  that we face being a virtual office is that our
17  clients, you know, our relationship for the most
18  part is just as a telephone relationship or
19  e-mail relationship, and so clients will get
20  frustrated quickly if they don't get a hold of
21  us.  They oftentimes will think that we don't
22  exist.  I think that also is a by-product of
23  telesales, that, you know, it's just a challenge,
24  so we found that these workshops are very
25  effective, clients love them, and so we do

---

Page 47

1            M. Savage
2  individual testimonials.  I know we sent them to
3  you, but most of them come from the workshops.
4  They're super excited.  We put them in our green
5  room and it's great PR for us, because it's a
6  constant struggle.  I think it's important to
7  mention, the PR struggle of having a virtual
8  office and telesales, it's tough.  You could
9  get -- you know, there's a lot of web sites out
10  there that disparage companies, virtual companies
11  recovery services, you know, in order to -- they
12  get paid on causing refunds or chargebacks or AG
13  issues for these virtual companies, and so,
14  anyway, long story short, we're making a big push
15  to have these face-to-face workshops and we're
16  going to go across the country with them.
17     Q.  Do your clients come from across the
18  country to come to New York?
19     A.  Yes.
20     Q.  You just mentioned that you're going to
21  be going on the road --
22     A.  Yes.
23     Q.  -- with these?
24     A.  That's what we want to do and we're
25  working that out now, but in the interim we're

---

Page 48

1            M. Savage
2  sticking with our local workshops, and people
3  love to come to New York City.  It's a fun
4  destination.  We take them to the top of the
5  Empire State Building.  It's a two-day workshop,
6  okay, so --
7     Q.  While we're talking about the
8  operations, do you have any attorneys on your
9  staff?
10     A.  Two full-time attorneys.
11     Q.  Who do the attorneys work under?
12     A.  Joe is our General Counsel and we have
13  another attorney, Preston Clark, and he doesn't
14  work as an attorney, even though he's -- he's the
15  same thing as a CPA.  He's current.
16        MR. SANSCRAINTE: He's a licensed
17     attorney.
18     A.  He's in charge of our customer services.
19  We've hired him recently.
20     Q.  When you say he doesn't serve as an
21  attorney, can you elaborate?
22     A.  He's -- he doesn't oversee our legal
23  department or legal issues per se.
24     Q.  Do you have a legal department?
25     A.  Yes, Joe.

---

Precise Court Reporting
516-747-9393   718-343-7227   212-581-2570

FTC-TTC-000599

Page 49

M. Savage

1
2    Q.  Within your day-to-day operations, are
3  your employees consulting with any attorneys is
4  kind of more the question I had?
5    A.  No.  Maybe some of the directors will
6  talk to you about certain things, but I talk to
7  Joe a lot.  As far as consulting, yeah, you know,
8  I do.
9    Q.  Thank you.
10      On specific client matters are attorneys
11  consulted, the two that you have, with regard to
12  a specific client or client issue?
13    A.  Yes.
14    Q.  Can you explain how that could happen?
15    A.  Sure.  We had a small claims court issue
16  where a client wanted all their money back.  We
17  had provided extensive fulfillment for them,
18  business plan, tax return.  I'm not sure exactly
19  what we did for them, but it was enough where
20  they're well out of our refund policy, which is
21  100 percent back within three days of request and
22  15 days 85 percent back, but they were well out
23  of that, and so they sued us in small claims
24  court.  Joe went and I think it was in mediation
25  or something.  We won.

Page 50

M. Savage

1
2    MR. SANSCRAINTE: Ahuh.
3    A.  But that would be a case where it would
4  go to Joe, and we also have -- that's client
5  matters which aren't as common as we have --
6  there's -- right now, I mean, what we've been
7  dealing with the last couple of months, so
8  recovery services are out there.  We're in
9  litigation or trying to be in litigation with
10  these companies that will contact our clients and
11  tell them the refund chargeback or write a letter
12  to the attorney general.  One of these recovery
13  services was mentioned in the original subpoena.
14  It's a popular -- I don't know.  It seems like
15  it's getting more and more popular.  We're
16  fighting it more and more often, and we have Joe
17  writing letters, you know, threatening to sue,
18  cease and desist type stuff, and for the most
19  part it works, but there's still some out there
20  that we're fighting with.
21    Q.  Now, that's representation of The Tax
22  Club, the entity?
23    A.  Yes.
24    Q.  Do you have any attorneys on staff or
25  legal professionals or paraprofessionals who work

Page 51

M. Savage

1
2  on the actual client incorporations as you say or
3  issues with their specific fulfillment?
4    A.  No.  No.  We're strictly an accounting
5  firm.
6    Q.  So you don't have any paralegals on your
7  staff?
8    A.  No.
9    Q.  We were getting through this, so let's
10  keep going, I guess, the organizational chart.
11    A.  Please interrupt with me questions,
12  because, you know, there's so, so much.
13    Q.  That's fine.  I want to get it from you.
14  I don't want to interject too much.  We all have
15  an idea of what things are from looking at the
16  paper.  I really would like to just get it from
17  you --
18    A.  Okay.
19    Q.  -- to debunk anything that's wrong in my
20  head.
21    A.  Okay.  So we have -- you know, here's
22  another change too.
23    Q.  Okay, so let the record reflect that
24  Mr. Savage is changing page three of now in
25  evidence Exhibit-5.

Page 52

M. Savage

1
2    A.  I shouldn't have crossed out Nicole
3  Joseph-Pauline's position, because she still
4  works with us and she still does that.
5    Q.  "That" being head of --
6    A.  Head of Client Services.  She's Head of
7  Client Services, this is what I should say, and
8  now instead of Client Services being under Gary
9  Milkwick, VP of Operations, we have a new Vice
10  President of Client Services, Preston Clark.
11    Q.  So there's a new position added.  Do you
12  have an updated organizational chart?
13    A.  Absolutely.
14 RQ    MS. PROSPER: So we'll ask for that to
15      be produced and updated, an organizational
16      chart
17    Q.  But go ahead and let the record
18  reflect that changes were made to page three
19  where Client Services no longer exists and
20  Preston Clark is now the -- I don't want to put
21  words in your mouth.
22    A.  Is now the Director of Client Services,
23  and he is a registered attorney, licensed
24  attorney, but he does not practice law.
25    Q.  Go ahead.

Page 53

M. Savage

1
2   A.  He's a real smart guy, and so he's in
3   charge of Client Services and he oversees the
4   account executives.  Again, the account
5   executives are assigned to every client right
6   after they join as their point of contact.  We've
7   been doing that for about a year now, a little
8   over a year, and we found it very effective with
9   our clients.  It eliminates the complaint I'm
10  confused, I don't know where to call, do I call
11  the original sales rep, which is not as effective
12  as calling an accountant.
13      And another thing that we've done is
14  we've -- this account executive will help bring
15  the sales rep, you know, from that discussion
16  when the client comes on board to the actual
17  accountant.  What we were doing, we were setting
18  up an appointment the next day with an
19  accounting.  We call it the accounting assistance
20  appointment, and so now we set that up five days
21  later.  The very next day is with the account
22  executive with the sales rep on the phone and the
23  accountant and it's more of a transition from
24  instead of the sales, typically, you know, higher
25  energy, more personality than the accountant,

Page 54

M. Savage

1
2   unfortunately.  I'm an accountant.  We're not as
3   gregarious maybe as the sales.  That is our sales
4   department.  So our clients were here,
5   emotionally here, perhaps.  The account executive
6   is really working as a liaison with the client
7   and our services.  Our refunds have gone down.
8   Our client complaints have gone down and we're
9   constantly tweaking and adjusting to our process.
10  You know, we do a lot of volume.
11      Q.  While we're on this operations and the
12  various people that are on this page three of
13  Exhibit-5, is there training for the various
14  tiers of employees that you mentioned in your
15  testimony?
16      A.  Absolutely.
17      Q.  Is it internal training or --
18      A.  Both.
19      Q.  The company trains them or do you send
20  them out?
21      A.  We have the -- both, but primarily
22  internal training.  From a -- we're still talking
23  about fulfillment.  We do a lot of training for
24  sales as well, a lot, but we do -- we have
25  meetings, training meetings daily, weekly, you

Page 55

M. Savage

1
2   know, often.  Each zone is in charge of training
3   their -- of, you know, training their -- each
4   member of the zone.
5       Q.  What do they train them to do?
6       A.  Tax preparation, general accounting, a
7   lot of compliance.  IRS has a lot of compliance
8   as far as what tax preparer's, you know, the
9   duties of a tax preparer to keep us from getting
10  in, you know, in trouble with the IRS.
11      Q.  Who does the trainings?
12      A.  The CPAs, the zone managers or Gary, but
13  we also do external trainings, seminars.  IRS has
14  seminars that we send out employees to, and
15  there's refresher courses for the CPA exam or the
16  enrolled agent exam.
17      Q.  Other than the small claims lawsuits
18  against The Tax Club for what you mentioned,
19  refund issues, has Tax Club and/or Manhattan
20  Professional Group ever been in litigation?
21      A.  Yes.
22      Q.  Can you talk about that?
23      A.  We had a lawsuit with a former employee
24  who said that, you know, we owed her some
25  overtime.  She was the director of HR, and that

Page 56

M. Savage

1
2   we owed her overtime pay, and our attorneys at
3   the time, this is before Joe, advised us to
4   settle, so there's that.
5       We've had other clients that -- it's
6   really not that much.  He would know.
7       Q.  He's not testifying.
8       A.  Okay, all right, but there's not that
9   much.
10      Q.  It's good to know that he would know.
11      A.  I would say there's maybe three cases,
12  and we're currently in litigation with a company
13  that -- I'm just trying to think if there's
14  anything else.  Currently in litigation with a
15  company that had stolen some of our data, but
16  we're the plaintiff on that.
17      Q.  What's the name of the company?
18      A.  Precision.  I'm trying to think if
19  there's anything else.  Joe is probably saying --
20  but I can't think of anything.
21      Q.  That's fine.  Again, this is your
22  memory, your testimony.
23      A.  Right.
24      Q.  So let's continue to go through sort
25  of -- I'm not sure if we're done and I'm in no

FTC-TTC-000601

Page 57

M. Savage

1  way rushing you.  I want to continue to go
2  through sort of the various tiers of employees
3  and the various divisions of The Tax
4  Club/Manhattan Professional Group, and let's also
5  let the record reflect, if that's okay with you,
6  Mr. Savage, that when we say "The Tax Club," we
7  mean Manhattan Professional Group as well, unless
8  we specify otherwise, if that's all right with
9  you, since you say that they're owned by the same
10 person?
11 A.   Absolutely.
12 So Preston Clark, he's in charge of
13 Client Services as a Vice President, and he
14 oversees the account executives.
15 And then Luke Kennedy, he is in charge
16 of operations for -- he's the Director of
17 Operations and his primary focus would be other
18 products that we sell.  Other core products are
19 tax preparation, tax consulting, tax planning,
20 assistance in entity formations, bookkeeping, you
21 know, general accounting -- preparation of
22 financial statements, payroll services and
23 business plans, but we have other products.
24 We'll get into later, I'm assuming, and Luke

Page 58

M. Savage

1  Kennedy is in charge of the fulfillment of such
2  products, so he makes sure that -- in other
3  words, he makes sure that when a client buys
4  something they get it, and Preston makes sure
5  that when they get it -- so Luke makes sure that
6  when a client buys something they get exactly
7  what they bought.  Preston makes sure that the
8  client is happy with what they bought, and from a
9  tax perspective, Joe makes sure that the IRS is
10 very comfortable with the way we prepare taxes,
11 and if I could just say one thing about that.
12 We're very conservative in our tax
13 preparation practices.  We don't over -- we don't
14 expense startup costs.  We amortize them over
15 five plus years.  We don't prepare aggressive tax
16 returns.  The IRS did perform an investigation on
17 us, and I could talk about that later, now,
18 whenever.
19 Q.   Since you mention it, go ahead.
20 A.   There is certain, you know, sections of
21 the IRS code where they explain what you can and
22 cannot do as a tax preparation company.
23 Primarily, you can't offer -- you can't promote
24 what they call tax shelters in the form of fake

Page 59

M. Savage

1  businesses, meaning set up an LLC and write-off
2  your personal expenses through the LLC or say
3  it's a business and it's not really a business.
4  A deduction has to be ordinary and necessary,
5  according to the IRS, and it has to be -- you
6  know, there's a nine-step process the IRS uses
7  when they determine whether a business is
8  actually a business or if it's a hobby, and we
9  don't have any ownership in any companies that
10 provide opportunities.  We don't own -- we don't
11 promote business opportunities.  When the client
12 comes to us, they already have a business.  They
13 have a business ID.  They're an entrepreneur or
14 they own properties or they own a web site that
15 they sell things on or whatever.  They're an
16 actual business when we get them, and when the
17 IRS found that out, that gave them a lot of
18 comfort that we weren't promoting businesses just
19 for tax purposes.  They gave us a letter and
20 discontinued their investigation.  They were
21 comfortable with that.
22 Q.   What year is that?
23 A.   2007.  It's either '06, '07, '08,
24 somewhere in the middle.  They essentially said

Page 60

M. Savage

1  that they were interested in how we grew so fast.
2  We went from zero to 100 miles an hour in two
3  years, and they thought that there might be
4  something up.  It was -- it was comforting to
5  know that they approved of our processes and
6  our --
7  Q.   For tax preparation?
8  A.   For tax preparation.  And, you know, we
9  signed all the tax returns.  We're very
10 compliant, and, again, we amortize our startup
11 costs and we hope the businesses are going to be
12 thriving businesses.
13 If you have any questions, I know there
14 is a lot more there, so --
15 Q.   Go ahead.
16 A.   Another thing that Luke is in charge of,
17 this is very important, we call it Compliance.
18 It's -- we call it Sales Compliance internally,
19 but essentially what it is sales verification.
20 Every single sale that is made, and you probably
21 saw this as you were going through our stuff,
22 every single sale that's made goes through a
23 sales verification process, meaning after the
24 client takes out their credit card, we're talking

Page 61

M. Savage

1 about a telephone call, takes out their credit
2 card, gives us their credit card number and it
3 gets transferred to our verification department
4 and then it goes over the credit card
5 information, the billing information with the
6 client, verifies exactly what they're getting,
7 tells them again what they're getting, verifies
8 again billing address, credit card information,
9 CVV number, and some more stuff. I mean,
10 there's -- you know, you guys have seen it, what
11 we call compliance scripts. It's a sales
12 verification script, and they go through several
13 things at that stage, and then that file --
14 everything is recorded. All of our phone calls
15 are recorded, but the verification record then
16 gets attached in our database, our CRM, Customer
17 Relations Management system, whatever. Once that
18 MP3 is attached, the sale is eligible to be
19 batched at night, to be processed. Without that
20 verification the sale won't go through.
21    Q.   Is that an internal mechanism that you
22 have or is that put on -- is that a requirement
23 put on you by an outside agency?
24    A.   Internal. Internal. And so Luke is in

Page 62

M. Savage

1 charge. It's a separate office. It's not
2 commingled with the sales guy, with the sales
3 reps at all, and Luke is in charge of that. He
4 oversees the operations of the sale.
5    Q.   So I don't want to put words in your
6 mouth, but a separate group of people other than
7 sales folks --
8    A.   Oh, yes.
9    Q.   What is word you used?
10    A.   Verifying.
11    Q.   -- are verifying, thank you, the sales?
12    A.   Yes, with the client, reiterating, and
13 in some cases even starting with the fulfillment
14 process if the product is applicable to -- like
15 if it's an entity registration, they might say
16 have you thought about different names for your
17 company, and they start that process immediately.
18    Q.   So they are not just compliance folks,
19 do they wear other hats?
20    A.   They're only compliance, only
21 verification. They're not customer service.
22 They're not fulfillment, but they will start the
23 process so the client is engaged. You know, in
24 telesales you often -- not oftentimes, but there

Page 63

M. Savage

1 are times where it's hard to get a hold of a
2 client, so we get that process immediately
3 started. That is one area of internal
4 regulation.
5       We also have a monitoring department
6 which is very important to mention. It's out of
7 Utah so it's a completely separate division.
8 Approximately six to 10 monitoring reps monitor
9 every single sales rep at least two times a week.
10    Q.   When you say "monitor," can you get into
11 that --
12    A.   They listen to the entire call.
13    Q.   They listen to one call? How do they
14 pick the call to listen to?
15    A.   What they'll do is they'll pick at
16 random two sales calls, longer calls, that
17 resulted in sales. From a sales rep's -- from --
18 two calls for each sales rep every week. Then we
19 have an extensive list of do's and dont's that
20 our sales reps cannot say. They would be
21 disciplined or fired if they violate our policies
22 that they've signed, and they get weekly
23 trainings on that, and every week the monitoring
24 department puts on a webinar, internal webinar

Page 64

M. Savage

1 training for all of our sales reps, and in that
2 webinar they discuss issues that they have
3 whether they're coming across or, you know, if a
4 sales rep is veering offer the, you know, the
5 path, and what I mean by that is, you know, if a
6 particular sales rep is getting too pushy, not
7 being as -- you know, monitoring their sales
8 behavior.
9    Q.   These people in Utah who are monitoring,
10 what is their training?
11    A.   They all have training in either the
12 telemarketing world, telemarketing training,
13 telemarketing experience. The guy that is in
14 charge of it, Jason Baum, B-A-U-M, he has 20 plus
15 years of telemarketing compliance. He's very
16 familiar with telemarketing law, as is Joe, and
17 him and -- Joe and Jason, they meet frequently.
18 Joe --
19    Q.   But Jason is in Utah?
20    A.   Yes. They meet and -- you know,
21 frequently in person and also they have weekly
22 phone meetings, conference calls to discuss
23 legalities of telemarketing laws to make sure
24 that we are complying. Joe, if I could brag, he

FTC-TTC-000603

**Page 65**

M. Savage

1
2 wrote --
3     Q.  Let the record reflect that "Joe" means
4 counsel, Joe Sanscrainte, who is seated with us.
5     A.  He wrote all the self-governance laws
6 for the ATA, the American Teleservices of
7 America, the ATA, and so he's also a specialist
8 in telemarketing law.  Okay?  So the monitoring
9 department, they also review -- not only do they
10 review, when I say "review," monitor the entire
11 phone call of the sales reps twice a week, they
12 also review every phone call that -- in which a
13 client calls to cancel.  We have clients call and
14 say "I didn't buy that" or "this isn't what I
15 thought it was."  We review every single one of
16 those calls, so that's -- again, that is an
17 internal regulation.  That's not an external
18 regulation.  We have approximately, you know,
19 close to 100 reps, sales reps, and, you know, we
20 do -- I think we do a fantastic job of keeping
21 our hands on exactly what they're saying, how
22 they're presenting their preparation and
23 training.
24     Q.  We're moving into the sales, and that's
25 okay.  I just want to be sure that we're -- we've

**Page 66**

M. Savage

1
2 completed sort of operations and want to move
3 into the sales, and please feel free to go out of
4 order in the pages.  Since we've been talking
5 extensively about sales or begun to, maybe we
6 want to move to that section and talk a little
7 bit about that or we could continue as we were
8 page by page.
9     A.  Okay, we'll continue with page by page
10 because I feel like I'm going to leave some stuff
11 out.
12     Q.  Are any Tax Club employees trained to
13 give any kind of legal advice?
14     A.  No.
15     Q.  Are they trained not to give legal
16 advice?
17     A.  Yes.
18     Q.  Can you elaborate on that a little bit?
19     A.  Yes.  Especially the sales reps, they
20 aren't to give any legal advice at all.  That's a
21 fine on our fine sheet, as well as tax advice.
22 They are to stay away from tax advice, the actual
23 sales reps, but what we do is -- this is
24 specifically having to do with entity formations,
25 we give advice, the accountants will give advice

**Page 67**

M. Savage

1
2 based on the tax perspectives of different
3 entities, but we stay -- the accountants will
4 give tax advice, yes, but not legal advice.
5     Q.  Now I think we're mixing two things.
6 I'll jump around my outline as well.  The first
7 person from The Tax Club to speak with a
8 potential client is who?
9     A.  Either a sales rep or an appointment
10 setter.
11     Q.  What's an "appointment setter"?
12     A.  Appointment setter will call people up
13 and say "Are you interested in hearing a tax
14 presentation?"
15     Q.  How are the potential clients chosen?
16     A.  We have people who come to our --
17 organically who come to our web site who signed
18 up for a consultation.  We have consultation
19 sign-ups on different web sites of different
20 companies that we don't own or, you know, have
21 any ownership interest in, meaning put in your
22 information here for a tax, you know, whatever,
23 presentation.  We get what we call referrals.  We
24 get referrals from certain partners, referral
25 partners we call them.  No shared ownership but

**Page 68**

M. Savage

1
2 they will give us names of our -- of clients who
3 might be interested in some tax help, some entity
4 formation who are brand new business owners.  Our
5 niche is really a brand new business owner.  We
6 feel if we set them up the right way, it's not so
7 expensive, it's not so difficult to maintain
8 their books, prepare their taxes if they're
9 set-up the right way from the very beginning, so
10 I think part of the secret to our success is
11 we've really stayed within our niche of the new
12 business owner.  We do some e-mail marketing but
13 primarily over the phone.
14     Q.  How do you choose which companies you're
15 going to obtain potential customers from?
16     A.  We'll take -- we'll -- you know, the
17 selection process is more, you know, we'll take
18 any entrapreneurial list or any brand new
19 business owner list that we can.  Some have
20 better -- you know, some we have more success
21 with than others.  Some are more pertinent than
22 others, you know, more effective.
23     Q.  Are you familiar with the term "lead
24 source"?
25     A.  Yes.

FTC-TTC-000604

Page 69

M. Savage

2  Q.  Can you describe what a "lead source"
3  is?
4      A.  Lead source/referral partner I've used
5  interchangeably.  A lead source would be someone
6  who sends over files of clients, either they've
7  referred them to us saying hey, you have to --
8  you know, you should listen to The Tax Club, they
9  have some services that could benefit from.
10  That would be a referral.  Lead source would be
11  someone who just sends over leads that we call
12  and telemarket our services to, whether it be a
13  list of small business owners.  You know, it
14  really varies.
15     Q.  Are there any types of payment
16  arrangements between The Tax Club and these lead
17  source or referral partners?
18     A.  Yes.
19     Q.  Can you describe those payment
20  arrangements?
21     A.  We do typically -- every lead source,
22  every referral partner has a different contract,
23  different arrangement, but typically we will do a
24  revenue share on the first products that we sell
25  the clients, which is pretty typical in the

Page 70

M. Savage

2  accounting world.  You know, oftentimes you'll
3  get a lead where -- we'll do up to 30 percent and
4  sometimes 35 percent, which we'll share in that
5  initial revenue.  I know that, you know, it's not
6  uncommon for CPA firms to pay 100 percent of the
7  first annual revenue for a client, so -- but we
8  rarely go over 30 percent.
9      Q.  How do the names come to you?  Are you
10  buying lists?  Are you buying -- I would like you
11  to describe, please, how does that come about,
12  you know, once you've identified a referral
13  partner or lead source.
14     A.  Well, two different ways.  Again, every
15  referral partner and lead source is different.
16  Some will come over in a rep share model where we
17  don't buy the list, we will share in the revenue
18  of what we sell them.  Some we'll buy, we'll say
19  okay, we'll give you $10, you know, a lead.
20     MS. PROSPER:  Would you like some water.
21     THE WITNESS:  I'm fine.
22     A.  So you either buy a lead or share in the
23  revenue.
24     Q.  Do any of your lead sources or referral
25  partners as you describe them disseminate any Tax

Page 71

M. Savage

2  Club information to these potential clients
3  before you contact them?
4      A.  I'm trying to think if there's an
5  instance where there's an e-mail or -- I can't
6  think of anything.
7      Q.  Do lead sources --
8      A.  I'm sorry, there is a situation where
9  sometimes they will say -- you know, they'll say,
10  hey, The Tax Club is going to call you about tax
11  services, incorporation services, business plans,
12  whatever, you know, the arrangement is, don't
13  worry, you know, they're not affiliated with us
14  but we know who they are and their services are
15  good.  That happens, I guess, in some cases, but
16  it's not like, you know, we make them say that
17  or -- they'll just say that and -- so they don't
18  get -- so their clients, you know, don't say who
19  is calling me or who did you sell my name to or
20  things like that.
21     Q.  Do you know, if you know, do the lead
22  sources tell potential customers that, you sort
23  of answered, that The Tax Club will be calling
24  them, is there --
25     A.  Some do.  Some don't.

Page 72

M. Savage

2  Q.  Do you give them any materials?  Do
3  you -- I don't want to put words in your mouth
4  again.  Do lead sources, for example, might they
5  have a video or -- I know some of that came in
6  the production.  Before one of your sales reps
7  calls one of these potential clients, what have
8  they heard of The Tax Club and where did they get
9  that information?
10     A.  I would say in some cases it's probably
11  pretty half and half.  I would say half have
12  never heard of us, and I would say the other half
13  maybe we'll send out a warm-up e-mail.  We'll
14  send out an e-mail saying who we are, that we're
15  going to be calling.  That improves our
16  appointment setting ratios.  People are more
17  familiar with us.  You know, we'll -- again, a
18  warm-up e-mail.  Some of our clients, I am
19  familiar that we have a video and it's, you know,
20  saying who we are, what we do.
21     Q.  Where do they get the video?
22     A.  I've never seen any videos.  I just -- I
23  know that there's been a couple that have been
24  made and in case you've seen them or whatnot, I
25  know what you're referring to, it's not that

Page 73

M. Savage

1
2 prominent, and more likely than not it was
3 designed to, again, answer the question of who
4 are these guys, did you sell my name to these
5 people, why are you doing that.  More for them,
6 not for us.
7    Q.  More for them who?
8    A.  More for the lead providers.
9    Q.  Maybe I didn't -- maybe I asked it
10 already, and if I did, excuse me.
11       Are you providing the lead sources with
12 information about The Tax Club to pass along to
13 these potential folks?
14    A.  Not that I know of.
15    Q.  Do you know someone who could -- is it
16 more of a marketing thing or is it more -- would
17 someone in the marketing department know better?
18    A.  Yes.
19    Q.  Who might know?
20    A.  Brendan Pack our Sales Manager.  Again,
21 it would be an e-mail that -- warm-up e-mail.
22    Q.  You're not sure yourself?
23    A.  No.
24    Q.  Who may have seen these videos and when?
25    A.  He would.  He would know, Brendan would

Page 74

M. Savage

1
2 know.
3    Q.  Okay, great.
4       Let's continue through -- and questions
5 will come up and we'll flip back and forth.
6       MR. SANSCRAINTE:  I'm sorry, could I get
7 a cup of water?
8       MS. PROSPER:  In fact, why don't we take
9 a five-minute break.  It's now 11:30, so
10 let's make take five or 10 minutes.
11       MR. SANSCRAINTE:  Sure.
12       (A recess was taken.)
13    Q.  Okay, so we were going through -- I
14 can't remember the last question but --
15    A.  We were talking about sales
16 verification, monitoring department, some of the
17 training we do for our sales rep, and then we
18 decided, okay, should we get into sales or --
19    Q.  We were talking about referral partners,
20 lead sources.
21       Are any of your lead sources any social
22 media sites, do you know, or if you don't know,
23 who would know?
24    A.  I would say no.  Social media sites like
25 Facebook?

Page 75

M. Savage

1
2    Q.  Yes.
3    A.  No, none of the major social media.
4    Q.  So you don't advertise on social media
5 sites?
6    A.  Oh, I don't -- we don't, but maybe some
7 referral partners might advertise, but I wouldn't
8 say that Facebook itself sends us any -- you
9 know, refers people to us.
10    Q.  So we were reviewing lead sources, the
11 financial arrangements between them.  How do you
12 rate employee performance?
13    A.  We do an annual review modeled a lot
14 after what we did at PricewaterhouseCoopers.  I
15 brought over a bunch of people that I worked with
16 at Pricewaterhouse as our company grew.  I
17 recruited a bunch of people in the division that
18 I worked in, and which was the fraud investigation
19 department, and so we applied the same type of,
20 you know, like the rating systems, promotions,
21 bonuses based on reviews.
22    Q.  Are there other ways to get -- do you
23 have some people who are commissioned, who work
24 only on commission?
25    A.  No one works strictly on commission, but

Page 76

M. Savage

1
2 the sales reps are definitely -- I mean, both of
3 their income -- I would say the bulk, the better,
4 the more effective sales reps would be commission
5 based.
6    Q.  So just briefly describe as we talk
7 about the different employees on the
8 organizational chart how folks are paid and if
9 there are incentives like commission or even
10 disincentives like penalties for certain
11 behaviors.  You talked about reviews.  What are
12 those reviews based on?
13    A.  Strictly performance.  An easy way to
14 look at it is to say okay, our office is divided
15 right down the middle.  The south side of the --
16 of our floor would be our sales department and
17 the north side would be our fulfillment
18 department.  Fulfillment department is
19 compensated strictly on salaries.  We've been
20 hiring as we've been growing.  We pay, I think,
21 very well, very competitively.  Based on their
22 reviews will determine whether or not they get a
23 bonus or a raise.  That's how they're
24 incentivized, on how well they prepare tax
25 returns.  Their direct supervisor will evaluate

Page 77

M. Savage

1  them.
2
3        Sales side, they are not only
4  compensated based on their sales performance, you
5  know, their typical sales job, but they're also
6  deincentivized if clients refund or cancel or
7  have -- we'll take commissions away if the client
8  is at all mislead.  If they don't understand what
9  they bought, you know, when we discover by
10  monitoring the call that the call wasn't that
11  effective of a sales call, they didn't follow the
12  script, we will take commission away and we
13  withhold 10 percent of all comissionable sales to
14  offset refunds.  We call that retention.  And
15  every quarter we will give sales reps, you know,
16  whatever they have remaining in that 10 percent
17  pool of their -- the people that they brought --
18  that they've sold that haven't cancelled or
19  refunded.
20        Q.  So those are the only two sort of
21  structures that you have for paying employees?
22        A.  Yes.
23        Q.  I know we're jumping back and forth, but
24  I'm not sure what's next on the operations chart.
25        A.  We pretty much went through it.

Page 78

M. Savage

1
2        Q.  Are these next pages, would you say,
3  breakdowns of each?
4        A.  Well, it looks as though we're getting
5  into product specific.  Luke is Director of
6  Operations.  Sharif is in charge of our sales
7  verification department/compliance department.
8        Q.  He's located where?
9        A.  New York.  This is all New York.
10        Q.  Because you mentioned a group of people
11  in Utah --
12        A.  Yes.
13        Q.  -- who review the calls.
14        A.  Monitor the calls.  So Sharif is in
15  charge of verifying the sale, saying hey,
16  Mrs. Smith, this is exactly what you bought, this
17  is exactly what you're going to get, this is
18  your -- what's your credit card information,
19  what's your billing address, blah, blah, and then
20  in Utah Jason Baum is in charge of the monitoring
21  department which monitors all of our sales reps
22  every week to make sure that they're in
23  compliance.
24        Q.  And then did you mention -- I'm not sure
25  again if this is in my head or you mentioned it

Page 79

M. Savage

1
2  earlier, that if a client calls to request a
3  refund those calls are also monitored --
4        A.  Absolutely.
5        Q.  -- and reviewed?
6        A.  Every complaint we get, you know, if we
7  get something, whether it be from the BBB or AG's
8  office, we will review all those calls and try
9  and figure out, you know, get to the root of the
10  dissatisfaction and change our processes
11  accordingly and our controls.  I mean, my
12  previous, you know, employment was all based on
13  internal controls, evaluating internal controls.
14  I'm very comfortable, I'm good at implementing
15  internal controls.  I'm good at monitoring them
16  and placing new ones in to fix a problem.
17        Q.  Since we were just talking about
18  salaries, you described earlier like a penalty
19  structure?
20        A.  Yes.
21        MS. PROSPER: These, again, were culled
22  from the production that you made to us.
23  Showing you an 11-page -- 11 pages which came
24  from the HR training, it was under additional
25  materials that I'll just call infractions and

Page 80

M. Savage

1
2  lists.  You could call it something else, but
3  just for identification can we mark it,
4  please, as 6, AG Number 6?
5        (Whereupon, AG Exhibit-6, 11-page
6  document, was marked for identification, as
7  of this date by the Reporter.)
8        Q.  Mr. Savage, I'm handing you what's been
9  marked as AG 6.
10        Are these documents things you
11  recognize?
12        A.  Yes.
13        Q.  What do you recognize them to be?
14        A.  Our internal Do Not Call Policy, which
15  essentially is if a client says okay, don't call
16  me, you know, anymore, we put him on our do not
17  call list and -- or if they're, you know --
18  that's one way they'll be put on the do not call
19  list, do not -- internal do not call list.  They
20  opt into it.  They're given that chance via
21  e-mail, and also if they're upset, they call in
22  and they had a bad experience, we'll put them on
23  our do not call list so it doesn't resurface, so
24  okay, they either opt in or we place them on the
25  do not call list.

FTC-TTC-000607

Page 81

M. Savage

1
2 Q. How do they opt in again? You send them
3 an e-mail that says --
4 A. Yes, if you don't want any sales calls,
5 you don't have to have sales calls.
6 Q. When do they get that e-mail?
7 A. When they join.
8 Q. When they join --
9 A. When they join we send them a bunch of
10 stuff electronically primarily where we send an
11 agreement, you know, listing out all -- exactly
12 what they bought and receipt and cancellation
13 policy on it and opt out e-mail. You know, I
14 don't know if we still do that, actually. I know
15 we did it for quite some time.
16 Q. Do you know who would know?
17 A. Brendan Pack, but, anyway, so back to
18 the do not call list. Either they instruct us to
19 be placed on the do not call list or we will
20 manually put them on if there -- if they've had
21 an issue, and, again, the different lead
22 providers have different arrangements. Some lead
23 providers said, you know, you sell tax services
24 only and because they might sell other stuff,
25 maybe a competing product or whatnot, and so

Page 82

M. Savage

1
2 there's a -- you know, let's say if it was tax
3 services only, I'm thinking of one lead provider
4 in particular, then we automatically place them
5 on the do not call list, so I guess that would be
6 the third way, if it was a contractual with the
7 lead provider.
8 Q. So you're saying a lead provider could
9 refer a customer to you just for tax purposes?
10 A. Ahuh.
11 Q. And you would be sort of barred
12 contractually from offering them anything besides
13 tax services?
14 A. One control is we place them on the do
15 not call list. I mean, I'm just thinking of an
16 example. It's a small percentage.
17 Q. I understand. Go ahead. So there's a
18 do not call list, so that's -- I'm not sure that
19 that's a penalty structure, although it was in
20 that same --
21 A. It definitely is a penalty structure.
22 Q. If someone calls?
23 A. Oh, yes. I don't know how they would
24 because the phone number will not show up in the
25 system that the sales rep sees, our database, but

Page 83

M. Savage

1
2 let's say they go to lunch with an accountant,
3 okay, you know, I could get that -- that's never
4 happened, to my knowledge, that would be the only
5 way they could, and then they would get fined for
6 calling a person on the list, or if it was a
7 client that they had their previous number,
8 again, I shouldn't assume how they would call
9 them, but it is an infraction.
10 Q. How do the infractions work? You get --
11 in general, how do the infractions work?
12 A. From the monitoring department, Jason
13 Baum issues them.
14 Q. Before we do that, can you review all
15 the sheets so we could get it into evidence as
16 you talk about them, please, and we'll get back
17 to this but --
18 A. Do Not Call Policy, the fine list, this
19 is just another copy of this, yeah, another fine
20 list. This is the one I'm familiar with, but
21 it's exactly the same, infraction policy for
22 monitoring. Okay, this would be our policy in
23 which we would issue the infraction, dress code,
24 sales training, infraction policy for employees,
25 which I've never heard of anyone but a sales rep

Page 84

M. Savage

1
2 being fined, and then some training information.
3 MS. PROSPER: So I would like to now
4 move what's been marked as AG 6 into
5 evidence, please, and then we'll be
6 discussing it.
7 (Whereupon, AG Exhibit-6, as previously
8 described, was marked in evidence, as of this
9 date by the Reporter.)
10 Q. Can you explain briefly the process for
11 issuing an infraction, and if there's any
12 financial penalty, how that -- you a little bit
13 touched on it with the 10 percent withholding,
14 but how that is paid by the employee, et cetera?
15 A. It's unrelated to the 10 percent
16 retention. 10 percent retention focuses strictly
17 on refunds. The fine sheet, our infraction
18 policy is taken right out of paycheck. If it's a
19 $500 fine, we reduce their paycheck by $500.
20 Q. Is there a process or procedure by which
21 one is informed that there's an infraction?
22 A. Yes.
23 Q. Can you briefly explain that?
24 A. Sure. Monitoring department, Jason
25 Baum, will contact the particular team leader,

Page 85

M. Savage

1  the particular team manager and tell them -- on a
2  weekly basis, actually on a daily basis who gets
3  fined.  The fine will be assessed on a weekly
4  basis but they're informed on a daily basis.
5  Typically one to two fines a week will actually
6  make it passed the -- okay, make it to that -- to
7  the week, meaning they're informed on a daily
8  basis, they're given an opportunity to explain
9  themselves or to discuss it.  I would say three
10  out of 10 times the fine is reversed based on,
11  you know, more of an innocent until proven guilty
12  type model, and then on a weekly basis then
13  they'll, you know, they'll be assessed the fine
14  that they can't -- you know, if someone gets
15  fined twice for the same thing, then they get
16  fired.  It's not that common.  I mean, we don't
17  have any repeat offenders.  We would get rid of
18  them.
19     Q.  What would be sort of the most common
20  way that an infraction comes to light?
21     A.  It always comes through our monitoring
22  department.
23     Q.  Always?
24     A.  Always.  Sometimes there might be a

Page 86

M. Savage

1  cancelled -- a cancellation request.  We then
2  monitor the call and then monitor decides whether
3  or not to fine that actual sales rep.
4     Q.  Then there's a back and forth process
5  where they get to sort of defend themselves?
6     A.  Yes.
7     Q.  And you said something about the end of
8  the week which I didn't understand, that when the
9  money is taken from paycheck or how does that --
10     A.  We get paid every two weeks, but what I
11  meant was -- I was just backing up the number one
12  to two fines actually go through a week.
13     Q.  I see.
14     A.  A week, every week we have one or two
15  fines.
16     Q.  Per --
17     A.  That go passed --
18     Q.  Per zone?
19     A.  No, no, per company.
20     Q.  Just in general?
21     A.  Yes, that go passed the arbitration or I
22  don't know --
23     MR. MITCHELL:  The due process?
24     A.  -- the due process.

Page 87

M. Savage

1     Q.  Internal due process?
2     A.  Internal.
3     Q.  Just to finish up with the employees and
4  payment, by what means are your employees paid?
5     A.  Via direct deposit, check.
6     Q.  Are they paid on the same cycle?
7     A.  Every two weeks, yes, every other
8  Friday.
9     Q.  Do you use a payroll company to do that?
10     A.  ADP.
11     Q.  Do you earn a salary from The Tax Club?
12     A.  Yes.
13     Q.  Is it a fixed salary or is it -- does it
14  fluctuate?
15     A.  It fluctuates based on revenue.  I have
16  a salary plus a small commission.
17     Q.  Are you also paid biweekly?
18     A.  Yes.
19     Q.  What about the small commission?
20     A.  Yes, all in one check.
21     Q.  Right, but it comes biweekly?
22     A.  Yes.
23     Q.  Based on --
24     A.  Sales performance or company

Page 88

M. Savage

1  performance.
2     Q.  For the two weeks before or --
3     A.  Yes.
4     Q.  And you are not a partner?
5     A.  Not an owner.
6     Q.  Not an owner?
7     A.  Ahuh.
8     Q.  You are a partner, is that what you're
9  saying?
10     A.  No, but the answer to your question, I
11  don't own any shares but I'm an officer.
12     Q.  Tell me your title again.
13     A.  President.
14     Q.  President, exactly, of course.  How much
15  are you paid?
16     A.  $104,000 a year is my salary and --
17     Q.  Commission?
18     A.  And my commission is two and a
19  half percent of revenue after refunds and
20  cancellations and --
21     Q.  We'll get into that a little bit later.
22     Let's go and finish with the
23  organizational chart so we don't forget about it
24  or leave anything off.

FTC-TTC-000609

Page 89

M. Savage

1
2    A.   Sure.
3    Q.   Now, I think earlier you testified that
4  the pages following -- as the pages go on they
5  sort of break things down a little bit further.
6  Why don't we go through and, again, if you feel
7  the need to elaborate, please do, because the
8  name Luke Kennedy is from another page, let's
9  just sort of go through -- so Luke Kennedy is
10  Director of Operations and under him --
11    A.   Compliance/Fulfillment Verification,
12  business plans, My Essential Plans is the name of
13  our brand. Sebastian who works with -- works
14  with the business plans and the -- in the
15  operation of business plans.
16    Q.   Fulfillment; is that correct?
17    A.   Fulfillment. And Julie Ramroop, Project
18  Coordinator. I don't really know what project
19  she's working on but -- and then the Database
20  Manager is -- that position is vacant at this
21  time, and then underneath Sharif in the
22  Compliance/Verification Department would be
23  our -- the actual compliance, the verification
24  reps and that's all they do.
25    Q.   Right, okay. But they also gather some

Page 90

M. Savage

1
2  information you said, may gather some
3  information?
4    A.   They may, ahuh.
5    Q.   Okay.
6    A.   And I know that we spoke pretty in depth
7  about the tax operations. Joe Rush also oversees
8  our Vital Payroll. We provide payroll services
9  for our clients, and then here are the different
10  zones based on -- so there's three zones. During
11  tax season, right now most likely there's four
12  zones. It's, you know, tax time is right now.
13    Q.   Thanks for reminding me.
14    A.   We get about 10,000 calls a month.
15    Q.   Who do those calls go to?
16    A.   Primarily to the accountants.
17    Q.   Who are they from?
18    A.   Clients.
19    Q.   That are already existing clients?
20    A.   Oh, yes, yes. Most of the calls in
21  are -- I would say 90 percent are existing
22  clients.
23    Q.   Down at the bottom you have --
24    A.   Our tax accountants, our accountants and
25  EAs and tax analysts.

Page 91

M. Savage

1
2    Q.   Who are?
3    A.   They would be the equivalent of like a
4  paralegal for tax accountants. They gather
5  information and talk to clients.
6    Q.   And your Corporate Department?
7    A.   That would be the entity setting up the
8  entities. Maria is in charge and she has
9  Corporate Specialists, meaning, you know, people
10  who do the -- who package up -- print off the
11  incorporation papers by each state and send them
12  to the clients for them to sign.
13    Q.   Packaging, okay. Maria Petrova, what
14  kind of educational background does she have?
15    A.   I don't know.
16    Q.   Do you know who would?
17    A.   Yes. Joe Rush would know, but I could
18  find out for you today.
19    Q.   Okay, so we're talking about tax
20  operations, Corporate Department, Maria Petrova
21  is Lead Specialist.
22    A.   I don't know why it says that. That
23  doesn't make any sense to me.
24    Q.   So maybe we'll get some elaboration on
25  that.

Page 92

M. Savage

1
2    A.   I think it could be a typo. I don't
3  know what "Lead Specialist" is.
4    Q.   Can you tell me about the Corporate
5  Specialists and what kind of background they have
6  and what exactly they do?
7    A.   From my understanding,
8  administrative/secretarial role in the sense of
9  communicating with clients and gathering
10  information and -- very administrative, data
11  entry. I would say their background would not
12  be -- it doesn't necessarily have to be -- I
13  don't know. I don't know what each individual
14  background is, but --
15    Q.   Would Joe Rush know?
16    A.   Yes.
17    Q.   You mentioned that they prepare the
18  incorporation papers.
19    A.   Yes. They --
20    Q.   How do they do that?
21    A.   They organize them. They will fill them
22  in. You know, very similar to, you know,
23  incorporation services like a Legal Zoom, if
24  you're familiar with them.
25    Q.   A little bit.

FTC-TTC-000610

Page 93

M. Savage

1
2    A.  They're a lead provider.  They gather
3  the information.  You know, client will say okay,
4  I want an LLC so they'll print off the LLC
5  documentation per state and send it to them,
6  client signs it.
7    Q.  Where do they get that stuff?
8    A.  Off the web site.  Each state has, you
9  know, a commerce web site that has all the forms,
10  or the IRS, federal stuff comes off IRS.  A lot
11  of states do it electronically so you don't have
12  to print out the forms.
13    Q.  What are they doing?  What are -- I
14  mean, maybe we could use an example, but if I
15  wanted to incorporate a business in New York for
16  selling Zabar's cups, I guess I want to know
17  what's the thought process or what are they
18  gathering, what are they spitting out, for lack
19  of a better term, and where are they pulling that
20  information from?
21    A.  Okay.  It's important to clarify that
22  they don't necessarily advise on what structure
23  would be best.
24    Q.  Does someone do that?
25    A.  Accountants will.  The accountants will

Page 94

M. Savage

1
2  talk to the client.  That's why we schedule that
3  accounting assistance meeting immediately and the
4  clients will talk to our -- our accountants will
5  talk to the clients immediately and talk -- these
6  are the tax effects of an S corporation,
7  flow-through entity, this is the tax effects of
8  an LLC taxed as a sole proprietorship or taxed as
9  a partnership.  What would you like to do?
10    Q.  Who is the first Tax Club employee -- I
11  may have asked this already.  Sorry if I did.
12        Who reaches out to the potential
13  customer?
14    A.  After the sales verification process we
15  set up a bunch of appointments and the first
16  appointment is with the account executive.
17    Q.  Maybe we need to get into sales first.
18  What are they sold at that first I guess -- you
19  know, I mean, this is the very next category.
20  What are they sold at that first sales call?
21  What information is exchanged?  I mean, we want
22  to break it down, but that's kind of the gist of
23  my question, because you're talking about
24  fulfillment of a sale that's already made, so
25  what are they sold?

Page 95

M. Savage

1
2    A.  They're sold a package, a membership,
3  Tax Club membership which includes tax
4  preparation, tax consulting, tax preparation for
5  both corporate and individual tax returns,
6  consulting.
7    Q.  What kind of consulting?
8    A.  Tax planning.  This would be a better
9  tax scenario for you, if you put that in an LLC,
10  your taxes as an S Corp., this would be the net
11  effect on your tax return.
12    Q.  How do they come to choose?  With whom
13  are they interfacing when they come to choose
14  which --
15    A.  A sales rep.  A sales rep won't get into
16  that detail.  A sales rep will say --
17    Q.  They won't or they shouldn't?
18    A.  Well, they shouldn't give specific tax
19  advice.  It's on the fine sheet.
20    Q.  Okay, the sales -- I just want to
21  understand, and I'm going to break it down
22  specifically.
23        The sales rep is the person who sells
24  them --
25    A.  Yes.

Page 96

M. Savage

1
2    Q.  -- the membership?  As part of the
3  membership are they getting an incorporation?
4    A.  Ahuh.
5    Q.  Who chooses or decides what
6  incorporation is sold to them?
7    A.  Well, what -- what we call
8  "incorporation" is -- includes an LLC, it might
9  be an LLC, it might be an S Corp., it might be a
10  limited family trust, not family trust, a family
11  limited partnership or a C corporation.  That's
12  not determined at the point of sale.
13        If I could put words in your mouth, is
14  this what you're asking, what is presented to the
15  client?
16    Q.  What are they sold?  What is pitched to
17  them at that initial sales call?
18    A.  They are presented with -- the client is
19  presented with a Tax Club membership which --
20  when they explain what a Tax Club membership is,
21  they will say it is a membership that includes
22  incorporation services, tax preparation for
23  your -- for whatever corporate structure you
24  decide to establish.
25    Q.  Let's stop there.  The word "decide,"

FTC-TTC-000611

Page 97

1          M. Savage
2 who is involved in the decision-making process as
3 to which corporate entity is chosen and when does
4 that take place?
5     A.  With the accountant.
6     Q.  So at the end of the sales call they've
7 purchased what?
8     A.  They've purchased tax preparation, tax
9 consulting, unlimited access to a tax advisor
10 throughout the year, and the process of
11 incorporating.
12     Q.  At the end of the call, before their
13 credit card is charged, do they know what
14 corporation they're going to --
15     A.  No.  They might ask a question, and this
16 is speculative, what do most people do when --
17 for properties?  And, you know --
18     Q.  What is the salesperson --
19     A.  I mean, the salesperson might say "a lot
20 of our clients will form an LLC," but they're not
21 saying "form an LLC."
22     Q.  Do the salespeople sort of run through
23 what options there are?
24     A.  I don't know.
25     Q.  Do you know who would know?

Page 98

1          M. Savage
2     A.  Brendan Pack, as per the script.
3     Q.  I'm glad you talked about scripts.  What
4 we received in our -- in what you produced were
5 compliance scripts, at least I didn't see any
6 like sales scripts.  I saw sort of outlines for
7 and I saw -- maybe I just didn't find them.
8     A.  I'll get those to you right away.
9     Q.  I'm interested in how the sales folks
10 are trained, what it is that they're supposed to
11 be pitching, like what you've entered already,
12 tax preparation services and membership, if you
13 could tell me a little bit about how the
14 membership works, like -- maybe I'll help you a
15 little bit, and pardon our very elementary
16 splicing together of this but it wouldn't fit on
17 legal and it wouldn't -- so what I've done here,
18 and you could -- if it's not accurate, please
19 tell me, is spliced together in pages of three, I
20 have four long sheets which are three and a half
21 by 11 sheets stapled together of what you gave us
22 as your incorporation packages, and so let's mark
23 this, please, as AG Number 7 I believe we're up
24 to, and it was called Price Lists in the
25 production.

Page 99

1          M. Savage
2          (Whereupon, AG Exhibit-7, Price lists,
3     was marked for identification, as of this
4     date by the Reporter.)
5          MS. PROSPER: And it's four stapled
6     together pages.
7     Q.  Can you look at that and tell me if it's
8 something that's familiar to you?
9     A.  Yes.
10     Q.  What is that?
11     A.  A description of products and price
12 points.
13     Q.  What kinds of products are these and
14 here's -- I'll help you, are these the initial
15 products sold or is that a fair representation --
16     A.  Yes.
17     Q.  -- of what this list represents --
18     A.  Yes.
19     Q.  -- versus later products that might be
20 sold to a customer?
21     A.  Yes.
22     Q.  So there are a lot of things on the
23 list, and we don't have to go through each and
24 every one, but can you give me a sense of the
25 difference between some of these packages?  First

Page 100

1          M. Savage
2 of all, I want to know what -- can you give me
3 some of the names, if we could start with the
4 first two or three?
5          MS. PROSPER: Sorry.  If this is
6     something you recognize, let's go ahead and
7     put it into evidence as AG 7 and then we'll
8     start talking about it.
9          (Whereupon, AG Exhibit-7, as previously
10     described, was marked in evidence, as of this
11     date by the Reporter.)
12     Q.  So let's go down maybe the first three
13 or four and tell us the titles they have and if
14 you could sort of briefly describe the
15 differences between them and then sort of give me
16 a general overview of what other differences
17 there might be, other than the prices.
18     A.  Okay.  Corporation Document Package,
19 item number one, would be access to our E-tax
20 hotline, which is electronic access to
21 accountants to ask tax questions.
22     Q.  When you say "electronic," is it like
23 one of those -- is it live?
24     A.  E-mail.
25     Q.  So you e-mail a question and then

Page 101

M. Savage

1  someone e-mails you back?
2
3      A.  Yes, as opposed to calling.
4      Q.  Or one of those -- what do you call that
5  when you live --
6      A.  Chat.
7      Q.  -- live chats?
8      A.  I think we have a chat here and there.
9  I know we do during tax season.
10         Corporation & Kit meaning the
11 corporation -- what we mean by this is it's -- it
12 doesn't necessarily have to be a corporation.  It
13 could be an LLC or it could be, you know, a
14 limited liability partnership, but what we mean
15 by that is the corporation paperwork to file for
16 a corporation, and the kit is, you know, the seal
17 and the stock certificates, if applicable, you
18 know, generic operating agreement.
19     Q.  And the salesperson, what are they
20 supposed to be --
21     A.  I mean --
22     Q.  Again, I don't want to assume things,
23 but I'm assuming that you want sort of higher
24 sales, and as I look down on this list, the
25 products get more expensive.

Page 102

M. Savage

1
2      Before we get into that, talk about
3  how -- what this POS Price?  And then there's a
4  2nd Half, I'm not very good at reading upside
5  down, Monthly Price, Quarterly Price.
6         Before we get to the description, how is
7  that structured?  How are people --
8      A.  Sure.  Point of Sale Price, this would
9  be the most -- you know, basic -- this is how
10 much it costs, that's it.  Half price would be
11 if -- some of our clients opt to have -- you
12 know, if they don't have, let's say, $1,400 but
13 they really want the product and they have $750,
14 we'll say you could pay us half the price later,
15 whether it's a month, two months or three months.
16 We'll put that into our system to automatically
17 bill them the second half price at a determined
18 time.
19     Q.  At an agreed upon time?
20     A.  Yes.  Monthly is the monthly cost for --
21 associated with our membership.
22     Q.  Is that paid off at a certain time
23 frame?  The monthly membership, is that like a
24 payment plan or --
25     A.  No.

Page 103

M. Savage

1
2      Q.  So please explain that.
3      A.  That's access to an accountant, access
4  to our members-only portion of our web site, but
5  yeah, it's part of being able to call in or in
6  the case of E-tax hotline, being able to e-mail
7  in year-round tax questions, so, for example, if
8  you're at a dealership and you want to know if
9  the SUV you want to buy is tax deductible, you
10 could call the accountant and say hey, is this
11 tax deductible?
12     Q.  You pay that monthly membership fee for
13 how long?
14     A.  For as long as you're current with your
15 membership.
16     Q.  What does that mean?
17     A.  Meaning as long as you don't cancel.
18 You could cancel at any time.
19     Q.  I'm starting a Zabar's cup selling
20 business, I purchase one of your initial packages
21 and I pay a fee.  Outside of that there's a
22 monthly fee to sort of maintain, is that the
23 correct word?
24     A.  Right.
25     Q.  The ability to contact The Tax Club with

Page 104

M. Savage

1
2  tax related questions?
3      A.  Yes.
4      Q.  So also inside of that is my
5  understanding that there's an incorporation or
6  some kind of corporate structure that is built?
7      A.  Corporate documentation will be
8  prepared, not necessarily associated with the
9  monthly though.
10     Q.  Not associated with the monthly.  So
11 would you say that that piece of it is a
12 one-time --
13     A.  Yes.
14     Q.  I just want to get really specific here.
15         At the end of the sales call, when all
16 is said and done and you have the compliance
17 people come on, what have I bought?
18     A.  Depending on your package, let's use a
19 basic package, you have bought tax preparation,
20 meaning we're going to prepare your taxes, sign
21 the return, you bought access to an accountant,
22 like the upfront fee I guess you could say, if
23 you want to associate the monthly with the access
24 and consulting, planning, and that's what we do
25 in the beginning, we'll do a tax plan, and in

FTC-TTC-000613

Page 105

M. Savage

1
2  some cases, in some packages --
3     Q.  What is a tax plan based on?
4     A.  Your current situation.  Like you would
5  say okay, I have this business, I have that
6  business, I have this car that I use for the
7  business, I have these dependents, these kids,
8  you know, I got this, this and that and we'll say
9  okay, this is your plan, if you change this up,
10 this is would be your savings.
11    Q.  When is the information gathered for
12 that tax plan?
13    A.  In the beginning of the membership.
14    Q.  What is to you the beginning of the
15 membership?
16    A.  We set up -- we set the appointment up
17 immediately.  Within five days we try and get the
18 process started, but I would say that it varies
19 depending on the client's responsiveness to the
20 questions we ask.  You know, they might need to
21 go look up, you know, information as to like how
22 many brokerage accounts they have or what stocks
23 they've sold.  There's a lot of variability, but
24 the back and forth probably will go on for six
25 months in an extreme case.

Page 106

M. Savage

1
2     Q.  Before --
3     A.  We try to get that done immediately.
4     Q.  So the six months before the plan is
5  implemented?
6     A.  No.  We'll start giving them -- we'll
7  give them plans based on the information they
8  provide us immediately.  You know, a lot of trial
9  and error.  We've -- clients get upset saying
10 hey, I bought this plan, where's my plan?  Well,
11 you haven't given us your information.  Well,
12 when they provide us basic information we say
13 this is where you're at, but if you give us this
14 X information, it will get more comprehensive.
15    Q.  At what point is a discussion had about
16 how to incorporate, what entity to choose?
17    A.  That happens with the accountant.
18    Q.  That happens approximately how many days
19 afterwards?
20    A.  That process would start five days
21 afterwards with the accounting assistance
22 appointment.
23    Q.  So at the end of my call when I turn
24 over my credit card information, do I get
25 anything tangible right away?

Page 107

M. Savage

1
2     A.  Well, you get an e-mail explaining
3  exactly what it is that you bought.  "Tangible"
4  in the sense of physical -- I mean, we're selling
5  a service, so I would say nothing, you know,
6  physical.
7        MR. MITCHELL:  Just to interject, let's
8     say she wants to start this business with the
9     cups, in selling the cups, she makes -- she
10    gets a phone call, correct, and just
11    reiterate, what is described to her by the
12    salesperson during that phone call
13    surrounding the services that she's expected
14    to get and the services surrounding the type
15    of corporation or entity to set up.
16        THE WITNESS:  Okay, she's going to get a
17    phone call saying Tax Club membership, buy
18    this Tax Club membership and this is what the
19    membership is; it's access to an accountant
20    year round so if you have tax questions you
21    call in any time and get those questions
22    answered.  It includes tax planning, initial
23    planning and also includes tax preparation,
24    you know, you give us the information in
25    order to prepare this 1120S for you, we sign

Page 108

M. Savage

1
2     it, we'll either E-file it, send it to you,
3     you could sign it and send it in or -- and
4     then the monthly -- and an incorporation, we
5     will prepare the documentation.  For example,
6     anyone can incorporate.  I don't even do it
7     myself.  If I want to incorporate, I usually
8     go to legalzoom.com and they'll -- you know,
9     I'll just fill in the -- fill out the survey
10    and they'll spit me out the forms that I
11    print out, sign, send off and send the state
12    filing fees for, so we'll provide that
13    process, and -- but we don't pay -- the
14    prices, the initial price does not include
15    the state filing fees.  We don't pay state
16    filing fees on behalf of the clients.
17        So you're selling cups, you get the --
18    you know, judyscups.com, whatever LLC or S
19    Corp., Inc., whatever you decide.
20 BY MS. PROSPER:
21    Q.  I'm sorry, I will decide that
22 approximately five days later with an accountant?
23 That's not decided at the time of the sales call.
24 I have not chosen yet whether I want to be an LLC
25 or S Corp.

FTC-TTC-000614

**Page 109**

M. Savage

1     M. Savage
2     A. Sometimes. Depends.
3     Q. How does that process work? You're
4  calling me because I went to cups.com and found
5  Zabar's cups. You know, I think they're going to
6  sell, so you obtain my name by one of the means
7  we talked about earlier, the lead source
8  referral, you call me and say hey, we've got
9  great tax preparation services. At some point do
10 you ask me whether I'm already incorporated or --
11 I mean, what information is gathered -- I mean,
12 obviously, you know, we've heard sales calls
13 because they were sent to us. What information
14 is gathered during that sales call? How is that
15 information manipulated to come up with a
16 solution for me? What questions am I asked in
17 that initial sales call?
18    A. I would say every sales call is
19 different and --
20    Q. How about what questions do you expect
21 sales folks to ask?
22    A. I would expect them to say have you
23 thought about incorporating your business, have
24 you thought about, you know, getting a web site,
25 have you thought about, you know, office -- home

**Page 110**

1     M. Savage
2  office deductions? These are all things that our
3  accountants will be able to help you out with but
4  things that you'll need.
5     Q. At the end of my call, and I'm going to
6  jump ahead to some other things, at the end of
7  our call when I've purchased one of these
8  packages and he reviewed what's in it, let's say
9  the basic one, so I expect to pay my monthly dues
10 and be able to call in at any time from the car
11 dealership, from the restaurant or my cruise, are
12 the salespeople supposed to give sort of
13 scenarios of different ways I might be able to
14 incorporate or are the salespeople -- do the
15 salespeople have a list of the different types of
16 incorporations, are they comparing and
17 contrasting the different corporations to the
18 sales -- to this potential customer?
19    A. I can't speak to exactly what any
20 particular sales rep has said. There are
21 scenarios that I could see would be appropriate
22 to say this is what -- this is how someone is
23 incorporated, this is how -- these are the
24 differences, maybe, but I would assume or hope
25 that -- I know that the sales reps are not

**Page 111**

1     M. Savage
2  preparing any of the incorporation documents
3  whatsoever. I know that for a fact.
4     Q. So they're not preparing them, but are
5  they helping the customer choose which type of
6  incorporation they may want to affiliate their
7  company with?
8     A. Are they? Again, I can't speak of a
9  particular situation, and I know that, you know,
10 we have thousands of calls a week and I don't
11 know exactly -- they're not supposed to --
12 they're not supposed to give legal advice.
13    Q. So let's elaborate on that. So are you
14 saying that to choose between which corporate
15 entity to incorporate is legal advice?
16    A. I would say in some cases.
17    Q. So at the end of my call when I turn
18 over my credit card, I have -- you spoke of it
19 earlier, three days or 15 days depending on -- so
20 right now what I bought is the ability to call in
21 really, it's almost virtual?
22    A. It's a service.
23    Q. It's a service, and I have three days to
24 decide on a refund?
25    A. Ahuh.

**Page 112**

1     M. Savage
2     Q. In those three days, do I have any
3  basis, other than oh my, I just spent so much
4  money to -- have I received any service or is
5  there anything tangibly that I could say this is
6  done terribly and very poorly, I would like my
7  money back, is there something that's given
8  service wise or tangible to the customer, the new
9  customer within that time frame?
10    A. I would say in some situations, yes.
11    Q. Something like what?
12    A. We've had clients come aboard who were
13 getting audited and within, you know, a very
14 short period of time immediately we will gather
15 their information, help them with the audit, call
16 the IRS on their behalf and in that situation I
17 would say the client would be very happy.
18    Q. And that's not a client whom you have
19 solicited to purchase something?
20    A. It could be.
21    Q. So someone who you call may say oh, I'm
22 so glad you called, I'm not trying -- this is
23 just me, I'm so glad you called, I just got a
24 letter from the IRS last week that I'm being
25 audited so let's get started on this?

| | |
|---|---|
| Page 113 | Page 115 |

Page 113

M. Savage

1           M. Savage
2  A.  I'm sure a sales rep would be happy to
3 get that call.
4  Q.  I bet they would.
5     In this window time, you know, three-day
6 or 15-day window, what is -- what may I have in
7 front of me, what might I have in front of me
8 after paying for the service to evaluate whether
9 or not I'm getting my monies worth or whether I
10 want to continue?
11  A.  Well, you get -- it varies by product.
12 We're specifically speaking about this product.
13 You get access to an accountant, means you could
14 start calling immediately.
15  Q.  What if I don't have any questions in
16 the first three days?
17  A.  I guess what -- the consideration that
18 you're getting -- that you're getting immediately
19 would be, you know, the access is one.
20  Q.  The ability?
21  A.  Yes.  We immediately start with the
22 documentation preparation for the entity.
23  Q.  "Immediately," elaborate on that,
24 please.
25  A.  I would say the very next day it's in

Page 114

M. Savage

1           M. Savage
2 process.
3  Q.  What's in process?
4  A.  The incorporation paperwork,
5 discussions.
6  Q.  I really want to clarify this point.  If
7 the decision is not made but with the accountant
8 five days later, what is in process?
9  A.  We'll get an EIN number immediately,
10 that's electronic.  I think we get that within
11 three days.
12  Q.  And an EIN number is --
13  A.  Employer Identification Number.
14  Q.  What does that get me?
15  A.  The incorporation process, so you're
16 incorporated.
17  Q.  Incorporated as what?  I'm just a
18 corporation?
19  A.  Yes.
20  Q.  And so you mentioned the paperwork is
21 starting immediately.  What paperwork is starting
22 immediately and when do I get it?
23  A.  Well, some states are paperless so
24 there's -- in some situations you never get
25 anything tangible or physical necessarily, but

Page 115

M. Savage

1           M. Savage
2 what you're getting is obviously beyond the
3 access to, you know, the services, you're getting
4 an EIN number, which, you know, maybe to you and
5 I it's easy to go on the IRS web site and obtain
6 but to a lot of our clients I think they
7 appreciate the guidance from people who have done
8 thousands and thousands of them, and in some
9 cases you'll get access to -- immediately access
10 to our members-only section of our web site which
11 has a ton of information on starting a small
12 business.  In some of these packages you'll get
13 money management guide, start-up guide.
14  Q.  Is some of that -- I'm glad you
15 mentioned that, the access.
16  A.  Immediately.
17  Q.  Could I find on the web site some
18 information about what kind of business I want to
19 incorporate as?  Is there a guide of some kind on
20 the web site?
21  A.  Not that I know of.
22  Q.  Do you know who would know?
23  A.  I would.  Tom, but Gary would know, Gary
24 Milkwick.
25  Q.  I guess what I'm -- we're going back and

Page 116

M. Savage

1           M. Savage
2 forth because I'm a little bit confused.  Now
3 that I've handed over my money, I have the
4 access, that piece I understand.  I get an EIN
5 which I'm not really quite sure what the EIN gets
6 me in terms of -- I mean, does it hold a
7 corporate name?  What does the EIN do?
8  A.  Yes.  It gets your corporate name.  When
9 you incorporate, you incorporate federally and
10 locally with the state.  It takes care of the
11 federal incorporation and in some cases with a
12 state -- I don't which states are completely
13 electronic, but, in other words, within three
14 days, yes, there are situations where you could
15 be fully incorporated.
16  Q.  How does that full incorporation occur
17 within three days if I haven't spoken to an
18 accountant yet, like how would that scenario
19 occur?
20  A.  I don't know.
21    MR. MITCHELL:  Then, again, just to
22 piggyback, you don't know if it's a Y Corp.
23 or S Corp. or LLC?
24    THE WITNESS:  In some cases.
25    MR. MITCHELL:  You get an EIN number and

Page 117

1              M. Savage
2    it starts the incorporation process?
3          THE WITNESS: Yes.
4          MR. MITCHELL: And we are not sure from
5    what point from there do we become
6    incorporated by way of an LLC, S Corp., and
7    the decision that is made, is that made with
8    an accountant, how much time after the EIN
9    number is given do we make a call, does the
10   accountant call us or e-mail us? How does
11   that process work?
12         THE WITNESS: Right, in some cases, and
13   I would say probably close to half, I think
14   this is an important point, is that clients
15   will know what entity they want and they'll
16   insist on an entity. You know, they'll say I
17   want an LLC, we're not going to talk them out
18   of it. In cases of that, I think it's a
19   little bit more clear-cut, but, you know,
20   when people say yes to the access to a
21   specialist, we have to make sure that
22   specialist is staffed. We have to make sure
23   they're available. We have to make sure that
24   they're there to make the appointment, and,
25   like we said earlier, they're expensive. We

Page 118

1              M. Savage
2    pay our accountants a lot, and so that's why
3    we have -- you know, we'll get people their
4    money back up to 15 days if they're unhappy
5    with the services regardless of how much
6    they've actually used us.
7    BY MS. PROSPER:
8      Q.   Now, I mean, 85 percent they'll get
9    their money back within 15 days?
10     A.   Ahuh.
11     Q.   Even if you've already produced the
12   incorporation papers for them?
13     A.   Yes, even if we prepared tax returns for
14   them.
15     Q.   Within 15 days they get 85 percent?
16     A.   Yes.
17     Q.   It's not based on use, that's the
18   question that I have?
19     A.   No.
20     Q.   This is probably a good time. What
21   kinds of corporate structures can The Tax Club
22   help a client form?
23     A.   Anything, trust, anything from a sole
24   proprietorship to a trust.
25     Q.   In creating these, would you say -- I

Page 119

1              M. Savage
2    don't want to put words in your mouth, they're
3    more form based or are they more specific to the
4    client? You mentioned earlier -- I always like
5    to take off from where you mention something.
6    You mentioned earlier that you go to the 50
7    Secretary of State web sites and pull documents
8    from there. Are there other sources from where
9    you might pull documents --
10     A.   No.
11     Q.   -- to create an entity?
12         Again, I'm interested in the
13   decision-making process of choosing. I just
14   bought, however I did, from one of your lead
15   sources this cup franchise and you call me and
16   this is sort of all virtual and hypothetical, I
17   don't know that you're calling, I don't know what
18   services you're going to offer me, I am, let's
19   say, just selling them out of my garage, I'm not
20   thinking about liability or incorporating
21   necessarily. In the sales pitch, you know, what
22   if I don't need incorporation or what if I don't
23   want incorporation or what if -- not to ask so
24   many questions, but I'm just trying to get us to
25   think a little bit, what if I'm already

Page 120

1              M. Savage
2    incorporated?
3      A.   Which happens a lot, and in some cases,
4    you know, it's good to have separate corporations
5    for separate properties. I mean, on a
6    case-by-case basis there definitely would be
7    scenarios where one corporation is not enough.
8    We do get leads from a lead source Legal Zoom and
9    they already have corporations so we're just
10   selling tax preparation to them.
11     Q.   You just said, right before you said
12   that there may be circumstances where one
13   corporation isn't enough. Who is involved in
14   helping me, the customer? I'm fine with my sole
15   proprietorship but someone is, for lack of a
16   better term, talking me into purchasing the
17   corporation, incorporation services, who is doing
18   that?
19     A.   I could see a scenario where it would
20   not be deemed giving tax advice.
21         (A recess was taken.)
22     Q.   So we were discussing sort of
23   expectations and outcome of this initial sales
24   call from The Tax Club to potential clients and
25   what the potential client has at the end of the

FTC-TTC-000617

Page 121

M. Savage

1   M. Savage
2   sales call, whether tangible or service wise or
3   the potential to tap into services.
4        I just have a question.  Is there a
5   process for deciding what will initially be
6   offered to what customer or are all customers
7   offered the same thing?
8        A.  There's no process.
9        Q.  So are salespeople trained to offer the
10  same product or the same series of products to
11  potential customers?
12       A.  Yes.  They're based on teams.  The sales
13  teams are based on products and, you know, it
14  might be a variation of a Tax Club membership, it
15  might be tax -- it might be an incorporation kit
16  or not, might be preparation or not.  A lot of
17  clients like to stay with their local CPA but
18  they want access.  They like that access to the
19  tax hotline to be able to ask a lot -- there's a
20  lot of -- there's a lot of questions that new
21  business owners have when it comes to taxes, so
22  maybe that's all they want.
23       Q.  You said that it's done by teams.  Are
24  the sales, these initial calls by the
25  salesperson, are they selling anything other than

Page 122

M. Savage

1   M. Savage
2   what's on the list, AG Exhibit-7?  Are they
3   selling some of the other products that your
4   company sells, that Manhattan Professional Group
5   sells?
6        A.  Initially?
7        Q.  Initially, this first call.
8        A.  In some instances, yes.
9        Q.  In what instances?
10       A.  A contractual agreement with a referral
11  partner who wants us to sell, I don't know,
12  business plan first.  That's an example I could
13  think of.  Not common.  This is the vast, vast
14  majority of what is initially offered.
15       Q.  What would happen if a potential
16  customer sought what you would consider legal
17  advice from a salesperson?
18       A.  If they thought it was legal advice?
19       Q.  Yes, if they had a question, if the
20  potential customer during the call had a legal
21  question and they don't know who they're talking
22  to, they say, hey, salesperson, answer me this
23  legal question, what is supposed to happen per
24  the training manner?
25       A.  No legal advice.

Page 123

M. Savage

1   M. Savage
2        Q.  What is a salesperson trained to do in
3   that case?
4        A.  Trained to do?  Not offer legal advice.
5        Q.  Do they say something to the potential
6   customer?
7        A.  I don't know.
8        Q.  I mean, I don't know how intricately
9   familiar you are with the training that a
10  salesperson gets, and if you're not, then tell me
11  who actually --
12       A.  They are instructed to say that they are
13  not attorneys and they are not accountants and
14  they are to not give legal advice.
15       Q.  Are they instructed to that say at the
16  onset, like don't ask me any legal questions or
17  only if a legal question would come up would they
18  be instructed to say that?
19       A.  I don't know if it's before or after.
20       Q.  Who would know, do you know?
21       A.  Jason Baum.
22       Q.  Who does the sales training?
23       A.  Jason Baum.
24       Q.  All of it himself?
25       A.  No.

Page 124

M. Savage

1   M. Savage
2        Q.  Who else?
3        A.  He's in charge of monitoring so he'll do
4   a weekly sales training.  Brendan Pack does sales
5   training and Preston Clark.
6        Q.  Is that sales training for when
7   employees first come to work before they get on
8   the phone?
9        A.  Yes.  In fact, now we have -- they have
10  to take a test on our products before they could
11  sell them.  We have all that information, all the
12  disclosures and agreements that they sign into
13  saying I won't do this, this and this.  Every
14  sales rep has that.
15       Q.  Every sales rep has that?
16       A.  Yes.
17       Q.  And how much training do the sales rep
18  get, like how many days?
19       A.  At least once a week and probably on
20  average twice a week.
21       Q.  I'm saying before they come on board,
22  before they start making phone calls, sales
23  calls.
24       A.  There's a series of webinars, you know,
25  electronic training courses, as well as personal,

Page 125

M. Savage

1 you know, live training. How much they get? I
2 don't know.
3
4    Q.   One of the two names you mentioned
5 earlier, the trainers would know how much they
6 get?
7    A.   Yes.
8    Q.   Are they paid during the training
9 period?
10   A.   Yes.
11   Q.   Do you know over what period of time the
12 training takes place?
13   A.   Constantly in training.
14   Q.   Before they get on the phone?
15   A.   Initial training?
16   A.   Yes, initial training.
17   A.   I do not know.
18   Q.   And the same folks who do the training
19 would know?
20   A.   Yes.
21   Q.   Okay, what information are new customers
22 given regarding how to use the services that they
23 just purchased? For example, I think you
24 mentioned an e-mail. What are they -- is
25 generated right after they make the purchase?

Page 126

M. Savage

1
2 Phone call ends, what do I have, what information
3 do I have for what I just purchased, how to use
4 it, how to tap into it? Q. I have a burning
5 question right after I hang up the phone, what do
6 I do?
7    A.   They are assigned an account executive
8 immediately. If they have a burning question,
9 they will be transferred to the account executive
10 to determine what their question is and what's
11 the best, you know, how to route that question to
12 their accountant, to there team.
13   Q.   What if it's after I hung up, what if
14 have it tomorrow morning, what do I know at the
15 end of my call about how to access the services?
16   A.   Right after the salesperson made and
17 verified, you get an agreement via e-mail stating
18 phone numbers, exactly how -- who to call in,
19 what to do in the event of a question, again,
20 reiterating what you bought, our cancellation
21 policy, and then the link for an E-agreement,
22 E-signature agreement where they sign exactly
23 stating what they bought, how much they bought it
24 for, and most of our clients sign that.
25   Q.   Most of them sign it. What happens to

Page 127

M. Savage

1
2 the ones that don't?
3    A.   We try to get them to sign it because it
4 helps us down the road.
5    Q.   What is the E-agreement? What are they
6 agreeing to?
7    A.   Agreeing to -- the description exactly
8 of what the package is that they bought, a
9 cancellation policy, refund policy. It's kind --
10 it's a mode that we use to, you know, further
11 manage their expectation. This is what you got,
12 this is what's coming, these are your
13 appointments, this is who to talk to and whatnot.
14   Q.   Can you explain those appointments, the
15 initial? Just explain to me when you say "these
16 are your appointments," what appointments are you
17 talking about?
18   A.   Immediately set up within 24 hours
19 with -- 24, 48 hours with an account executive
20 who then understands the situation of the client
21 and gets them on the path of, you know,
22 incorporating and sets up -- we also set up an
23 accounting assistance appointment. We're
24 assuming that they buy a Tax Club membership
25 because they need The Tax Club, they need tax

Page 128

M. Savage

1
2 preparation, tax advice, so we get to an
3 accountant as soon as possible.
4    Q.   Are there any other appointments that
5 are set up for them?
6    A.   There are several appointments set up,
7 and I don't know every single one.
8    Q.   What are they for?
9    A.   I know -- okay, we, again, have account
10 executive appointment, we have accounting
11 assistance appointment. In some cases we have a
12 corporate specialist if they already know what
13 entity they want. There are -- there's a
14 bookkeeping appointment to evaluate their record
15 keeping system.
16   Q.   I'm just going to backup a little bit
17 and then I'm going to follow up on what you said.
18        What method of payment does Tax Club
19 accept?
20   A.   Credit cards, checks.
21   Q.   How would you process a check over the
22 phone?
23   A.   We don't process checks over the phone.
24 They mail them in.
25   Q.   When does their membership start?

FTC-TTC-000619

Page 129

M. Savage

1
2    A.   As soon as we get payment.
3    Q.   You talked about the compliance folks
4  coming in.  Are the sales people on the line when
5  the compliance person comes on the line?
6    A.   No, not in New York, maybe in Utah.
7    Q.   So the salesperson is cutoff somehow
8  from the call?
9    A.   It's transferred.
10   Q.   It's transferred, and do they come back
11 to the salesperson?
12   A.   Sometimes.  If there like hey, you know,
13 they have -- they're not buying, they're not
14 going to -- actually, that's speculative, that's
15 not true.  The compliance -- there are situations
16 where the compliance will transfer the client
17 back to the sales rep if they want to talk to the
18 sales rep or whatnot, but the compliance is
19 instructed if the client says no, they mean no.
20   Q.   Does The Tax Club offer any financing
21 for customers who want their products or services
22 but don't have the money at the time?
23   A.   Yes.
24   Q.   Could you explain that?
25   A.   Sure.  We have a financing program where

Page 130

M. Savage

1
2  we have a minimum amount down.  It varies by
3  product.  10 to 20 percent, let's say, and then a
4  monthly payment to finance the package.
5    Q.   Does The Tax Club sort of finance it, I
6  might be using the wrong banking term, or is
7  there an outside credit company?
8    A.   Both.
9    Q.   Can you explain how -- when you finance
10 and when an outside company would finance?
11   A.   We use a service called Divera
12 (phonetic).  They're a loan servicing company,
13 but we also do it internal as well.
14   Q.   Why would you use one over the other?
15   A.   We're starting to go towards internal.
16 Because we're internally financing it, it's
17 not -- it's only our products and, you know, just
18 to save on fees.  They charge a lot.
19   Q.   So are you floating the customer?  Are
20 they making payments?
21   A.   They're making payments.
22   Q.   Over time?
23   A.   Ahuh.
24   Q.   So at what point do they get access to
25 the services?

Page 131

M. Savage

1
2    A.   Immediately.
3    Q.   Do you have your own internal
4  collections in that case?
5    A.   Yes, but we're not aggressive with our
6  collections at all.  If someone doesn't pay, then
7  we cancel them.  We cancel them out or we
8  don't -- you know, we'll talk to them, we'll try
9  to get another mode of payment, obviously, but
10 it's not -- yes, the answer to that question is
11 yes, we have our internal collections.  Our
12 billing department does that.
13   Q.   Does The Tax Club profit in any way over
14 and above the price of the product with the
15 financing?  Is there interest?
16   A.   Yes.
17   Q.   So can you just briefly tell me the
18 terms, if they're the same or if they vary, why
19 they would vary?
20   A.   They vary, and I believe them to be
21 12 percent three years.
22   Q.   And three years to pay for the product
23 in full?
24   A.   Yes.
25   Q.   Do they vary by, let's say, credit

Page 132

M. Savage

1
2  history or anything like that?
3    A.   No.  We accept everyone.
4    Q.   Once a sale is final, that is to say
5  it's gone through the compliance process, you may
6  have answered this, but what happens right away?
7    A.   What happens immediately?
8    Q.   Yes.
9    A.   Well, immediately they get -- again,
10 they get that -- they get the e-mail and the
11 agreement.  They get access to the member-only
12 portion of the web site.  They get access to an
13 accountant.  Their appointments are set for them.
14 They get -- they get sent down the path of, you
15 know, the description of whatever the product is
16 that they bought.
17   Q.   We talked about appointments and I
18 understand the appointments for the product that
19 they purchased, that is to say appointments are
20 set up, as you say, with an accountant right away
21 to assess various things.  Are there other types
22 of appointments set up?
23   A.   Yes.
24   Q.   What kinds of appointments?
25   A.   Sales, admin.

FTC-TTC-000620

Page 133

1          M. Savage
2     Q.   Explain that, please?
3     A.   There will be a business sales plan
4  appointment.  Hey, do you have a business plan?
5  Do you want a business plan?
6     Q.   Are customers told at the time that
7  these appointments, as you call them, are set up
8  that they are in fact solicitation calls for
9  other products?
10    A.   I don't know.
11    Q.   Do you know who would?
12    A.   Who would be the best person?  Probably
13 Gary.  He's in charge.  Luke Kennedy.
14    Q.   How quickly after the initial call are
15 these appointments, I'll call them solicitation
16 appointments set up for?
17    A.   It varies.  I would say over the course
18 of the next couple months.
19    Q.   Couple two months or six months?
20    A.   Two months.
21    Q.   I'm going to run down a list of
22 entities, again, from your production to us.  I
23 just want to verify that they are entities of The
24 Tax Club and I'm trying to think of the best way
25 to do this, if we should -- there are about a

Page 134

1          M. Savage
2  dozen of them.  If you give me a brief
3  description after each one, you tell me if it's a
4  Tax Club entity indeed, a brief description and
5  whether or not it is a separate entity from The
6  Tax Club or Manhattan Professional Group.  Is
7  that too many questions?  So what we want to
8  know, is this an entity that The Tax Club is
9  affiliated with, what do they do and are they a
10 separate company within The Tax Club or are they
11 part of that same club?
12         I'm going to rephrase that last
13 question.
14         So the three parts of the question are:
15 Have you ever heard of this company, how is it
16 affiliated, if at all, with the Tax Club, a brief
17 description of what it does, and if it's not
18 under your umbrella, tell me how -- I don't want
19 to say incorporated, I'm not sure it is, so how
20 it's structured.
21    A.   Okay.
22    Q.   So My Essential Plans?
23    A.   Is a brand, it's our business plan
24 brand, Manhattan Professional Group, under
25 Manhattan Professional Group.

Page 135

1          M. Savage
2     Q.   When you say a business plan brand, it
3  is one of your products?
4     A.   Yes.
5     Q.   Briefly describe what you do, what My
6  Essential Plans does?
7     A.   Business plans, produce a business plan.
8  Business plan has several different components;
9  has a financial/marketing/operational component
10 based on their business.  Like your cups, it
11 would be, you know, how you're going to obtain
12 the money, I guess, to start your business, do
13 you have a web site, how are you going to market
14 to your web site, what are your financials.  You
15 know, a business plan.  You want me to elaborate
16 or --
17    Q.   No.
18    A.   It's a business plan by definition.
19    Q.   Is it specific or is it a generic
20 business plan or is it specific to what I've told
21 you my business is going to be?
22    A.   Specific.
23         MS. PROSPER: Let's take a half an hour
24    break and we'll be back at a quarter to 2.
25         (A luncheon recess was taken.)

Page 136

1          M. Savage
2     Q.   So we're back on the record and I think
3  we are going through these entities that are
4  related in some way to the Tax Club, and you're
5  telling me if they are or not and we are on All
6  Access Books.
7     A.   Brand of MPG.
8     Q.   What is All Access Books?
9     A.   Bookkeeping product.
10    Q.   Vital Payroll?
11    A.   A brand of MPG, payroll services.
12    Q.   Business Document Center?
13    A.   Discontinued.  At one point it was just
14 a random library of documents.  Discontinued
15 though.  We don't sell that.
16    Q.   For how long?
17    A.   It's been discontinued for over a year.
18    Q.   Success or Successful Planning?
19    A.   It's another brand of MPG.
20    Q.   What do they do?
21    A.   There's different products within that
22 brand.  There is a -- we do -- we sell -- I think
23 we sell -- not I think, merchant account
24 services.
25    Q.   Describe that for me, please.

FTC-TTC-000621

In the Matter of
The Tax Club

Michael Savage
March 2, 2011

Page 137

M. Savage
1
2    A.  Setting up clients with the ability to
3  accept credit cards.  Wills, trusts, that we
4  outsource to --
5    Q.  That's under Successful Planning too?
6    A.  Yes.  We outsource that to an attorney.
7  What else do we do?
8    Q.  Is it Success or Successful Planning?
9    A.  It's Success Planning.
10    Q.  If you don't know, is there someone who
11  could give me -- if you haven't -- if you don't
12  feel like you're giving me the full circle --
13    A.  Luke Kennedy.
14    Q.  Small Biz Credit?
15    A.  Business credit.
16    Q.  That is a brand as you call it?
17    A.  Yes, it's a brand of MPG, and that is a
18  service in which it helps clients, you know, have
19  a business, brand of business, established
20  credits, Dun & Bradstreet number, credit lines,
21  credit cards in that business' name, Home Depot
22  cards, bank accounts.  It's a way of, you know,
23  establishing credit for your business.
24    Q.  Success Merchant Processing?
25    A.  That is a brand, MPG.  It's also part of

Page 138

M. Savage
1
2  Success Planning Group.  Anything with "Success"
3  is Success Planning Group.  We use Success
4  Planning Group just for internal organizational
5  purposes, but anything with the name "Success" in
6  it, that is the merchant processing, setting
7  clients up with the ability to take credit cards.
8    Q.  I'm going to stop you and ask you to
9  define when you say "brand" what you mean because
10  you've used that term throughout?
11    A.  Something we would market, something
12  that our clients -- I mean, we don't necessarily
13  market Manhattan Professional Group.  We'll
14  market Success Merchant Processing as a brand.
15    Q.  When you say "brand," something that you
16  oversee versus something that comes in from the
17  outside, is that a good way of putting it?
18    A.  Yes.
19    Q.  Okay, that's good for me.  Internet
20  Marketing?
21    A.  That is under -- that's a brand for
22  Manhattan Professional Group and that does web
23  site design.
24    Q.  Were you going to say something else?
25    A.  Web site design.

Page 139

M. Savage
1
2    Q.  My E-Biz?
3    A.  Discontinued, and it was web site
4  design.
5    Q.  When was it discontinued?
6    A.  I don't know.  If I had to guess, a year
7  ago.
8    Q.  Corporate Records Pro?
9    A.  That is a brand of The Tax Club, and
10  what that is is an on-line program allowing
11  companies to keep track of their corporate
12  documentation, minutes, corporate filing papers,
13  and it's a reminder system, oh, your sales tax is
14  due or -- it's just an organization system for
15  corporate documents.
16    Q.  You distinguish a brand of The Tax Club
17  and you mentioned all the other ones were brands
18  of Manhattan Professional Group.
19    A.  Ahuh.
20    Q.  What's that distinction?
21    A.  It's associated with selling
22  incorporation services.  That's why it's part of
23  The Tax Club.
24    Q.  And the MPG brands are non-incorporation
25  services related, would you say?

Page 140

M. Savage
1
2    A.  For the most part.
3    Q.  I don't want to put words in your mouth.
4    A.  To the best of my knowledge, yes.
5    Q.  And the last one I have is I-Congo?
6    A.  I-Congo, done, discontinued.  That was
7  logo design.
8    Q.  Discontinued as of when?
9    A.  Over a year ago.
10    Q.  And Logo Design?
11    A.  Yeah, let me clarify.  It was a separate
12  entity.  Now it's a brand and all it is is logo
13  design.
14    Q.  So it's discontinued or it's now Logo
15  Design?
16    A.  Yes, I misspoke.  Logo Design, it's
17  always been Logo Design.  It used to be a
18  stand-alone entity.
19    Q.  So the stand-alone entity is
20  discontinued?
21    A.  Yes, dissolved.
22    Q.  So it's now --
23    A.  It's a brand of MPG.
24    Q.  Is this list exhaustive that you know of
25  or are there others that I didn't mention?  I

FTC-TTC-000622

Page 141

M. Savage

1
2 could say them again if you --
3     A.  We have a lot of products.  They come
4 and go depending on client demand.  You know,
5 business services, they're all related business
6 services, so to say that that's completely
7 comprehensive, the answer would be no, but it's
8 definitely the vast, vast majority.
9     Q.  Is there a category of things that are
10 not listed here?
11    A.  No.
12    Q.  Must a customer purchase one of your
13 basic incorporation before they could purchase
14 one of these other plans?
15    A.  No.
16    Q.  Is there a basic Tax Club membership
17 that you need before you can tap into any of the
18 other resources?
19    A.  No.
20    Q.  The entities that we just spoke about,
21 the 11 including the discontinued ones, are they
22 useful to a non-incorporated business, would you
23 say, in your estimation that they're used for?
24    A.  They certainly could be useful, yes.
25    Q.  Are they more useful to an incorporated

Page 142

M. Savage

1
2 business?
3     A.  Most of them could be used either with a
4 corporation or with a sole proprietorship.
5     Q.  Something like Corporate Records Pro --
6     A.  That's the one I was thinking of.
7     Q.  Board meetings and such?
8     A.  There would be no reason to have that if
9 you're a sole proprietor.
10    Q.  What about Vital Payroll?
11    A.  Again, you wouldn't be able to have a
12 payroll if you didn't have a corporation.
13    Q.  At what point, if at all, during the
14 initial sales call is The Tax Club's refund
15 policy explained to a new or potential customer?
16    A.  We explain the refund policy in
17 compliance, in verification.
18    Q.  So that's the second portion of the
19 call?
20    A.  It's the same phone call, but yeah, I
21 won't elaborate and probably shouldn't, but the
22 reason we don't have the sales rep say it because
23 then they would say get this, don't worry, we'll
24 refund it tomorrow.  It would be a sales tactic.
25 It would be a mess, is what it would be.

Page 143

M. Savage

1
2     Q.  How soon after the sale is the
3 customer's payment charged, that verification
4 piece of the sale?
5     A.  Immediately.
6     Q.  If a customer wanted to refer someone,
7 an existing customer wanted to refer someone to
8 Tax Club for its services, is there any type of
9 commission to that --
10    A.  No.
11    Q.  I'm going to talk about the refund
12 policies themselves.
13        Can you please describe, I know you
14 touched on it before, Tax Club's refund policy?
15    A.  Our refund policy is three days from the
16 point of the sale that they get all their money
17 back.  Very easy process, e-mail or call into
18 billing, 100 percent money back up to --
19    Q.  Three business days?
20    A.  -- three business days.
21    Q.  If I bought on Friday, it's now Monday,
22 it would be a few days later?
23    A.  Yes.
24    Q.  Just business days or not business days
25 is the question?

Page 144

M. Savage

1
2     A.  No, I would say no because we're open on
3 Saturday.
4        MR. MITCHELL:  Do you want to confer
5 with counsel?
6        MR. SANSCRAINTE:  Off the record.
7        (A discussion was held off the record.)
8        MS. PROSPER:  So back on the record.
9 Just let the record reflect that Mr. Savage
10 conferred with Mr. Sanscrainte, his attorney,
11 and clarified that it was business days in
12 regards to three, the three days.
13        THE WITNESS:  Yes.
14    Q.  For a full refund?
15    A.  Yes.  Our attorney wrote it.  Joe wrote
16 it.
17    Q.  And then do you give partial refunds?
18    A.  Oh, yes.
19    Q.  Until what point?
20    A.  15 days regardless of fulfillment we
21 will give up to 85 percent back, meaning we've
22 retaken 15 percent, and we generally have a
23 minimum to no complaints about that.  That
24 15 percent represents, obviously, having to staff
25 accountants in the event that a client would --

FTC-TTC-000623

Page 145

M. Savage

1
2 would, you know, take our -- take up -- you know,
3 take the services by asking accountants
4 questions, also merchant fees, you know,
5 Visa/MasterCard, they'll charge both ways,
6 charging and refunding. I think you could look
7 at it as a restocking fees. I'll say most
8 clients don't have a problem with that, and that
9 if they do, we'll always make exceptions. In
10 fact, we very oftentimes will make exceptions
11 beyond the 15-day period as well.
12    Q.   Who makes decisions on those exceptions?
13    A.   Our billing manager.
14    Q.   Who is that?
15    A.   Lindsey Kush.
16    Q.   Is it within her full discretion whether
17 or not she goes outside of the policy?
18    A.   Ahuh.
19    Q.   What, if any, specific steps must be
20 undertaken by the customer to ensure they get a
21 refund?
22    A.   We send them a refund authorization form
23 that they sign saying that they got the refund so
24 they can't get a refund and then also charge it
25 back and then we don't have any proof with the

Page 146

M. Savage

1
2 credit card companies, and it's important to note
3 that when they request the refund, that's -- it's
4 not when they actually send us back the signed
5 form or fax it back, it's when they request it
6 when we determine it's three days or 15 days.
7    Q.   So on the day of the request you count
8 back --
9    A.   Yes.
10    Q.   -- how many days?
11    A.   Yes. Not the day that we actually
12 receive the request. That could happen 30 days
13 later.
14    Q.   How long does it take for a customer's
15 credit card to be credited after the request
16 date?
17    A.   What we tell them is typically seven to
18 10 business days. We try and do it immediately,
19 but we say seven to 10 business days.
20    Q.   Are you familiar with something called a
21 "save call"?
22    A.   Yes.
23    Q.   Could you explain what a save call is?
24    A.   We have a saves department. It's within
25 our customer service department and they --

Page 147

M. Savage

1
2 oftentimes clients will call wanting to cancel,
3 thinking about cancelling. They go to our
4 customer service department. Within our customer
5 service department we have a saves department
6 which is two or three people and they attempt to
7 what we call save the client, meaning keeping
8 their membership active. If they agree to it, we
9 have a separate compliance/verification process,
10 so someone calls and wants to cancel, they get
11 sent to the saves department, saves department
12 says oh, no, they're fine, they want to stay on
13 board, they get sent to our verification process
14 which is, you know, a different script. It says
15 you're agreeing to stay on board, you're agreeing
16 that we're going to charge your credit card X
17 amount, this is who you are, this is your billing
18 address, your credit card number, so it's almost
19 as if it's a brand new sale.
20    Q.   From the time that a customer calls to
21 cancel, what's the time frame before they get a
22 save call?
23    A.   Immediately. If they don't -- in fact,
24 our policy is if the saves call -- if they call
25 and cancel and the saves, quote/unquote, don't

Page 148

M. Savage

1
2 save the client, within 48 hours they immediately
3 start going through our refund process.
4    Q.   So would you say you wait for the save
5 call before you start the refund process?
6    A.   No. The refund process starts
7 immediately, but I would say that we wouldn't
8 actually refund the client money until either the
9 saves -- someone in the saves department had a
10 chance, customer service department had a chance
11 to talk to them or it was 24 to 48 hours, unless
12 they fall within the three days, obviously that's
13 immediate.
14    Q.   So what you just described is for day
15 four through 15?
16    A.   Four through forever.
17    Q.   Do you also try to save folks who have
18 paid for their -- paid in full for their initial
19 package but just want to cut off the monthly fee?
20    A.   No.
21    Q.   So would you say that the save calls are
22 only for folks who want a full refund, a full or
23 85 percent refund?
24    A.   Full or partial refund, yes.
25    Q.   How many save calls are attempted?

FTC-TTC-000624

Page 149

M. Savage

1
2   A.  I don't know.
3   Q.  Do you know who would?
4   A.  Preston Clark.
5   Q.  What, if anything, happened to the
6  salesperson who made a sale that is later
7  refunded?
8   A.  They do not get commission on it.
9   Q.  Is there a reward for The Tax Club
10 employee who saves a call?
11  A.  There is a small commission.  It's not
12 the same commission as if it's an original sale
13 but there is incentive.
14  Q.  Does the original salesperson get their
15 commission for a saved call?
16  A.  They split it with the saves
17 representative.
18  Q.  Can you estimate the total number of
19 customers serviced by The Tax Club in an average
20 year?
21  A.  In an average year?
22  Q.  Yes, let's say over the last three to
23 five years.
24  A.  Over the last three to five years,
25 unique customers, I would say over 100,000.

Page 150

M. Savage

1
2   Q.  I'm glad you mentioned the word "unique"
3  versus products sold.  Can you estimate total
4  profits, gross or net, for the last three to five
5  years?
6   A.  Estimate?
7   Q.  Yes.
8   A.  I could tell you last year our profit,
9  our books aren't closed yet so it's not official,
10 but our profit is anywhere from 3 to $5 million
11 in 2010.
12  Q.  Is that net or gross?
13  A.  That's net.
14  Q.  Net after everything?
15  A.  Yes.
16  Q.  If you know, what percentage of your
17 customers eventually request a refund?
18  A.  I do not know the cancellation request,
19 but I do know what our cancellation rate is.
20  Q.  What's the cancellation rate?
21  A.  15 to 20 percent.
22  Q.  And when you say your cancellation rate,
23 what does that mean, what number is that?
24  A.  People who call in and say -- people who
25 call in and want a refund and, you know, want to

Page 151

M. Savage

1
2  part ways.
3   Q.  And actually get the refund?
4   A.  Yes.
5   Q.  And does that encompass the three day
6  through the 15th day refund?
7   A.  Yes.
8   Q.  If you know, what percentage of
9  customers who request refunds actually get them?
10 You might not know the answer to the first
11 question.
12  A.  Who request them?  I don't know the
13 answer to that.
14  Q.  Do you know who might?
15  A.  Lindsey Kush.
16  Q.  Has The Tax Club or any related entity
17 been the subject of an investigation or
18 enforcement action by a law enforcement agency?
19  A.  We had an IRS investigation that I spoke
20 of earlier.  You want me to reiterate?
21  Q.  No, thanks.  We have that on the record.
22  A.  That was it.
23  Q.  Has any other Attorney General's office
24 brought an action or investigation against The
25 Tax Club?

Page 152

M. Savage

1
2   A.  No.
3   Q.  You're talking about Utah and New York?
4   A.  Ahuh, and we do business in all 50
5  states.
6   Q.  Does The Tax Club engage in advertising?
7   A.  We have in the past, yes.
8   Q.  What kind of advertising did you engage
9  in?
10  A.  We've had radio commercials, one, and
11 we've done some Internet advertising but nothing
12 material.  Our advertising budget is nil, so it's
13 not material at all.
14  Q.  When you say "radio," what radio waves?
15  A.  It was a Spanish radio station about
16 eight years ago, six years ago.  This was when we
17 were trying to start Tax Club Latino.  We were
18 helping undocumented workers file for -- you
19 know, pay taxes.  It wasn't very successful.
20  Q.  You mentioned some web advertising.
21  A.  Yes.  I believe there's been a banner
22 somewhere.  I shouldn't speculate.  I don't know.
23  Q.  Do you know who would know?
24  A.  Lindsey Kush.
25  Q.  Do you have a specific audience to

FTC-TTC-000625

---

Page 153

M. Savage

1
2 which -- to whom you advertise?
3    A.   If we advertised, do we have a
4 demographic?
5    Q.   Are you looking for a certain person?
6    A.   Yes, entrepreneurs and small business
7 owners.
8    Q.   Is there a web site maintained for The
9 Tax Club?
10    A.   Yes, thetaxclub.com.
11    Q.   What does it contain?
12    A.   It contains our general information
13 about what we do, who we are, also has a
14 members-only section, also gives access to our
15 Virtual Tax Organizer which is a database of our
16 clients' information that we use to prepare their
17 taxes.
18    Q.   What's on the members-only part?
19    A.   There's articles specific to small
20 businesses, there's information -- helpful
21 information regarding being successful as a small
22 business owner.
23    Q.   When you say your members, that is
24 someone who pays a monthly fee of some kind?
25    A.   Yes.

---

Page 154

M. Savage

1
2    Q.   Are there products that don't require a
3 monthly fee?
4    A.   Yes.
5    Q.   Can you tell me the category of ones,
6 you know, which ones do or some of them?
7    A.   Business Plans do not, yeah.
8    Q.   Who maintains your web site?
9    A.   We do internally.
10    Q.   Do you have a team of web site people?
11    A.   Ahuh.
12    Q.   Who are they or who do they work under?
13    A.   They work under -- it falls underneath
14 Gary Milkwick.
15    Q.   He's -- I'm sorry?
16    A.   Director of Operations.
17    Q.   In general, who created the content for
18 the web site?
19    A.   We did internally.
20    Q.   Does The Tax Club and its affiliates
21 maintain business bank accounts in association
22 with its day-to-day operations?
23    A.   Yes.
24    Q.   Can you tell me what banks those are?
25    A.   Bank of America.

---

Page 155

M. Savage

1
2    Q.   All of them?
3    A.   Yes.  We might have one or two in Wells
4 Fargo, but 95 percent, if not more, Bank of
5 America.
6    Q.   What kinds of accounts do you have?
7    A.   Business accounts, checking, savings
8 accounts.
9    Q.   Do you have like operating versus, I
10 don't know, something else or payroll and
11 different --
12    A.   Yes, we have a payroll account,
13 operating account, and then various savings
14 accounts, checking accounts, but all of which are
15 from the operations.
16 RQ   Q.   Can you provide us with the accounts,
17 the routing numbers and the current balances
18 associated with your business accounts?  I'm sure
19 you don't have that with you right now.
20    A.   Yes.  I don't have it memorized, no.
21    Q.   Where do you bank personally?
22    A.   Bank of America.
23    Q.   Do you have any personal bank accounts
24 in any other states, other than New York?
25    A.   Washington.

---

Page 156

M. Savage

1
2    Q.   State?
3    A.   Ahuh.
4    Q.   What about other countries?
5    A.   No.  No.  I'm sorry, I don't.  I do not.
6    Q.   You don't?
7    A.   No.
8    Q.   What about other countries?
9    A.   No.
10    Q.   Have any other Tax Club related entities
11 ever received funding in any way from the
12 government?
13    A.   No.
14    Q.   Have any Tax Club related entities
15 received any other types of grant or funding from
16 private or any other sources?
17    A.   No.
18    Q.   Does The Tax Club owe any debt?
19    A.   No.
20    Q.   What are, you know, I guess big picture,
21 unless you know specifically, what are the Tax
22 Club's assets?
23    A.   We don't have -- our balance sheet is
24 not asset heavy.  We don't have cash on hand.  We
25 don't own property.  Our assets would be our

---

FTC-TTC-000626

**Page 157**

1           M. Savage
2 employees, intellectual property.
3     Q.   Who controls these assets?  Who
4 controls, as you call it, the intellectual
5 property or whatever funds there are?  Who is in
6 charge of that?
7     A.   Lindsey Kush.
8     Q.   Has The Tax Club ever filed for
9 bankruptcy?
10    A.   No.
11    Q.   Have you ever personally filed for
12 bankruptcy?
13    A.   No.
14    Q.   Do you plan to?
15    A.   No.
16    Q.   Are there any pending judgments against
17 you personally?
18    A.   No.
19    Q.   Are there any pending judgments against
20 any Tax Club related entities?
21    A.   No.
22        MS. PROSPER: So we just want to review
23 based on the answers you gave what documents
24 were sort of promised or information that
25 were not already produced on the hard drive

**Page 158**

1           M. Savage
2 as well as -- just so we know what we're
3 waiting for and then we could set some sort
4 of time frame.  We have the various names of
5 folks who could provide information you
6 didn't off the top of your head.  I know that
7 there were --
8        MR. MITCHELL: I'm going to offer you a
9 couple names; Lindsey Kush regarding the
10 advertisement, we have radio Internet and
11 others.  Lindsey Kush with respect to the
12 intellectual property ownership rights or The
13 Task Club assets.
14        MS. PROSPER: Could I ask a follow-up
15 question on the intellectual property?
16    Q.   Do you have trademarks and -- you have
17 certain things trademarked?
18    A.   Yes.
19    Q.   So that's part of the answer that
20 Lindsey Kush would give us?
21    A.   Yes.
22        MS. PROSPER: Okay, thank you.
23        MR. MITCHELL: Building management,
24 Lindsey Kush.
25        MR. SANSCRAINTE: Permission to

**Page 159**

1           M. Savage
2 interrupt?
3        MS. PROSPER: Please.
4        MR. SANSCRAINTE: Is there anybody that
5 owns intellectual rights, other than
6 Mr. Johnson?
7        THE WITNESS: No.
8        MR. SANSCRAINTE: So I'm just thinking
9 there may -- Mr. Johnson owns --
10        MS. PROSPER: What is it that he owns?
11        MR. SANSCRAINTE: Okay, got you.
12        MR. MITCHELL: Regarding if a customer
13 wanted to refer someone to The Tax Club for
14 services, are they paid any type of
15 commission?  Lindsey Kush would talk about
16 any question we have regarding the point of
17 sales and point of refunds.  She could answer
18 those?
19        THE WITNESS: Yes.
20        MR. MITCHELL: Preston Clark would deal
21 with any question we have regarding save
22 calls?
23        THE WITNESS: Ahuh.
24        MR. MITCHELL: Luke Kennedy can tell us
25 about the business plan sales appointments;

**Page 160**

1           M. Savage
2 is that right?
3        MS. PROSPER: Are we talking about the
4 appointments that come after the initial?
5        MR. MITCHELL: Right.
6        MS. PROSPER: Web site content, did we
7 have a question on that?
8        MR. MITCHELL: He already said Lindsey
9 Kush.
10        MS. PROSPER: Lindsey Kush, sorry.
11        MR. SANSCRAINTE: Off the record.
12        (A discussion was held off the record.)
13        MR. MITCHELL: Brendan Pack, he's a
14 Sales Manager?
15        THE WITNESS: Yes.
16        MR. MITCHELL: He would answer questions
17 about training?
18        MS. PROSPER: Training, right, Brendan
19 Pack.
20        THE WITNESS: Ahuh.
21        MS. PROSPER: I mean, I think there was
22 a series of specific questions and we could
23 talk about how we get the answers to any
24 specific questions, if we want to do an
25 interrogatory or something like that to

FTC-TTC-000627

Page 161

M. Savage

1  follow up or especially as to him because I
2  think we would have some follow-up questions
3  on sales training.
4      MR. SANSCRAINTE: Sure, absolutely.
5      MS. PROSPER: Do you have others?
6      MR. SANSCRAINTE: I have a couple of
7  other things, updated org chart.
8      THE WITNESS: Sales scripts.
9      MS. PROSPER: Sales scripts, yeah, or
10 sales training materials.  I think I saw a
11 few things on there but I didn't -- wasn't
12 enough to satisfy.
13     MR. MITCHELL: Ted Johnson, he was head
14 of Utah; is that right?
15     MS. PROSPER: He's head of the whole --
16     THE WITNESS: He's the owner but he's --
17 he lives in California.
18     MR. SANSCRAINTE: We need background on
19 Maria Petrova.
20     MS. PROSPER: What does she do again?
21     THE WITNESS: Corporations, Corporate
22 Department.
23     MS. PROSPER: Right, the Corporate
24 Department.  She's actually somebody who --

Page 162

M. Savage

1      MR. SANSCRAINTE: That's all I got.
2      MS. PROSPER: Do you happen to have job
3  descriptions for anyone like an official --
4      THE WITNESS: I could get them.
5      MS. PROSPER: Do they exist?  I mean,
6  don't make them up.  I mean, if they already
7  exist.
8      THE WITNESS: We have titles.
9  Descriptions and duties?  Not that I know of.
10     MR. SANSCRAINTE: Could I interrupt?  I
11 think we do.  I've seen some things in human
12 resources.
13     THE WITNESS: But they're more -- I
14 don't know.  They're just like titles and
15 what --
16     MR. SANSCRAINTE: I shouldn't interrupt,
17 sorry.
18     THE WITNESS: I'll look.  I'll send it
19 over, if we do.
20     MS. PROSPER: Okay, and any degree
21 requirements for any of the positions
22 specifically.  You know, I know we went
23 through a lot of this, especially with the
24 accountants and all that, so if you have -- I

Page 163

M. Savage

1  guess it would be --
2      THE WITNESS: Qualifications.
3      MS. PROSPER: Qualifications, yeah, but
4  I guess it would be more of a job posting.
5  If I wanted to know how could I get that job,
6  what would I refer to to know what the
7  qualifications were and/or the degree
8  requirements, if any.
9      MR. MITCHELL: Just to follow-up on
10 Jason Baum, you know, he does sales training
11 and if a customer sought legal advice, what
12 is told to a salesperson, we could get that
13 from Jason Baum?
14     THE WITNESS: Yes, he would be all over
15 that.
16     MS. PROSPER: He does the sales
17 training, Jason Baum?
18     THE WITNESS: Yes.
19     MS. PROSPER: You mentioned another
20 name, Brendan Pack will sort of be able to
21 complete that narrative of the complaining?
22     THE WITNESS: Yes, and Preston Clark.
23     MS. PROSPER: Do you have anything else?
24     MR. MITCHELL: No.

Page 164

M. Savage

1      MS. PROSPER: I think we're done,
2  gentlemen.
3      This concludes the subpoena hearing of
4  Mr. Michael Savage, President of The Tax
5  Club, and thank you for your time gentlemen.
6  The time now is 2:15.
7      (TIME NOTED: 2:15 P.M.)

9      MICHAEL SAVAGE

12
13 Subscribed and sworn to
14 before me this     day
15 of        , 2011.

17     NOTARY PUBLIC

FTC-TTC-000628