```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
FEDERAL TRADE COMMISSION et al.,                                        :
                                                                        :
                                    Plaintiffs,                         :     13 Civ. 210 (JMF)
                                                                        :
              -v-                                                       :     OPINION AND ORDER
                                                                        :
THE TAX CLUB, INC. et al.,                                              :
                                                                        :
                                    Defendants.                         :
                                                                        :
------------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/17/2014

JESSE M. FURMAN, United States District Judge:

In this civil enforcement action, the Federal Trade Commission ("FTC"), the State of Florida, and the State of New York (collectively, "Plaintiffs") sue a group of corporate entities (the "Corporate Defendants") that this Opinion will refer to as the "Tax Club Enterprise" or the "Enterprise," and four people associated with the Enterprise (the "Individual Defendants" and, together with the Corporate Defendants, "Defendants"). Plaintiffs allege that the Tax Club Enterprise engaged in deceptive telemarketing tactics, in violation of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a), the Telemarketing Sales Rule (the "TSR"), 16 C.F.R. Part 310, and Florida and New York state statutes. Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' motions to dismiss are DENIED.

## BACKGROUND

The following facts are taken from the Amended Complaint ("AC") (Docket No. 88) and are assumed to be true for purposes of this motion. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

**A.  History and Structure of the Enterprise**

The Tax Club Enterprise is a business that sells products and services to people seeking to build their own small businesses.  (AC ¶ 30).  Defendant Edward Johnson started the business in 2003 by forming companies known as The Tax Club, Inc. ("TTC") and Manhattan Professional Group, Inc. ("MPG").  (*Id.* ¶ 37).  At some point later in 2003, Johnson relocated the business from St. George, Utah, to New York City.  (*Id.*).  At or about the same time, Johnson recruited Defendant Michael Savage to help him run the business; Savage has served as the president of TTC and MPG since 2008.  (*Id.* ¶ 38).  Savage, in turn, hired Defendant Gary Milkwick in 2007, who has served as MPG's Vice President of Operations since at least 2009.  (*Id.* ¶ 40).  Defendant Brendan Pack also joined the business in 2004, and he has supervised sales operations and managed the sales staff at MPG since at least 2010.  (*Id.* ¶ 39).

In February 2008, these men — the Individual Defendants — began to form new corporate entities related to the business.  Between February and September 2008, they formed entities known as VisaVis, Inc. ("VisaVis"), Tahuya, Inc. ("Tahuya"), Ikongo, Inc. ("Ikongo"), and 5410, Inc. ("5410").  (*Id.* ¶¶ 41-44).  In April 2010, 5410 acquired controlling ownership interests in HB Marketing Services, LLC ("HB Marketing Services") and Premier Coaching & Consulting, LLC ("Premier Coaching"), which, until then, had been separate companies selling similar products as the Enterprise.  (*Id.* ¶ 45).  Pack formed an entity known as Marble Base, Inc. ("Marble Base") in May 2010, and in August 2011, Savage formed another known as Skorpios Holdings, Inc. ("Skorpios").  (*Id.* ¶¶ 46-47).  At this point, these entities were all owned by some combination of Johnson, Savage, and Pack.  (*Id.* ¶ 51).

In November 2011, the Enterprise underwent a reorganization, as a result of which Johnson was no longer an owner of any corporate entities associated with the Enterprise.  (*Id.* ¶¶

48, 50). Instead, the corporate entities comprising the Enterprise were held by Savage, Pack, and Milkwick, as well as a non-party named Lindsay Kush. (*Id.*). Many of the entities were owned by Skorpios which, in turn, was owned by Savage, Pack, Milkwick, and Kush. (*Id.*). Milkwick formed two more entities in February 2012, 6015, LLC ("6015") and 1800Accountant, LLC ("1800Accountant"), both of which became additional holdings of Skorpios. (*Id.* ¶ 49). These entities — twelve in total — are the Corporate Defendants.

**B. The Enterprise's Business and Marketing Techniques**

As noted, the Tax Club Enterprise sells products and services to assist people in developing their own small businesses. (*Id.* ¶ 30). Among other things, the Enterprise sells tax advice, business planning services, and business credit development assistance. (*Id.*).

The Enterprise markets its products by calling potential customers over the telephone. (*Id.* ¶¶ 31-32). It identifies these potential customers by purchasing their contact information (known as "consumer leads") from businesses that sell similar products as the Enterprise. (*Id.* ¶ 31). Once the Enterprise acquires a lead, a sales representative calls the potential customer and states that he or she is calling "on behalf of" the company from which the lead was purchased. (*Id.* ¶ 33, 95). The Enterprise's sales representative then says that the Enterprise offers an array of services that are essential to the success of the potential customer's business, and that these services will ultimately pay for themselves. (*Id.* ¶ 33). Such services allegedly include "unlimited, year round consulting," "comprehensive business plans," and "personal business advisors." (*Id.* ¶¶ 33, 95). If a consumer does, in fact, purchase an Enterprise product, a sales representative will make "upsell" calls to that consumer, attempting to persuade him or her to buy additional products, sometimes indicating that the customer must supplement the already-purchased products with additional ones to recoup the money already he or she already spent.

(*Id.* ¶¶ 34, 114-19).  One entity within the Enterprise, 5410, provides financing to consumers so that they can make these additional purchases.  (*Id.* ¶ 55).

When consumers buy the Enterprise's products with credit or debit cards, the transactions are processed through various accounts, known as "merchant accounts," that Defendants have established with merchant acquiring banks.  (*Id.* ¶¶ 57, 63, 65-66).  Defendants have set up over fifty such accounts since 2008.  (*Id.* ¶ 65).  Proceeds processed through these accounts are then deposited into the Corporate Defendants' commercial bank accounts (*id.* ¶¶ 69-71), and are often transferred among the various commercial bank accounts maintained by the different corporate entities (*id.* ¶ 76).  In fact, the purpose of the Enterprise's numerous corporate entities other than TTC, MPG, and 5410 is to maintain these merchant and commercial bank accounts, receiving and redistributing funds from consumer purchases.  (*Id.* ¶ 56).

In their Amended Complaint, Plaintiffs allege that the representations that employees of the Enterprise make on the telemarketing calls are misleading in several ways.  For example, they contend that the representation that the Enterprise calls potential customers "on behalf of" the companies from which it purchases the customer leads is inaccurate.  (*Id.* ¶¶ 99-101).  In addition, contrary to the representations made on the calls, "in numerous instances, consumers who purchase the Defendants' products and services are not able to recoup the purchase price from future business income" (*id.* ¶ 106), "are unable to access a live tax or business advisor" (*id.* ¶ 111), "do not receive individualized business plans" (*id.* ¶ 112), and "receive only generic business credit information"  (*id.* ¶ 113).  Further, the upsell calls are "masked as fulfillment calls that were scheduled for the ostensible purpose of providing services that the customer already purchased," and the telemarketers on such calls fail to "disclose promptly that the purpose of the call is . . . to sell additional products and services."  (*Id.* ¶ 115).

The result of these practices has been an extraordinarily high level of consumer complaints against the Enterprise. Apparently, dissatisfied consumers have filed numerous complaints against TTC with the Better Business Bureau of Utah, have initiated a high rate of chargebacks (that is, disputes of charges on credit card bills) with their credit card issuers, and have requested many returns (that is, requests for reversal of charges on credit card accounts) from the Enterprise itself. (*Id.* ¶¶ 121-30). As a result of the high rate of chargebacks and returns, at least two merchant acquiring banks have terminated the Enterprise's accounts. (*Id.* ¶ 132). In addition, state attorneys general brought some of the consumer complaints to the attention of Johnson and Savage. (*Id.* ¶ 135).

**C. Procedural History**

Plaintiffs filed their initial Complaint on January 9, 2013 (Docket No. 1), accompanied by a motion for a temporary restraining order and preliminary injunction (Docket No. 2). The Court held hearings on the requested temporary relief on January 11 and 15, 2013, and entered interim Orders on January 11 and 18, 2013 (Dockets No. 31 and 65), which, *inter alia*, prohibited Defendants from making false or misleading statements; prohibited them from failing to disclose certain information to people receiving calls from the Defendants; and established a monitoring program to record sales, billing, and fulfillment calls. The Court subsequently replaced those Orders with a stipulated preliminary injunction order containing essentially the same terms. (Docket No. 74).

On March 18, 2013, Defendants moved to dismiss the Complaint. Johnson filed his motion individually (Mem. Law. Supp. Def. Edward B. Johnson's Mot. Dismiss Pls.' Compl. ("Johnson Mem.") (Docket No. 80)), while all of the other Defendants filed a single, joint motion (Mem. Law. Supp. Defs.' Mot. Dismiss ("TTC Mem.") (Docket No. 82)). Pursuant to

5

the Court's Order of March 19, 2013 (Docket No. 84), Plaintiffs filed an Amended Complaint on April 8, 2013 (Docket No. 88).  On May 13, 2013, Defendant 1800Accountant, LLC filed a new motion to dismiss in response to the Amended Complaint (Mem. Law. Supp. Def. 1800Accountant, LLC's Mot. Dismiss. Am. Compl. ("1800Accountant Mem.") (Docket No. 94)), but all other Defendants (including Johnson) indicated that they were relying on their previously filed motions to dismiss (Docket No. 95).

The Amended Complaint asserts claims against Defendants under the FTC Act (AC ¶¶ 139-50); the TSR (*id.* ¶¶ 151-60); the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (*id.* ¶¶ 161-65); the New York Executive Law (*id.* ¶ 166); and the New York General Business Law (*id.* ¶ 167).  The Amended Complaint also asserts an equitable claim against Relief Defendant Sandra Savage, the wife of Defendant Michael Savage, for ill-gotten gains.  (*Id.* ¶¶ 27, 168-70).

## DISCUSSION

Collectively, Defendants press four main arguments.  First, they contend that the allegations in the Amended Complaint are insufficiently specific with regard to each particular Defendant.  (TTC Mem. 6-8; Johnson Mem. 6-9; 1800Accountant Mem. 5-9).  Second, they assert that the Amended Complaint fails to allege the elements required for individual liability under the FTC Act and the TSR.  (Johnson Mem. 8-10; Reply Mem. of Law Supp. Defs.' Mot. Dismiss (Docket No. 102) ("TTC Reply") 12-13).  Third, they insist that the FDUPTA claim should be dismissed because of the Amended Complaint's alleged failure to adequately plead causation.  (TTC Mem. 9-11).  Finally, they argue that the claim against Relief Defendant Sandra Savage should be dismissed for the Amended Complaint's failure to plead that she was unjustly enriched.  (TTC Mem. 8-9).  The Court addresses these arguments in turn.

**A. Legal Standard**

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive a Rule 12(b)(6) motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

**B. Specificity of the Pleadings**

First, Defendants argue that the Amended Complaint should be dismissed because it impermissibly engages in "group pleading" — that is, it "lumps" the Defendants together, and "does not distinguish . . . any aspect of their alleged misconduct." (TTC Mem. 6-7). As a general matter, pleadings are required to specify "which defendant is alleged to have committed a particular . . . act." *Merrill Lynch, Pierce, Fenner & Smith*, No. 91 Civ. 2923 (CSH), 1994 WL 88129, at * 15 (S.D.N.Y. Mar. 15, 1994); *see also Appalachian Enters., Inc. v. ePayment Solutions Ltd.*, No. 01 Civ. 11502 (GBD), 2004 WL 2813121, at * 7 (S.D.N.Y. Dec. 8, 2004) (dismissing complaint that "lump[ed] all the defendants together and fail[ed] to distinguish their

conduct" (internal quotation marks omitted)). There is an exception to this rule, however, where multiple corporate defendants operate a "common enterprise." *See Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (per curiam); *FTC v. Consumer Health Benefits Ass'n* (*Consumer Health Benefits II*), No. 10 Civ. 3551 (ILG), 2012 WL 1890242, at *5, *10 (E.D.N.Y. May 23, 2012); *Commodity Futures Trading Comm'n v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004).

Under the common enterprise theory, each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group. *See FTC v. Consumer Health Benefits Ass'n (Consumer Health Benefits I)*, No. 10 Civ. 3551 (ILG) (RLM), 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011) ("Corporate entities that operate in a common enterprise may be held liable for one another's deceptive acts and practices."), *aff'd*, No. 10 Civ. 3551 (ILG) (Docket No. 250) (E.D.N.Y. Oct. 12, 2011); *Int'l Fin. Servs.*, 323 F. Supp. 2d at 511 ("IFS Inc. and IFS LLC engaged in a common enterprise, and IFS LLC therefore bears joint and several liability for IFS Inc.'s violations . . . ."). In determining whether a common enterprise exists among a set of corporate defendants, courts consider a set of non-dispositive factors, including "whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Consumer Health Benefits II*, 2012 WL 1890242, at *5; *see also FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) (similar); *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008) (similar). Thus, to state a claim for common enterprise liability, a plaintiff must allege facts plausibly supporting the existence of these factors.

The Amended Complaint alleges facts that support the existence of each one of these

factors among the twelve Corporate Defendants. Some combination of Johnson, Savage, Pack, and Milkwick are alleged to occupy or have occupied officer positions at each of the twelve Corporate Defendants. (AC ¶¶ 23-26). All twelve are alleged to share the same office space (*id.* ¶¶ 11-22) and employ the same telemarketing, customer service, billing, and administrative staff (*id.* ¶¶ 28, 40). They are alleged to maintain a highly integrated set of banking services; consumer funds processed through a credit card merchant account in the name of one Corporate Defendant are often deposited in a commercial bank account in the name of another Corporate Defendant (*id.* ¶ 75), and funds are frequently transferred among the bank accounts of the Corporate Defendants (*id.* ¶ 76). They are also alleged to share common ownership; prior to the November 2011 reorganization, all of the Corporate Defendants (except 6015, 1800Accountant, and Skorpios, which did not exist at the time) were owned by Johnson, Savage, Pack, or some combination of the three, (*id.* ¶ 51), and after the reorganization, all of the Corporate Defendants other than Ikongo and Tahuya were controlled by Savage, Pack, Milkwick, Kush, or some combination of the four (*id.* ¶ 52). Finally, they are alleged to use the same process of identifying potential customers and marketing their products. (*Id.* ¶¶ 28, 90-92, 96).

     Defendants' arguments that the Amended Complaint inadequately alleges specific conduct by certain corporate entities (*see* TTC Reply 6-7; 1800Accountant Mem. 5-9) fail to recognize the effect of the common enterprise theory. The very nature of this theory is that corporate entities that are a part of the common enterprise are liable for the conduct of other entities in the enterprise, regardless of whether the particular entity engaged in the behavior at issue. *See Del. Watch. Co.*, 332 F.2d at 746 (holding that where "the same individuals were transacting an integrated business through a maze of interrelated companies . . . the pattern and frame-work of the whole enterprise must be taken into consideration" (internal quotation marks

9

omitted)); *Consumer Health Benefits II*, 2012 WL 1890242, at *5 (noting that where the "structure, organization, and operation of a business venture among separate corporate entities reveal[s] a common enterprise . . . the FTC Act will "disregard[] the corporate form"). Thus, so long as the Amended Complaint adequately alleges wrongdoing by the common enterprise, as well as facts supporting a finding that the entity in question is part of the common enterprise, it is immaterial whether the Amended Complaint alleges that each Corporate Defendant "specifically engaged in deceptive telemarketing practice[s]." (1800 Accountant Mem. 5; *see also* TTC Reply 6-7). Defendants do not appear to dispute that the Amended Complaint adequately alleges wrongdoing by the Enterprise as a whole, and, as discussed above, it sufficiently alleges facts establishing common enterprise liability.

Defendants' remaining arguments warrant little discussion. First, Defendants somehow contend that the Amended Complaint fails to allege a "common purpose" among the corporate entities (TTC Reply 8-10), in spite of the Amended Complaint's lucid description of the Defendants' business as a seller of "tax preparation and advice, business planning and counseling, and business credit development services" (AC ¶ 30) as well as its clear explanation of the roles the different corporate entities play in furthering that business purpose (*id.* ¶¶ 54-56). Second, Defendants cite no legal authority — and the Court is aware of none — for the proposition that "[w]here . . . the businesses of . . . Corporate Defendants . . . could continue in operation despite the shuttering of some, there is no common enterprise." (TTC Reply 9). Finally, to the extent that Defendants' argue that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply,[1] the only relevant authority they cite actually concludes to

---

[1]   In their initial Memorandum of Law, Defendants did not explicitly raise this argument, merely stating — in a footnote, no less— that "there is no controlling authority excusing Plaintiffs from [the] obligation" of meeting Rule 9(b)'s requirements, and that the Court "need not reach the question of the applicability of Rule 9(b)." (TTC Mem. 7 n.4). But in their Reply

the contrary, holding that Rule 9(b) does *not* apply to claims brought under the FTC Act.  *See Consumer Health Benefits II*, 2012 WL 1890242, at *5.

## C.  Individual Liability

Next, Defendant Johnson argues that the Amended Complaint fails to state a claim against him personally (Johnson Mem. 8-9; Reply Further Supp. Def. Edward B. Johnson's Mot. Dismiss (Docket No. 101) ("Johnson Reply") 7-12).  In order to state a claim for individual liability for deceptive telemarketing practices, Plaintiffs must allege "(1) that the individuals participated directly in the wrongful acts or practices or that the individual defendants had the authority to control the corporate defendants; and (2) that the individuals had some knowledge of the acts or practices."  *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000).  Johnson contends that Plaintiffs fail to allege authority to control, direct participation in the wrongful acts, and knowledge of the wrongful acts.  (Johnson Mem. 8-9; Johnson Reply 7-12).  None of these arguments, however, is persuasive.

"Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."  *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Five-Star Auto Club*, 97 F. Supp. 2d at 538 ("An individual's assumption of the role of president and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation to be held liable under the FTC Act." (internal quotation marks and alterations omitted)).  Here, the Amended

---

Memorandum, Defendants changed course, affirmatively stating that the Court "should evaluate the Amended Complaint in light of the particularity requirements of Rule 9(b)."  (TTC Reply 5).  It is well settled, however, that a court need not consider arguments relegated to footnotes or raised for the first time in a reply brief.  *See, e.g.*, *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001); *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993); *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431, 434 n.2 (S.D.N.Y. 2001).

Complaint alleges that Johnson served as the CEO of the main operating entities of the Enterprise — TTC and MPG — until August of 2011 (AC ¶ 23), that he was the sole owner of these entities until November 2011 (*id.*), and that he served in officer positions at Ikongo (*id.*) and 5410 (*id.* ¶ 44).  The Amended Complaint also alleges that he helped formulate policies regarding the Enterprise's sales practices by creating sample scripts to be used during telemarketing calls (*id.* ¶ 93), and that he had authority to operate bank accounts on behalf of the Enterprise (*id.* ¶ 74).  The fact that Johnson has not owned or served as an officer of any of the Corporate Defendants since 2011 (*see* Johnson Reply 8) is immaterial, as the Amended Complaint alleges illegal conduct since 2008, and Johnson has not argued that any of Plaintiffs' claims are time barred.[2]

Not only does the Amended Complaint allege sufficient factual content to support the authority-to-control prong, but it also alleges sufficient facts supporting the direct participation prong.  The Amended Complaint alleges that Johnson helped to formulate sales scripts used in the Enterprise's telemarketing calls (AC ¶¶ 93, 95, 97), and Plaintiffs' theory of liability depends on the allegedly misleading language from these scripts, such as the telemarketers' representations that they were calling "on behalf of" particular lead sources (*id.* ¶¶ 95, 148(a), 161(a), 166(a), 167(a)).  Regardless of whether the particular sample script Johnson is alleged to have helped draft was "ever used by the corporate defendants" (Johnson Mem. 9), the Amended Complaint clearly alleges direct participation in the wrongful acts by claiming that he "created sample sales scripts to guide sales representatives in making deceptive claims during telemarketing calls," and that the sales scripts "guide sales representatives[] to," *inter alia*, "falsely claim they are calling consumers 'on behalf of' a particular lead source." (AC ¶ 95).

---

[2]   The other Defendants explicitly disavow any arguments based on a statute of limitations. (TTC Reply Mem. 11 n.5).

Finally, it is beyond doubt that the Amended Complaint sufficiently alleges Johnson's knowledge of the Enterprise's wrongful practices. The "knowledge requirement may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Five-Star Auto Club*, 97 F. Supp. 2d at 535 (internal quotation marks omitted); *see also Consumer Health Benefits II*, 2012 WL 1890242, at *5 ("The degree of participation in a corporate defendant's affairs can be probative of knowledge."). Here, the Amended Complaint alleges that Johnson participated in at least two meetings regarding consumer complaints concerning the very kinds of deceptive practices for which the Plaintiffs seek redress. (AC ¶¶ 121, 135-36). It also alleges that the Enterprise had unusually high chargeback and return rates, which resulted in the termination of several of the Enterprise's merchant accounts prior to the time that Johnson sold his interest in the Enterprise. (*Id.* ¶¶ 122-32). Accepting these allegations as true, as the Court must, Johnson had to have been aware of the Enterprise's misrepresentations or, at the very least, recklessly indifferent to their truth or falsity. *See, e.g., FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) (granting preliminary relief under the FTC Act against an individual defendant where there was "ample evidence of [the individual defendant's] communications about charge backs and customer disputes"); *FTC v. MacGregor*, 360 F. App'x 891, 894-95 (9th Cir. 2009) (holding that "evidence showing the high volume of consumer complaints, the high refund and return rates, and the number of investigations by state Attorneys General and the Better Business Bureau" showed that the individual defendant "likely knew of material misrepresentations . . . or was at least recklessly indifferent to the truth").

The remaining three Individual Defendants — Pack, Milkwick, and Savage — also

contend that the Amended Complaint fails to adequately allege their personal liability (TTC Reply 12-13), but their arguments fail for largely the same reasons.  The Amended Complaint adequately alleges authority to control by all three.  Pack is alleged to be an officer of Marble Base, Tahuya, and Skorpios (AC ¶ 25), and a signatory on a number of different merchant and commercial bank accounts (*id.* ¶¶ 64-65, 69-71).  He also is alleged to have drafted scripts guiding the sales staff in making the allegedly misleading telemarketing calls.  (*Id.* ¶¶ 93-95).  Milkwick is alleged to be an officer of 5410, 6015, 1800Accountant, HB Marketing, and Premier Coaching (*id.* ¶ 26), and a signatory on numerous merchant and commercial bank accounts (*id.* ¶¶ 64-65, 69-73).  And Savage is alleged to have held senior positions at TTC, MPG, 5410, Marble Base, Tahuya, and Skorpios (*id.* ¶ 24), to oversee a wide range of functions for the Enterprise (*id.* ¶ 38), and to be a signatory on a number of merchant and commercial bank accounts (*id.* ¶¶ 64-65, 69, 71-73).  The Amended Complaint also alleges knowledge on the part of all three, claiming that they discussed the Enterprise's high level of customer complaints and chargebacks on at least two occasions.  (*Id.* ¶¶ 133-137).  Put simply, the Amended Complaint goes far beyond "conclusory allegations about their oversight roles in the companies" and "general allegations of knowledge."  (TTC Reply 12).  Accordingly, Defendants' motion to dismiss the Amended Complaint with respect to the Individual Defendants is DENIED.

**D.  FDUPTA Claims**

Next, Defendants move to dismiss Florida's FDUPTA claim on the ground that the Amended Complaint fails to "adequately plead causation."  (TTC Mem. 9; TTC Reply 2 n.2).[3]  Their argument, however, misrepresents the law.  When bringing a civil enforcement action

---

[3] In their initial Memorandum of Law, Plaintiffs also argued that the Amended Complaint failed to adequately allege damages.  In their Reply Memorandum, Defendants withdrew that argument.  (TTC Reply 2 n.2; *see also* Endorsed Letter of May 13, 2013, at 1 n.1 (Docket No. 95)).

under FDUPTA for injunctive relief, the Florida Attorney General is not required to plead that the allegedly deceptive conduct caused harm to individual consumers. Instead, the pleadings must simply claim that a person "has violated, is violating, or is otherwise likely to violate" FDUPTA, Fla. Stat. § 501.207(1)(b), which the Amended Complaint does. (AC ¶¶ 161-62). Moreover, to the extent that the Florida Attorney General seeks damages on behalf of Florida consumers, it is not required to name the consumers affected by the allegedly fraudulent conduct. *See, e.g.*, *Taubert v. State*, 79 So. 3d 77, 79-80 (Fla. Dist. Ct. App. 1st 2011). Accordingly, Defendants' motion to dismiss the FDUPTA claim is DENIED.

### E.  Relief Defendant Sandra Savage

Finally, Defendants contend that the claim against Relief Defendant Sandra Savage should be dismissed. "A relief defendant is a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010). District courts have the power to order disgorgement from such a defendant "upon a finding that she (1) is in possession of ill-gotten funds and (2) lacks a legitimate claim to those funds." *Id.*

Here, there is no question that the Amended Complaint states a claim against Relief Defendant Savage. Defendants argue that Sandra Savage has not been unjustly enriched (TTC Mem 8-9), but the Amended Complaint explicitly alleges that, from April 2010 to June 2010, she "received monthly electronic funds transfers from VisaVis totaling well in excess of $6 million," transfers representing "funds from consumer purchases deposited . . . with VisaVis." (AC ¶ 27). Defendants' contention that "Plaintiffs have inadequately pleaded their claims against VisaVis" (TTC Reply 13) is simply a rehash of the arguments that this Court has already rejected, and they make no suggestion that Sandra Savage is or was otherwise entitled to these funds. Defendants

rely heavily on *FTC v. Leanspa, LLC*, 920 F. Supp. 2d 270 (D. Conn. 2013), but that case actually supports Plaintiffs' position, as the court permitted a claim against a spousal relief defendant even where the complaint did not specify the dates or amounts of the alleged transfers. *Id.* at 281. The Amended Complaint in this case does far more; accordingly, Defendants' motion to dismiss the claim against Sandra Savage is DENIED.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are DENIED. The Clerk of Court is directed to terminate Docket Nos. 79, 81, and 93.

SO ORDERED.

Dated: January 17, 2014
      New York, New York

_____
JESSE M. FURMAN
United States District Judge